## IN THE UNITED STATE DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **REED C. DEMPSEY, and SHELLEY DEMPSEY,** | : |
| | : |
| **Plaintiffs** | : |
| **v.** | : |
| | : |
| **BUCKNELL UNIVERSITY, JOHN C.** | : |
| **BRAVMAN, LEWIS A. MARARRA,** | : |
| **DANIEL C. REMLEY, AMY A.** | : |
| **BADAL, LINDA LOCHER, KARI M.** | : |
| **CONRAD, MICHAEL SMYER,** | : |
| **CHIEF JASON FRIEDBURG,** | : |
| **OFFICER JULIE HOLTZAPPLE,** | : |
| **OFFICER DARRELL FISHER,** | : |
| **OFFICER ROBERT ULMER,** | : |
| **OFFICER JAMES MIDDLETON,** | : |
| **OFFICER JED RISHEL, DETECTIVE** | : |
| **JEFFREY ETTINGER, CAPTAIN** | : |
| **DOUGLAS LAUVER, and** | : |
| **ANTHONY J. VOCI, JR.,** | : |
| **Defendants** | : |

## <u>COMPLAINT</u>

**AND NOW** comes the Plaintiffs, Reed C. Dempsey and Shelley Dempsey, by and through his counsel, Dennis E. Boyle, Esquire, Megan E. Schanbacher, Esquire, and the firm of Boyle, Autry & Murphy, and avers as follows:

## JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §1983.

2.      Jurisdiction is also founded upon 28 U.S.C. §1332 due to diversity of citizenship because the Plaintiffs are citizens and permanent residents of the State of Connecticut, and the Defendants are citizens or entities of the Commonwealth of Pennsylvania.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) as all of the Defendants reside or have a place of business within this Judicial District, and all of the events that give rise to the claims in this action occurred within this District.

## PARTIES

4.      Plaintiff, Reed C. Dempsey, is an adult individual, who currently resides in Wilton, Connecticut.

5.      Plaintiff, Shelley Dempsey, is an adult individual who currently resides in Wilton, Connecticut.

6.      Defendant, Bucknell University, is a Pennsylvania University, with its main campus located at One Dent Drive, Lewisburg, Pennsylvania 17837.

2

7.     Defendant, John C. Bravman, is an adult individual serving as President of Bucknell University, with an office located at Marts Hall, One Dent Drive, Lewisburg, Pennsylvania 17837.

8.     Defendant, Lewis A. Mararra, is an adult individual serving as an Assistant Dean of Students and Judicial Administrator for Bucknell University, with an office located at 211 Langone Center, One Dent Drive, Lewisburg, Pennsylvania 17837.

9.     Defendant, Daniel C. Remley, is an adult individual serving as a Associate Dean of Students and Director of Housing Services for Bucknell University, with an office located at 207 Langone Center, One Dent Drive, Lewisburg, Pennsylvania 17837.

10.     Defendant, Amy A. Badal, is an adult individual serving as a Associate Dean of Students and Director of Residential Education and Fraternity and Sorority Affairs for Bucknell University, with  an office located at 306 Langone Center, One Dent Drive, Lewisburg, Pennsylvania 17837.

11.     Defendant, Linda Locher, is an adult individual formerly serving as an Interim Dean of Students for Bucknell University, with an office located at One Dent Drive, Lewisburg, Pennsylvania 17837.

12.     Defendant, Kari M. Conrad, is an adult individual serving as a Associate Dean of Students and Director of Campus Activities and Programs for Bucknell University, with an office located at 47 Langone Center, One Dent Drive, Lewisburg, Pennsylvania 17837.

13.     Defendant, Michael Smyer, is an adult individual serving as Provost for Bucknell University, with  an office located at 217 Marts Hall, One Dent Drive, Lewisburg, Pennsylvania 17837.

14.     Defendant, Chief Jason Friedburg, is an adult individual serving as the Chief of the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

15.     Defendant, Officer Julie Holtzapple, is an adult individual serving as a Public Safety Officer with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

16.     Defendant, Officer Darrell Fisher, is an adult individual serving as a Public Safety Officer with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

17.     Defendant, Officer Robert Ulmer, is an adult individual serving as a Life & Fire Safety Officer with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

18.     Defendant, Officer James Middleton, is an adult individual serving as a Public Safety Officer with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

19.     Defendant, Officer Jed Rishel, is an adult individual serving as a Public Safety Officer with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

20.     Defendant, Detective Jeffrey Ettinger, is an adult individual serving as a Detective-Sergeant with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

21.     Defendant, Captain Douglas Lauver, is an adult individual serving as Operations Captain with the Department of Public Safety for Bucknell University, with its main office located at 580 Snake Road, Lewisburg, Pennsylvania 17837.

22.     Defendant, Anthony J. Voci, Jr., is an adult individual who resides in the Commonwealth of Pennsylvania, and maintains a business address located at 2 Penn Center #900, 1500 JFK Boulevard, Philadelphia, PA 19102.

5

## **FACTS**

23.     At approximately 2:00 AM on September 5, 2010, R.D. returned to Smith Hall with his roommate, Student A, and Student A's friend, Student B.

24.     R.D, Student A, and Student B sat in R.D's dorm room for a few minutes and talked about their evenings before exiting the room and standing in the hallway.

25.     At the other end of the hallway, K.S. was returning to Smith Hall with two of her friends, Student C and Student D.

26.     K.S. pointed at R.D., and R.D. interpreted this as an indication to go and talk to K.S., so he walked down the hallway to meet up with the other group as it approached K.S's room.

27.     After spending a few minutes hanging out in K.S.'s room with Students C and D, K.S. initiated play-fighting with R.D., which consisted of friendly horsing-around and wrestling.

28.     R.D. and K.S. had engaged in play-fighting several times over the past academic school year, and K.S. frequently initiated play-fighting with different males at Bucknell.

29.     Student C and Student D understood R.D. and K.S.'s horsing-around to be playful, so they began to play-fight, as well.

6

30.     As the play-fighting continued, R.D. picked K.S. up and put her over his shoulder.  K.S. continued laughing and smacking R.D. on his butt as they left K.S.'s room to return to R.D.'s room.

31.     R.D. put K.S. back onto her feet once the two entered R.D.'s room. Student A and Student B, were still in R.D.'s room.

32.     R.D. and Student A started talking about their evenings, and at that time Student A revealed to the two girls that R.D. had kissed K.S.'s roommate, Student E, earlier that night.

33.     K.S. then re-initiated play-wrestling with R.D..  For the next few minutes R.D. and K.S. engaged in consensual horse-play.  K.S. could have left R.D.'s room at any time.

34.     Student B decided that she wanted to return to her dorm room.  Student A offered to walk her to her hall, and the two left the room.

35.     R.D. and K.S. were still play-fighting when Students A and B left the room.  K.S. pushed R.D. onto a futon and jumped on top of him, straddling him.

36.     K.S. pinned R.D.'s arms to the side of his head as he lay on his back.

37.     K.S. then began verbally harassing and taunting R.D. about R.D.'s having kissed K.S.'s roommate earlier in the evening.   After a few minutes of continued verbal harassment, R.D. tried to sit up.

38.     K.S.'s foot kicked over R.D.'s Brita water filter, spilling water all over the floor.  R.D. jumped off the futon and started cleaning up the water.

39.     R.D. then told K.S. that they should leave his room.

40.     R.D. and K.S. walked into the hallway where they encountered their hall mates Student F, Student G, Student H, and Student I.  R.D. and K.S. started talking with their hall mates about their evenings.

41.     K.S. again started hitting R.D., trying to incite more play-fighting. R.D. tried to ignore K.S. so that he could continue the conversation with his hall mates.

42.     At that time, two freshman students entered the hallway.  K.S. introduced herself to the new students, and R.D. and K.S. spoke with the new students about possibly pledging fraternities.

43.     After the freshman students left, R.D. turned his attention back to the ongoing conversation with his hall mates.

44.     K.S. again tried to initiate play-fighting with R.D..  However, R.D. was tired and did not want to continue horsing around with K.S..

8

45.     K.S. slapped R.D. in the face, forcing R.D. to grab K.S.'s wrists and hold her arms out in front of her so that she would stop hitting him.  R.D. then released K.S.'s hands and asked her to not hit him again.

46.     Moments later, K.S. again hit R.D., and punched R.D. in his groin.

47.     R.D. reached out and gave K.S. a "bear hug" in an effort to restrain her arms so that she could no longer hit him.

48.     K.S. started thrashing her body around, causing both R.D. and K.S. to fall to the ground.  The hall mates who were conversing with R.D. and K.S. witnessed the chain of events.

49.     As R.D. picked himself up from the hallway floor, the Resident Advisor, ("RA") came into the hallway and saw K.S. laying on the floor.

50.     K.S. got up from the floor and quickly walked passed the RA towards her room.  At that point the RA noticed red marks over K.S.'s left eye, on her left shoulder, and on her left hand.

51.     The RA attempted to find out what was going on, and he asked the pair what had occurred. Instead of answering, K.S. ran up to R.D. and slapped him in the face hard enough to leave a hand print.

52.    The RA intervened, and he restrained K.S. by holding both of her arms, similar to the way that R.D. had restrained K.S. earlier in the night to prevent K.S. from hitting him.

53.    K.S. started yelling at R.D., repeatedly calling R.D. "pussy licker" and "pussy lips."

54.    The RA directed R.D. to return to his room while he escorted K.S. back to her room.  At that point, RA noted that the red marks on K.S.'s face, shoulder, and hand were rug burns, which K.S. had received during the fall.

55.    R.D. went back to his room, removed his shirt, picked up his Brita water filter, and then walked down the hall to the water fountain to refill the Brita.

56.    K.S. left her dorm room and went down the hall to the girl's bathroom.

57.    While R.D. was filling the Brita, K.S. came out of the bathroom, walked up to R.D. and smacked him on his bare back.  K.S. then ran down the hallway laughing as R.D. flicked water at her.

58.    The RA approached K.S. and asked her what was going on.  In response, K.S. shouted that R.D. was a "pussy lips," and that R.D. could suck K.S.'s "big fat black cock."  The RA told K.S. that quiet hours were in effect and that she needed to stop shouting.

59.     K.S. told the RA that R.D. had tackled her to the ground, and that she then "kicked R.D. in the nuts" multiple times and that she was not sorry for her actions.

60.     The RA asked K.S. to send him an email or write him a letter the next day about what had occurred, but K.S. said that she could not because she was going on a team field hockey trip the next day.  The RA then asked K.S. to retell her story, this time without yelling.

61.     After K.S. retold her story, the RA asked her if she wanted him to file a report.  K.S. said that she did not want a report filed, that K.S. and R.D. had just been playing around, and that neither K.S. nor R.D. had intended for things to get out of hand.

62.     R.D. came out of his room and approached the RA.  R.D. told the RA that he and K.S. had been horsing around, and that neither of them had meant for things to get out of hand, or for anyone to get hurt.  The RA asked R.D. to return to his room, but K.S. said that it was okay for R.D. to stay.

63.     The RA again asked K.S. if she wanted to talk about everything the next day, and K.S. said "no."  K.S. then asked the RA to shake her hand and promise not to file a report.

64.     The RA approached R.D. to get R.D.'s side of the story.  R.D. explained that K.S. had initiated play-fighting with him, and others, since the previous academic year, and that they were just playing and no one had ever sustained any injury before that night.

65.     R.D. apologized for any injuries and problems that had resulted from the play-fighting.

66.     Meanwhile, after seeing the rug burn mark on her face, K.S. became upset and started to cry.

67.     K.S.'s roommates brought K.S.'s friend, Student K, into K.S.'s room to comfort her.  From approximately 3:00 AM to 6:00 AM on September 5, 2010, Student J stayed with K.S. in her bed.

68.     K.S. told Student J that she was afraid that her field hockey team, her coach, and her father would see the rug burns on her face and find out she had been drinking that night.

69.     Ultimately, K.S. was worried that she would be kicked off of the field hockey team.

70.     Later in the day of September 5, 2010, while on the field hockey team bus, K.S. told her teammates that the scrape on her face happened after she banged herself on the ceiling above her loft.

71.     K.S.'s coach, Jeremy Cook, pulled K.S. aside to ask about the mark on her face.  K.S. told Coach Cook that she was hurt by a male hall mate, but insisted that she did not want to talk about it and that she was fine to play in the game. K.S. played approximately 28 minutes of the game against Princeton University that afternoon.

72.     After the game, Coach Cook again pulled K.S. aside to ask about the scrape on her face.  K.S. then embellished her story, telling Coach Cook that she was physically assaulted by a drunk frat boy.

73.     K.S. named R.D. as the drunk frat boy.

74.     K.S. stated that the RA had only talked to R.D. about what had occurred, but that he never talked to K.S..

75.     K.S. also spoke with her father on September 5, 2010, after her field hockey game.  Her father saw the scrape on her face and asked K.S. how she got the scrape.

76.     K.S. told her father that she had gotten into a fight with a boy in Smith Hall.

77.     K.S. stated that she and the boy had been fooling around, but that suddenly things escalated.

78.     K.S. told her father that the boy took K.S. into his room and did "horrible things" to her.

79.     K.S.'s father had a camera with him.  He took photographs of the scrapes on K.S.'s face, wrist, shoulder, and knee.

80.     K.S.'s father asked her "who did this to you," and K.S. named R.D.

81.     After hearing K.S.'s story, her father emailed the RA about the incident, and called the RA several times.

82.     K.S. emailed the RA and granted him permission to discuss the incident with her father, and anyone within the Bucknell administration.  The RA replied to both K.S. and her father via email, and informed them that a formal report had been filed with the Dean of Students.

83.     During the bus ride back to Bucknell, Coach Cook arranged for alternative housing for K.S., and contacted the athletic director and deans about the alleged assault.

84.    During the bus ride, K.S. spoke with Associate Dean of Students Amy Badal via cell phone.  In speaking with Dean Badal, K.S. changed her story further, and told the Dean that R.D. had sexually assaulted her.

85.    Dean Badal told K.S. that she needed to report the incident to Public Safety and the Lewisburg Police.

86.    K.S.'s father called Public Safety to report the alleged attack.  He spoke with Officer Julie Holtzapple, who requested that K.S. come to Public Safety to discuss the incident.

87.    At approximately 6:00 PM on September 5, 2010, K.S., accompanied by her friend, Student K, and Dean Badal, met with Officer Holtzapple, Officer Darrel Fisher, and Officer Robert Ulmer at Public Safety.  K.S. reiterated her story to the Public Safety officers, this time even more exaggerated than the story she told her father and Dean Badal hours earlier.

88.    K.S. stated that she had been sitting with R.D., Student G, and two other people in R.D.'s room.

89.    K.S. stated that the other students left the room, and she and R.D. were alone.

90.     K.S. stated that R.D. picked her up, put her on the futon, jumped on top of her, and then they started to struggle.

91.     K.S. stated that R.D. had her arms pinned down above her head.

92.     K.S. stated that R.D. pinched her and punched her in inappropriate places.

93.     K.S. stated that Student G and the other two students who were in the room witnessed R.D. punching K.S. in inappropriate places.

94.     K.S. stated that she hit, punched and smacked R.D. in the face over and over until she was able break free and run into the hallway.

95.     K.S. stated that the attack lasted approximately 20 minutes.

96.     K.S. stated that once in the hallway, R.D. grabbed her arms and pulled them behind her back.  R.D. then fell on top of her, causing the mark on her face.

97.     K.S. stated that she had been screaming at R.D. while they were alone in the room.

98.     K.S. stated that over the summer R.D. had taken advantage of her roommate, Student E, so when K.S. and R.D. were alone K.S. screamed at R.D. that he would not take advantage of her like he did her roommate.

99.   K.S. stated that when she and R.D. were in the hallway, she tried to walk away but R.D. grabbed her arm, so she turned around and smacked him across the face.

100.   K.S. stated R.D. then tackled her to the ground.

101.   K.S. stated that R.D. was dragging her, and that she was struggling on the ground while her arms were pinned behind her back.

102.   K.S. stated "that while [R.D.] was on top of me, he was getting off to it."

103.   K.S. stated that the RA did not witness any of what occurred on September 5, 2010.

104.   K.S. stated that the RA had not spoken with her at all after the incident to get her side of the story.

105.   K.S. stated that the RA was friends with R.D., and the way the RA phrased the incident report was to help R.D.

106.   During the interview, Officer Fisher asked K.S. to distinguish any bruises that she received from field hockey from those inflicted by R.D.  K.S. agreed that some of her bruises were from field hockey and pointed some of those bruises out to the officers.

107.   The officers never documented which bruises resulted from field hockey.

108.   During the interview, Officer Holtzapple told K.S. that she was the bravest person she knows, and that R.D. "was born this way, basically."

109.   Officer Holtzapple told K.S., "you could have saved somebody's life in the future." Dean Badal agreed, and said that she and K.S. had already discussed that before the interview.

110.   Officer Fisher said that R.D. "obviously has a problem."

111.   At approximately 9:00 PM on September 5, 2010, Officer Holtzapple and Officer Fisher accompanied K.S. to Evangelical Hospital.  Dean Badal and Student K also accompanied K.S. to the hospital.  K.S.'s father arrived at the hospital approximately 15 minutes later.

112.   At the hospital, K.S. was examined and photographs were taken of her scrapes and bruises.

113.   K.S.'s exam results indicated that her skin was "normal," with moderate sized contusions on her face, chest, and right leg.

114.   K.S.'s exam indicated that the scrape on her face was superficial, and that it was being aggravated by sweat.

115.   K.S.'s exam results indicated that her abdomen had no bruising or swelling.

116.   Overall, K.S.'s condition was "good," and her condition had already improved.

117.   At approximately 9:30 on September 5, 2010, Officer Ulmer contacted R.D. by telephone and asked R.D. to meet him in front of Smith Hall.

118.   R.D. met Officer Ulmer in front of Smith Hall, and Office Ulmer informed R.D. that he was a suspect in a criminal investigation.

119.   Officer Ulmer told R.D. that if he had any contact with K.S., including via text, email, phone, or through third party contacts, R.D. would be charged with "Intimidation of a Witness."

120.   On September 5, 2010, at approximately 11:00 PM, Officer Ulmer again contacted R.D. and asked R.D. to come to Public Safety to be interviewed about the incident.  Officer Ulmer and Officer Jed Rishel picked R.D. up from Smith Hall and drove him to the Public Safety building.

121.   R.D. had already typed up a statement prior to being contacted by the police about an interview.  R.D. used a computer at the Public Safety Office to print out his statement, which he then gave to the officers.

122.   Officer Ulmer and Officer Fisher were present for R.D.'s interview. Officer Ulmer read R.D. his *Miranda* rights prior to starting the interview.

123.   Officer Ulmer asked R.D. to describe what happened with K.S. in the early morning hours of September 5, 2010.   R.D. recounted the series of events detailed in the preceding paragraphs of this Complaint.

124.   The report that Public Safety generated about its interview with R.D. misrepresents and misstates what R.D. actually told Public Safety, and instead the report adopts portions of K.S.'s interview.

125.   Throughout September 5, 2010 and September 6, 2010, Bucknell Public Safety Officers interviewed multiple witnesses and obtained written statements from people who had witnessed the incident between R.D. and K.S., including: Student A, Student B, Student C, Student D, Student E, Student F, Student G, and Student J.

126.   K.S.'s father had also gone to Smith Hall and questioned many of the students who witnessed the incident between R.D. and K.S..

127.   Witness statements, both oral and written, contradicted K.S.'s story that she was attacked and sexually assaulted by R.D..

128.   The witness statements supported R.D.'s story that R.D. and K.S. were play-fighting.  Generally, the statements named K.S. as the aggressor during the play-fighting.

129.   On September 6, 2010, at approximately 11:15 AM, R.D. received a call from Bucknell's Interim Dean of Students, Dean Linda Locher, requesting that R.D. meet her to discuss the September 5, 2010 incident.

130.   R.D. met with Dean Locher and Dean Badal at approximately 11:40 AM on September 6, 2010.  The Deans informed R.D. that he would have a meeting with Dean Lewis Mararra on Tuesday, September 7, 2010, and that he would have to move to a new room in Harris Hall for the time being.

131.   Dean Locher asked R.D. for a "time-slot" of when R.D. could return to Smith Hall and move some of his belongings from his room. Dean Locher wanted to ask K.S. if the "time-slot" would work well for K.S.

132.   Dean Locher then directed R.D. to return to the Dean's office after his noon class in order to get a key for Harris Hall.  R.D. picked up his new room key at approximately 1:00 PM.

133.   Dean Locher told R.D. not to return to Smith Hall to remove his belongings unless he had an escort.

134.   R.D.'s hall mate, Student G, accompanied R.D. to his Smith Hall room, where R.D. retrieved his school books, his computer, and some clothing.  R.D. then moved into Harris Hall.

135.   On the evening of September 6, 2010, R.D. stopped at the Public Safety Building and requested a copy of his statement.  Officer Ulmer told R.D. that he could only have a copy of his statement if K.S. pressed charges against him.

136.   Officer Ulmer did not tell R.D. that K.S. had already requested that formal criminal charges to be filed against R.D.

137.   Officer Ulmer did not tell R.D. that only hours earlier K.S. had provided the officers with a four page written statement.

138.   K.S.'s four-page written statement accused R.D. of pinching, slapping, and scratching K.S.

139.   K.S.'s four page statement accused R.D. of repeatedly punching K.S. with a closed fist in her chest and groin.

140.   K.S.'s four page statement accused R.D. of restraining K.S.

141.   K.S.'s four page statement accused R.D. of telling K.S. that she "wanted to" and that she was "a huge bitch for resisting."

142.   K.S.'s four page statement included a claim that K.S. told R.D. to "stop" and "leave me alone" a thousand times during the alleged incident.

143.   K.S.'s four page statement is almost entirely contradicted by statements provided by other eye-witnesses.

144.   The Officers ignored the witnesses statements and medical report, which indicated that K.S.'s version of events was not true, and instead decided to file criminal charges against R.D. for Simple Assault, Harassment, and Disorderly Conduct.

145.   On September 6, 2010, Officers Ulmer and Middleton typed up criminal charges and the supporting Affidavit of Probable Cause.  Officer Holtzapple did not participate in drafting either the charges or Affidavit of Probable Cause, but swore out and signed the Affidavit.

146.   Chief Jason Friedberg reviewed the charges with Bucknell University General Counsel Wayne Bromfield.

147.   At approximately 5:45 PM on September 6, 2010, Dean Locher again called R.D. and asked him to come to her office because she had some new developments.  R.D. agreed to meet with her immediately.

148.   R.D. met with Dean Locher and Dean Mararra.  The Deans informed R.D. that he was being temporarily suspended based on a review of the evidence provided to Bucknell's Public Safety Office.

149.   Dean Locher provided R.D. with a written copy of a temporary suspension order.

150.   Dean Mararra told R.D. that he had the option of meeting with an administrator to discuss the case, and the administrator would then made a decision regarding the case, or, in the alternative, R.D. could have a Community Conduct Board hearing.

151.   R.D. told the Deans that he would prefer to have a Community Conduct Board hearing so that he would be able to call witnesses and have other evidence presented to the Board to support his case.

152.   After leaving Dean Locher's office R.D. called his father, John, to inform him of the temporary suspension.

153.   R.D. also spoke with the President of his fraternity, Phi Psi, to inform him that R.D. had been placed on temporary suspension, and he would not be able to continue pledging for the following week.

154.   R.D.'s mother, Shelley, then spoke to Dean Locher on the telephone about R.D.'s situation.

155.   Dean Locher refused to discuss any facts surrounding the incident at Smith Hall.

156.   Dean Locher told Shelley that R.D. was better off at home with friends and family who loved him as he dealt with his emotions of what happened in Smith Hall.

157.   Dean Locher refused to elaborate to Shelley, but stated that "R.D. must have a lot bottled up inside," and that he was "holding a lot in."

158.   Shelley expressed concern about R.D. missing up to a month of school due to the suspension, which realistically meant that R.D. could lose his entire semester.  Dean Locher told Shelley that there was nothing the Dean could do about it.

159.   Shelley told Dean Locher that the she and R.D.'s father, John, would be arriving at Bucknell University the next morning, and requested a meeting with the Administration.

160.   Dean Locher said nothing to indicate the seriousness of K.S.'s allegations, or that Bucknell and Public Safety had initiated criminal charges against R.D.

161.   R.D. left campus on September 6, 2010, and spent the night at the Hampton Inn in Danville, Pennsylvania.

162. R.D.'s parents, John and Shelley, arrived at the Hampton Inn at approximately noon on September 7, 2010. John and Shelley left a short time later to meet with the Deans and the Bucknell Public Safety representatives.

163. At approximately 1:15 PM on September 7, 2010, John and Shelley attended a meeting in Bucknell's Langone Center with Dean Locher, Dean Mararra, Dean Badal, and Captain Douglas Lauver of the Department of Public Safety. R.D.'s attorney, Steve Becker, also attended the meeting.

164. In the meeting, Dean Locher refused to reveal any facts that would support R.D.'s temporary suspension.

165. Dean Locher stated that it would be inappropriate for John and Shelley to visit Smith Hall to discuss the September 5, 2010 incident with hall residents.

166. K.S.'s father had already gone to Smith Hall and questioned many of the students who witnessed the incident.

167. Dean Locher stated that she was not at liberty to describe the nature or the extent of the University's contact with K.S.'s family regarding the September 5, 2010 matter.

168.    Captain Lauver stated that all witness statements were in the possession of Chief Friedberg, and that he had no personal knowledge of any facts giving rise to R.D.'s suspension.

169.    Captain Lauver stated that the witness statements could not be released immediately because they were still being prepared.

170.    Captain Lauver stated that he did not know why criminal charges had been filed against R.D. on the basis of incomplete statements.

171.    Dean Locher assured R.D's parents that the witness statements would be expedited and produced in a couple of days.

172.    At no time during the September 7, 2010 meeting did Dean Badal indicate that she was personally acquainted with K.S.; that she had facilitated the initial investigation of the criminal charges filed against R.D.; that she had attended K.S.'s September 5, 2010 interview; or that she had personally participated in the decision to suspend R.D. from Bucknell.

173.    On September 7, 2010, the Bucknell Public Safety Officers filed criminal charges against R.D. with Magisterial District Judge Leo S. Armbuster, in Lewisburg, Union County, Pennsylvania.

174.   R.D.   had   his   Preliminary   Arraignment   on   the   Simple   Assault, Harassment,   and   Disorderly   Conduct   charges   at   approximately   2:30   PM   on September 7, 2010.

175.   R.D. had his fingerprints taken at the Union County Courthouse.

176.   At   approximately   9:00   AM   on   September   9,   2010,   during   a   phone conference, Dean Mararra told R.D. that R.D.'s temporary suspension was rescinded effective immediately and he could return to campus.

177.   Dean Mararra instructed R.D. to call Dean Daniel Remley because Dean Remley would return R.D.'s Bucknell ID and dorm room key.

178.   R.D. returned to campus with his mother a few hours later and called Dean Remley to set up a meeting.   Dean Remley was out at lunch and would not return until around 1:00 PM.

179.   While R.D. and Shelley walked back to their car, R.D. received a voice mail from Detective Jeffrey Ettinger from Bucknell Public Safety.   In the message, Detective Ettinger asked R.D. to call him to answer a quick question.

180.   In the voice mail Detective Ettinger told R.D. that there was no need for an attorney.

181.    Based upon information and belief, Detective Ettinger called R.D. in connection to the criminal investigation.

182.    At the time Detective Ettinger left the voice mail, he knew that R.D. was represented by counsel.

183.    At approximately 1:00 PM, R.D. emailed Dean Mararra asking for a written copy of his reinstatement.  Dean Mararra later sent R.D. an email stating that R.D.'s original email would be forwarded along to Dean Locher.

184.    R.D. and Shelley then met with Dean Remley.  Dean Remley returned R.D.'s Bucknell ID, but did not yet have a key ready for R.D.'s temporary dorm room in Trax Hall.

185.    Before leaving Dean Remley's office, Shelley asked Dean Remley to notify Dean Locher, that Shelley had requested a written copy of R.D.'s reinstatement.

186.    Dean Remley left his office to speak with Dean Locher about Shelley's request.  Upon returning, Dean Remley informed Shelley that the paperwork would be ready the following day.

187.    Dean Remley then handed R.D. the key to his new room in Trax Hall, and assured R.D. and Shelley that everything was fine.

188.   Meanwhile, during approximately the same time frame, K.S.'s father and Anthony J. Voci, Jr., K.S.'s attorney, were meeting with John C. Bravman, the President of Bucknell University, and Bucknell University General Counsel Wayne Bromfield.

189.   R.D. and Shelley then went to Trax Hall to deliver the few belongings that R.D. had with him.

190.   At approximately 2:22 PM R.D. emailed Dean Locher.  R.D. requested to meet with the Dean prior 4:00 PM so that he could obtain the Smith Hall key and retrieve the rest of his belongings.

191.   R.D. walked to Dean Locher's office, but upon arrival was told that the Dean was in a meeting, and she would not be available until 4:30 PM.

192.   R.D. left, and returned to Dean Locher's office at 4:30.  However, all of the office's were closed and locked.

193.   R.D. tried calling Dean Locher, but received no answer.

194.   R.D. met back up with his mother, and told Shelley she could leave campus.

195.   R.D. returned to Trax Hall at approximately 5:00 PM to settle into his new room and to complete homework.

196.   At approximately 7:14 PM on September 9, 2010, K.S. met with Bucknell Public Safety for another interview.  Detective Ettinger interviewed K.S.

197.   Anthony J. Voci, Jr. accompanied K.S. to the interview, and sat with K.S. throughout the interview.

198.   K.S.'s September 9, 2010 interview was more exaggerated than her previous statements and interviews, and contained even more contradictory information.

199.   In the interview, K.S. stated that over the past year, on numerous occasions, R.D. called her derogatory names, hit her in her vaginal area, and was generally inappropriate.

200.   K.S. stated that most of the people from the hall "knew what our relationship was," and could verify K.S.'s story.

201.   K.S. stated that on September 5, 2010, R.D. started to "jokingly horse play", but she immediately told him to stop.

202.   K.S. stated that R.D. carried her to his room and, in the presence of other people, started "punching me inappropriately."

203.   K.S. stated that R.D. picked her up, pinned her to the futon with her arms above her head, and sat on top of K.S..

204.   K.S. stated that R.D. was "aggressively holding my arms down against my will."

205.   K.S. stated that R.D. was aroused and that he started punching K.S. and calling her names, such as "bitch."

206.   K.S. stated that she was disgusted because "I noticed that R.D. had been aroused, and you know there had been no kissing, there had been no fondling or groping, it was just like him pummeling me, and you know, punching me as hard as he could in my vagina, and him getting aroused by it.

207.   K.S. stated that R.D. had previously sexually assaulted Student E, one of K.S.'s roommates.

208.   K.S. stated that Student E "despises R.D.."

209.   K.S. stated that she started fighting back and screamed at R.D. "stop," "get off me," "no," and "you did this to Student E, you're not going to do it to me!"

210.   K.S. stated that she managed to get away and go into the hallway, but that R.D. chased after her, telling her "get back here," at which time she slapped him across the face.

211.   K.S. stated that R.D. became angry, grabbed her arms, and tackled her to the ground.

212.   K.S. stated that after R.D. tackled her to the floor "we were struggling for a couple of minutes."

213.   K.S. stated that the alleged attack lasted for 5 to 7 minutes.

214.   During the interview, Detective Ettinger asked K.S. if she was concerned for her safety, to which K.S. replied that R.D. made her feel "extremely uncomfortable, unsafe, threatened."

215.   During the interview Detective Ettinger asked K.S. "in your opinion, what should be done to R.D.?"

216.   K.S. stated "In terms of the University, I really hope they expel him."

217.   Detective Ettinger then asked K.S., "So, other than being expelled from the University and staying away from you, what else would you want to see?"

218.   K.S. stated "you know, the fact that maybe he'd possibly have a record, so people will know that this is the kind of person he is..."

219.   K.S. stated that two hours earlier she had learned that R.D.'s temporary suspension had been lifted, and that R.D.'s being back on campus "makes me uncomfortable, makes me anxious, makes me scared."

220.    During the interview K.S. listed several people who witnessed the incident who K.S. said would corroborate her story, including: Student A, Student E, Student F, and Student G.

221.    All of the witnesses that K.S. named had already provided written statements to Public Safety and/or were interviewed by Public Safety officers.

222.    None of the witnesses supported K.S.'s story.  All of the witnesses contradicted K.S. and supported R.D.'s story.

223.    According to Student G's statement, R.D. and K.S. had been playfully wrestling on the futon, and no one was causing the other person harm.

224.    According to Student G's statement, when R.D. and K.S. came into the hallway, they were laughing and still playfully wrestling.

225.    According to Student G's statement, R.D. and K.S. agreed to stop the play-fighting, and everyone was standing in the hallway together talking; however, K.S. then slapped R.D. in the face.

226.    According to Student G's statement, R.D. tried to contain K.S., but they fell to the ground because K.S. was struggling and trying to hit R.D..

227.    According to Student G's statement, R.D. splashed water from the water fountain at K.S., and K.S. ran laughing back to her room.

228.   According to Student G's statement, the RA came into the hallway and asked what was going on.  Everyone - including K.S. - assured the RA that everything was friendly in nature.

229.   According to Student G's statement, he was sure that if both R.D. and K.S. had been left "unscathed" from the play-fighting, the incident would have been a "non-issue."

230.   According to Student A's statement, R.D. and K.S. started play-wrestling in the room, as they had done on other occasions.

231.   According to Student A's statement, R.D. and K.S. eventually took their horse-play into the hallway.

232.   According to Student A's statement, K.S.'s rug burn "was clearly the result of a little horseplay that got out of hand, and not a malicious attack."

233.   According to Student F's Statement, R.D., K.S., and two other people had been hanging out in K.S.'s room.

234.   According to Student F's statement, R.D. carried K.S. over his shoulder down to his room.  K.S. was hitting R.D. on his butt with a shoe, and K.S. was laughing the entire time.

235.   According to Student F's statement, there was laughing and "crashing" coming from R.D.'s room, which sounded like "play-wrestling" with laughing and goofy insults.

236.   According to Student F's statement, eventually the play-fighting went too far, and every time R.D. tried to walk away, K.S. chased after him saying insults and trying to "egg him on."

237.   According to Student F's statement, the RA stopped K.S. "with some effort," but K.S. stayed at R.D.'s door trying to call him back into the hallway.

238.   According to Student F's statement, Student F took K.S. back to her room to put Neosporin on K.S.'s rug burn.

239.   According to Student F's statement, K.S. only started to cry once she saw the scrape on her face.

240.   According to Student F's statement, after K.S. saw her face she said that R.D. had tried to take advantage of her.

241.   According to Student F's statement, K.S.'s pride may have caused the play fighting to escalate.

242.   Student E was interviewed at length by Public Safety.  During her interview, Student E stated that any relationship she had with R.D. was completely consensual.  Student E refuted everything that K.S. said about Student E and R.D.

243.   According to Student E's written statement, nothing that K.S. said about Student E had any relation or relevance to the September 5, 2010 allegations that K.S. made against R.D.

244.   At approximately 9:00 PM on September 9, 2010, R.D. heard a knock on his door.  When R.D. opened the door he was confronted by Officers Holtzapple and an unknown male officer.

245.   The Officers entered R.D.'s room and told him that he was trespassing.

246.   The Officers handed R.D. a paper, which based upon information and belief detailed R.D.'s *persona non-grata* status, and directed him to sign the document.  Despite numerous requests, a copy of this document was never provided to R.D..

247.   The Officers ordered R.D. to collect his belongings.  R.D. was given less than five minutes to gather his belongings.

248.   While collecting his belongings, R.D. called his mother and told her that he was being removed from campus by the police.

249.   Upon learning that R.D. was being removed from campus only hours after she had been assured that all issues were worked out, Shelley became extremely emotional and was unable to direct R.D. on how to proceed.

250.   Shelley told R.D. to call his attorney, but R.D. was unable to do so before the Officers made him sign the document and leave the building.

251.   R.D. tried to tell the officers that he had met with Dean Remley only hours earlier, and that he had permission to return to campus.

252.   R.D. showed the officers his new room key and his Bucknell ID as proof that his suspension had been lifted.  The officers ignored him.

253.   The officers led R.D. out of his room and placed him in the back of a Bucknell Public Safety vehicle.

254.   The unknown male officer asked R.D. if he knew anyone in the area, or if R.D. had anywhere to go.

255.   Because R.D. did not have any place to stay or know anyone to call in the area, the officers drove R.D. to Hufnagle Park, dropped him off, and then drove away, leaving R.D. by himself.

256.   R.D. again tried calling his mother, who was staying approximately 30 minutes away in Selinsgrove, Pennsylvania with family friends.  Shelley was too emotionally distraught to even drive a car and come and find R.D.

257.   Eventually, R.D. was able to get in touch with a friend from Smith Hall. The friend picked him up and drove him to his mother.

258.   On September 10, 2010, Office Holtzapple filed a second criminal complaint against R.D..  The second complaint, which replaced the first complaint filed on September 7, 2010, charged R.D. with False Imprisonment, Simple Assault, Indecent Assault, Disorderly Conduct, and Harassment.

259.   Officer Holtzapple filed the September 10, 2010 criminal complaint even though all witness statements and interviews, as well as the medical report from Evangelical Hospital, contradicted K.S.'s story.

260.   R.D. was arrested on September 10, 2010 on the second criminal complaint.  His preliminary arraignment occurred that same day.

261.   On September 10, 2010, General Counsel for Bucknell University Wayne Bromfield advised Steve Becker, R.D.'s attorney, that Bucknell would provide R.D. with all witness statements on Monday, September 13, 2010.

262.   On September 13, 2010, Wayne Bromfield advised Steve Becker that the Union County District Attorney's Office asked the school not to provide R.D. with any witness statements, and therefore Bucknell would not give R.D. any statements.

263.   On September 14, 2010, Anthony J. Voci, Jr. emailed Dean Kari Conrad, the Judicial Administrator for Sexual Conduct at Bucknell University, regarding R.D.'s criminal case and the HBSM hearing.  In the email, Anthony J. Voci, Jr. stated "I just received a call from Judge Armbruster's staff.  R.D.'s criminal defense attorney, Stephen Becker, has requested a continuance of the preliminary hearing next Thursday, September 23, 2010."

264.   Based upon information and belief, Anthony J. Voci, Jr. was also in close contact with the Union County District Attorney's Office regarding R.D.'s criminal charges.

265.   On September 14, 2010, K.S. filed internal student conduct charges against R.D., alleging Sexual Misconduct, Physical Assault, Disorderly Conduct, Harassment, and Freedom of Movement.

266.   R.D. filed related internal student conduct charges against K.S. on September 15, 2010, alleging Sexual Misconduct; Disorderly Conduct; False

Accusation or Testimony, and Retaliation, Threatening, or Intimidation of Participants in a Hearing; Physical Assault; and Harassment.

267.   Dean Conrad notified both R.D. and K.S. by letter of the charges filed against each person.

268.   The letters also notified R.D. and K.S. of the school's Sexual Assault Policy and Adjudication Procedures.

269.   The letters stated that R.D. and K.S. would be provided in advance of the hearing with any documents and statements relevant to the case.

270.   On September 14, 2010, R.D.'s father, John, and R.D.'s attorney, Steve Becker, met with Bucknell University President John Bravman and General Counsel Wayne Bromfield in President Bravman's office.

271.   During the meeting, Steve Becker and John asked why all objective evidence, such as the witness statements, were being ignored.

272.   Steve Becker and John pointed out that K.S.'s story was continually changing and evolving, and that her allegations had no support.

273.   During the meeting, President Bravman and Wayne Bromfield conceded that if K.S.'s story was proven to be false, then Bucknell could be liable to R.D. and his family.

274.   On or about September 15, 2010, Wayne Bromfield directed a conference call between himself, Steve Becker, and Anthony J. Voci, Jr..

275.   During the conference call, Wayne Bromfield asked Anthony J. Voci, Jr. if he had any objection to R.D. being back on campus if Bucknell could insure K.S.'s safety.

276.   Anthony J. Voci, Jr. insisted that R.D. not be allowed to attend any classes or be present anywhere on campus.

277.   Wayne Bromfield proposed that R.D. be allowed back on campus just to attend classes.  Wayne Bromfield stated that R.D. would be escorted by armed security officers at all times.

278.   Anthony J. Voci, Jr. rejected this proposal, as well.

279.   Throughout the conference call, Anthony J. Voci, Jr. referred to R.D. as dangerous, and as a sexual offender.

280.   Anthony J. Voci, Jr. insisted that R.D.'s mere presence on campus, even with an armed security escort, would cause K.S. severe emotional trauma.

281.   Anthony J. Voci, Jr. intimated that if R.D. was allowed back onto campus, K.S. her family would pursue legal action against the University.

42

282.   Anthony J. Voci, Jr. stated that if R.D. left Bucknell for good, the whole case would go away.

283.   As a result of the conference call, R.D. was not permitted back on campus.

284.   On September 21, 2010, Anthony J. Voci, Jr. sent a letter to Dean Conrad inquiring why the internal charges that R.D. filed against K.S. were not dropped.

285.   In his letter, Anthony J. Voci, Jr. objected to the sexual misconduct hearing being held before the preliminary hearing in R.D.'s pending criminal case.

286.   In his letter, Anthony J. Voci, Jr. referred to R.D. as "the perpetrator of a sex crime" who was being allowed "to misuse the internal process to continue to victimize a student/victim."

287.   On September 23, 2010, Dean Conrad sent a letter, accompanied by witness statements and other materials relevant to the sexual misconduct hearing, to Steve Becker.  K.S. and/or her attorney received similar correspondence.

288.   The letter detailed the procedures that R.D. and K.S. would need to follow.   Additionally R.D. and K.S. needed to provide the HBSM with any

documents, photographs, and statements that they intended to introduce at the hearing, as well as a list of potential witnesses.

289.   Steve Becker responded to Dean Conrad's letter, and requested production of additional materials, including but not limited to: handwritten notes from the officers who conducted any of the interviews, all notes and statements taken from K.S.'s second interview with Public Safety, the interview notes and statement from Student E's interview, the incident report or notes related to R.D.'s removal from campus on September 9, 2010, copies of all notes generated from any contact or discussion with K.S., her parents, and her attorney Anthony J. Voci, Jr., the medical report from K.S.'s hospital visit, any reports from Dean Badal concerning statements made to her by K.S., and any mitigating evidence that suggested R.D. was innocent.

290.   Steve Becker asked what method would be used to make a verbatim record of the hearing, considering that Bucknell and the faculty endorse the 1967 Joint Statement of Rights and Freedoms of Students, which requires that a verbatim record be made of such hearings.

291.   Bucknell University assured Steve Becker that an audio recording would be made of the hearing.

292.   On September 29, 2010, Anthony J. Voci, Jr. wrote a letter to Wayne Bromfield voicing dissatisfaction with Bucknell's refusal to dismiss the internal charges that R.D. filed against K.S.

293.   In his letter, Anthony J. Voci, Jr.  repeatedly referred to R.D. as an "attacker," who tried "to force himself upon a female college student."

294.   In his letter, Anthony J. Voci, Jr. references R.D.'s criminal preliminary hearing, and accused the University of doing "irreparable harm to the Commonwealth's case in Union County" by holding the HBSM hearing and providing R.D. with witness statements.

295.   Anthony J. Voci, Jr. also sent the letter to the entire Bucknell Board of Trustees.

296.   Based upon information and belief, Anthony J. Voci, Jr. also corresponded with Pennsylvania state senators Robert M. Tomlison and Gene Yaw about his dissatisfaction with Bucknell.

297.   Senators Tomlison and Yaw sent an October 1, 2010 letter to Bucknell University President Bravman.  The letter references many of the defamatory statements that Anthony J. Voci, Jr. previously made about R.D., including that R.D. assaulted K.S.

298.   Throughout the duration of the case, Anthony J. Voci, Jr. contacted multiple media outlets, such as the *Daily Item*, and made similar defamatory statements that R.D. had forcibly taken the K.S. to his room, got on top of her and hit her in her breast and groin.

299.   Bucknell University representatives were also quoted in many of the articles.  For every day of the sexual misconduct hearing, University representatives were quoted discussing the hearing.

300.   On October 2, 2010, Anthony J. Voci, Jr., on behalf of K.S., filed a Motion for Preliminary Injunction in the Middle District of Pennsylvania. The Motion sought to enjoin Bucknell University from proceeding with the sexual misconduct hearing until after the preliminary hearing in R.D.'s criminal case occurred.

301.   The Honorable Judge Yvette Kane denied the motion on October 5, 2010.

302.   The sexual misconduct hearing, which took place in front of the Hearing Board for Sexual Misconduct ("HBSM") began on the evening of October 5, 2010 and lasted through October 7, 2010.

303.   Dean Conrad served as the Student Conduct Administrator ("SCA") for R.D.'s hearing. The SCA's responsibilities include:  maintaining procedural

documentation of board proceedings; keeping records of proceedings; advising the Hearing Board regarding hearing procedures, questioning, and precedent; recording each decision regarding a specific charge; and, providing a summary of the respondent's previous conduct record to assist the board in determining the appropriate sanction if the respondent is determined responsible in the case at hand.

304. At the start of the hearing, K.S. requested not to take-part in the hearing. The HBSM denied her request because she was the person who initiated the hearing by filing charges against R.D.

305. K.S. informed the Board that she would not be answering any questions from R.D. or the HBSM.

306. K.S. did not submit a witness list or any other materials to the HBSM prior to the hearing, as required by University's hearing procedures and the Student Handbook.

307. R.D. objected to K.S. being allowed to call any witnesses or submit any materials to the HBSM that were not provided in advance.

308. Over R.D.'s objection, K.S. was allowed to submit photographs taken by her roommate on the night of the incident. R.D. and his attorney had specifically

requested copies of the photographs prior to the hearing, but the pictures were never produced.

309.   R.D. also objected to the HBSM reviewing K.S.'s prior statements because he was unable to cross-examine K.S. on any of the statements.

310.   K.S. then asked the HBSM for a one-week continuance. Her request was denied.

311.   For her opening statement K.S. read the text from the Motion for Preliminary Injunction, which Anthony J. Voci, Jr. filed only days earlier, and which consisted of numerous false, defamatory statements about R.D..

312.   Officer Holtzapple testified first. Officer Holtzapple admitted that she did not draft the Affidavit of Probable Cause, yet she signed and swore to the document.

313.   Officer Holtzapple admitted that an audio recording of K.S.'s September 5, 2010 interview existed, and that the recording was not turned over to R.D., despite the fact that R.D. and his attorney had requested the recording weeks earlier.

314.   The HBSM asked Officer Holtzapple whether she believed K.S. was lying at any point.  After hesitating, Officer Holtzapple simply stated that her main responsibility was to protect K.S.

315.   Officer Ulmer testified that he authored the Affidavit of Probable Cause on September 6, 2010, and that he spoke with the Magistrate that day but because it was Labor Day, charges had to be filed on September 7, 2010.

316.   Officer Ulmer testified that he and Officer Middleton typed up the criminal charges.

317.   Student C testified that the interaction he observed between R.D. and K.S. was playful.

318.   Student C testified that he and Student D had also been play wrestling that evening, just like R.D. and K.S..

319.   Student C's testimony was consistent with the written statement that he gave to Public Safety on September 6, 2010.

320.   Student D testified that R.D. and K.S. were playfully wrestling, and that neither party was under distress.

321.   Student D's testimony was consistent with the written statement that she gave to Public Safety on September 6, 2010.

322.    Student A testified that R.D., Student A, and Student B were all in R.D. and Student A's shared dorm room on September 5, 2010.

323.    Student A testified that R.D. left the room for a few minutes and when he came back, K.S. was with him.

324.    Student A testified that R.D. and K.S. were play-wrestling in a friendly manner, and K.S. could have stopped or left the room at any time.

325.    Student A testified that R.D. did not make any sexual advances towards K.S., and if Student A had observed any unwanted advances, he would have intervened.

326.    Student A testified that he never witnessed R.D. hit or pummel K.S. in the head or the vagina.

327.    Student A's testimony was consistent with the written statement that he gave to Public Safety on September 5, 2010.

328.    Student G testified that he witnessed R.D. and K.S. play-fighting on September 5, 2010.

329.    Student G testified that there was no punching or striking while R.D. and K.S. wrestled in the dorm room.

330.    Student G testified that he was in the hallway with Student F, Student H, and Student I when R.D. and K.S. left R.D.'s dorm room.

331.    Student G testified that when R.D. and K.S. came into the hallway they were horsing around and everything appeared consensual.

332.    Student G testified that he was standing approximately fifteen feet away from R.D.'s door, and if someone in the room had been screaming, he would have heard it.

333.    Student G testified that he did not hear K.S. scream "stop," "get off me," or anything about assaulted Student E.

334.    Student G testified that if he heard anyone screaming he would have rushed in to help.

335.    Student G testified that K.S. had no marks on her body when she left R.D.'s room.

336.    Student G testified that R.D. and K.S. started talking to two freshman students who were in the hallway, and that the conversation lasted for several minutes.

337.    Student G testified that R.D. stopped the play-fighting, but then K.S. slapped R.D. in the face.

338.    Student G testified that K.S. continued trying to slap R.D. in the face in an effort to re-initiate play-fighting.

339.    Student G testified that in an effort to defend himself, R.D. grabbed K.S.'s arms and held them down to her sides.

340.    Student G described the fall that led to K.S.'s rug burn as a "loss of balance" resulting from K.S. flailing around as R.D. was trying to keep her hands to her sides.

341.    Student G testified that K.S. kept calling R.D. names, such as "pussy lips"

342.    Student G testified that after the fall, R.D. flicked water from the water fountain at K.S., and in response K.S. laughed and ran down the hall to her room.

343.    Student G's testimony was consistent with the written statement he provided Public Safety on September 5, 2010.

344.    Student F testified that she was in the hall with Students G, H and I while R.D. and K.S. were still play-fighting in R.D.'s room.

345.    Student F testified that she vaguely remembered hearing laughing coming from the room, but that she never heard K.S. screaming "stop," "get off me," or anything about Student E.

346.    Student F testified that if she had heard any screaming, she would have intervened immediately.

347.    Student F testified that when R.D. and K.S. came into the hallway, they were joking and laughing and horsing around.

348.    Student F testified there was no reason to believe anything improper had taken place, and K.S. had no bruising or marks on her body when she left R.D.'s room.

349.    Student F testified that R.D. did not want to continue play-fighting, but that K.S. did and she continued trying to escalate the situation.

350.    Student F testified that K.S. only started crying after she saw the rug burn on her face.

351.    Student F's testimony was consistent with the written statement that she provided Public Safety on September 6, 2010.

352.    Student J testified that he was good friends with K.S..

353.    Student J testified that he did not witness the play-fighting or the fall, but that he heard K.S. crying in the bathroom, at which time he walked K.S. back to her room.

354.    Student J testified that K.S. never mentioned that R.D. assaulted her or tried to take advantage of her.

355.    Student J testified that K.S. was afraid that her field hockey coach would see the rug burn on her face and find out she had been drinking.

356.    Student J testified that K.S. was afraid she would be kicked off of the field hockey team.

357.    Student J testified that K.S. told him she could have stopped the play-fighting at any time.

358.    Student J testified that he had witnessed K.S. play-fighting with other people on previous occasions.

359.    Student J testified that play-fighting was not sexual in nature.

360.    Student J's testimony was consistent with the written statement that he provided to Public Safety on September 5, 2010.

361.    Student E testified that she and R.D. had consensual intimate relations the prior summer, and that R.D. never assaulted her or took advantage of her.

362.    Student E testified that her prior relations with R.D. were in no way relevant to the allegations that K.S. made against R.D..

363.    Student E's testimony was consistent with the interview she had with Public Safety and the written statement provided on September 8, 2010.

364.    The RA testified that he returned to the hall at approximately 2:15-2:30 AM on September 5, 2010, and that everyone on the hall was smiling and laughing.

365.    The RA testified that K.S. then became very loud, and she ran up and slapped R.D. in the face.

366.    The RA testified that all of the students eventually started walking back to their rooms, and he then walked to R.D.'s room to see what had happened.

367.    The RA testified that K.S. ran up and attempted to get past the RA to R.D..

368.    The RA testified that he restrained K.S.'s arms because he did not want her to hit R.D..

369.    The RA testified that according to R.D., K.S., and the other students in the hall, R.D. and K.S. had only been play-fighting, and it was not malicious.

370.    The RA testified that all pertinent information about what occurred between R.D. and K.S. was contained in the report that he filed.

371.    The RA testified that K.S. did not want him to file a report, and she made him "pinky swear" that he would not file anything.

372.    The RA testified that he had considered calling Public Safety, but after speaking to all witnesses, including R.D. and K.S., he believed everything was fine and the fall had been accidental.

373.    The RA's testimony was consistent with the report he drafted and filed with Bucknell University administrators on September 5, 2010, and that he provided to Public Safety on September 6, 2010.

374.    On the third day of the hearing, October 7, 2010, the HBSM asked K.S. whether she had her vagina checked while she was at Evangelical Hospital.

375.    K.S. responded that she did not have her vagina checked, but then requested that her answer be withdrawn because she did not want to answer any questions in the hearing and would be exercising her right to remain silent.

376.    The HBSM then asked R.D. whether he called K.S. any of the names she alleged.  R.D. answered "No."

377.    The HBSM asked R.D. if K.S. ever said "stop" during the incident.  R.D. answered "No."

378.    The HBSM asked whether R.D. recalled hitting K.S. in her vagina in the past.  R.D. answered "No."

379.   The HBSM asked R.D. whether he would have filed charges against K.S. if K.S. had never filed charges against R.D.

380.   R.D. told the HBSM that he probably would not have filed charges against K.S. if she had not initiated the proceedings.

381.   R.D. told the HBSM that once K.S. filed charges against him, he knew he wanted to file charges against her because everything she said was false.

382.   R.D. told the HBSM that he also filed charges because, looking back on the events, what R.D. had initially thought were playful actions had actually been escalated by K.S., and K.S. became increasingly aggressive as R.D. tried to stop the play-fighting.

383.   The HBSM then recalled three witnesses: Student F, Student A, and Student G.

384.   In response to the HBSM's questions, Student F testified that she did not observe any questionable behavior, and she never heard R.D. call K.S., "bitch," "whore," or "slut."

385.   Student F testified that no one in the hallway was "jeering" at R.D., as K.S. alleged in her September 9, 2010 interview.

386.   Student F testified that she did hear a crash coming from R.D.'s room while R.D. and K.S. were horse-playing, but that K.S. then screeched and started laughing in a lighthearted manner.

387.   Student F testified that she did not see any injuries on K.S. when K.S. came into the hallway, and that the injuries resulted from the fall.

388.   In response the HBSM's questions, Student A testified that he did not hear K.S. or R.D. say anything about Student E, and that he did not hear K.S. say anything resembling "stop."

389.   In response to the HBSM 's questions, Student G testified that while the people in the hallway were all laughing and joking, it was not directed at R.D. or K.S.

390.   Student G testified that he noticed K.S.'s scrapes after the fall.

391.   Student G testified that after Student G filled out his witness report, K.S. kept apologizing.

392.   Student G testified that he was surprised when he heard about the assault charge because nothing out of the ordinary had occurred that night.

393.   Student G testified that he was really surprised to hear about the sexual assault charge.

394.    Throughout the hearing, R.D. made multiple motions to dismiss the charges against him because K.S. refused to answer any questions about her allegations and failed to present evidence in support of her claims, as was required by the Bucknell University Student Handbook.

395.    According to the Student Handbook, an aggrieved party "must respond to relevant questions posed by the respondent."

396.    At the conclusion of the hearing, R.D. made a final request to have the charges against him dismissed because K.S. had not participated in the portion of the hearing that dealt with the charges she filed against R.D.

397.    All of R.D.'s requests to dismiss the charges were denied.

398.    On October 7, 2010, at the conclusion of the hearing, the HBSM found R.D. not responsible for Sexual Misconduct, Physical Assault, Harassment, and Freedom of Movement.

399.    The HBSM found R.D. responsible for Disorderly Conduct, despite the fact that K.S. failed to present any evidence in support of her claims, and K.S. refused to be questioned by the Board or R.D.

400.   The HBSM found R.D. responsible for Disorderly Conduct, despite the fact that all witness statements indicated that K.S. was the aggressor and all injuries were the result of K.S.'s persistent disorderly behavior.

401.   The HBSM refused to state the factual basis supporting its finding of Disorderly Conduct.

402.   R.D. still does not know what actions were deemed disorderly because he was not permitted to ask any questions about the charge, and because K.S. refused to answer any questions about the charge and she introduced no evidence in support of her claims.

403.   On October 7, 2010, the HBSM found K.S. responsible for Disorderly Conduct.

404.   The HBSM found K.S. not responsible for all other charges brought by R.D., including: Sexual Misconduct; False Accusation or Testimony, and Retaliation, Threatening, or Intimidation of Participants in a Hearing; Physical Assault; and Harassment.

405.   Based on information and belief, the HBSM's decision was a compromise verdict designed to bring a close to the case while sweeping the most controversial issues, such as K.S.'s False Accusation and Testimony, "under the rug."

406.   As a result of being found responsible for Disorderly Conduct, R.D. was forced to change his on-campus residence, and he is not permitted to be on the same floor where K.S. resides at any time.

407.   Bucknell University also issued a formal letter of censure detailing the results of the HBSM hearing and its decision that R.D. committed Disorderly Conduct.

408.   On October 7, 2010, after the HBSM hearing ended, Officer Ulmer said to R.D.'s student advisor, Martin Ligare, "I always knew this was just a disorderly conduct matter."

409.   On October 14, 2010, R.D. emailed Dean Conrad notifying her that he wanted to appeal the HBSM decision finding him responsible for Disorderly Conduct. In that same email, R.D. requested a copy of the tape from the HBSM hearing to use for the appeal.

410.   On October 19, 2010, Dean Conrad emailed R.D. notifying him that his Appeals hearing was scheduled for October 20, 2010, at 5:45 PM.

411.   At the Appeals hearing, Dean Conrad, acting as SCA, failed to produce the audio recording of the HBSM hearing, which R.D. specifically requested.

412.   Bucknell also refused to record the Appeals Board hearing, in violation of the Student Handbook, the Bucknell Faculty Handbook, and the 1967 Joint Statement on Rights and Freedom of Students, which the Faculty and the Board of Trustees of Bucknell University endorse.

413.   During the Appellate hearing, Dean Conrad erroneously told the Appeals Board that during the HBSM hearing, R.D. made only one request to dismiss the charges against him after all evidence was heard.

414.   Dean Conrad repeatedly told the Appeals Board that the HBSM hearing was a long, drawn-out process, thus misrepresenting that sufficient evidence was presented to support a finding of responsibility on R.D.'s part.

415.   Dean Conrad did not tell the Appeals Board that K.S. failed to present any witnesses to support her claims, and that K.S. failed to answer any questions posed by either the HBSM or R.D..

416.   The Appeals Board rejected R.D.'s appeal and upheld the HBSM finding of responsibility for Disorderly Conduct.

417.   On October 27, 2010, R.D. notified Dean Locher that he wanted to appeal the HBSM finding of responsibility and the Appeals Board decision.

418.   R.D. also raised concerns about procedural errors, the University's failure to provide him with relevant, exculpatory evidence in advance of the HBSM hearing, and the HBSM's finding of responsibility when K.S. had not presented any evidence or testimony in support of her claims.

419.   R.D. also expressed concern that during his Appeals hearing, Dean Conrad failed to produce the audio recording of the HBSM hearing, and then misrepresented what had taken place during the hearing.

420.   On October 28, 2010, Dean Locher emailed R.D., confirming that she had received R.D.'s request for appeal and informing R.D. that she would be reviewing his materials.

421.   On November 15, 2010, Dean Locher recused herself from taking part in R.D.'s appeal due to "[her] office's role in the prior history of this matter."

422.   Dean Locher referred the appeal to Provost Mick Smyer.

423.   On December 1, 2010, R.D. emailed Provost Smyer to request, among other things, the audio recording and/or transcript of the HBSM hearing.  R.D. also requested that the second appeal hearing be recorded.

424.   On December 2, 2010, Provost Smyer informed R.D. that "we will not be providing or transcribing the original hearing for the purposes of this appeal but will review your allegations of procedural error, for which no transcript is necessary."

425.   Provost Smyer refused to include a transcript or verbatim record of the original hearing despite the fact that many of the procedural errors that ultimately effected the outcome of R.D.'s hearing would have been documented in the recording or transcript.

426.   Provost Smyer also told R.D., "[b]ecause the appeal is limited to statements of those persons invited to attend, and my questions of those participants for the purpose of clarification, there will be no need to record the appeal proceedings."  Thus, R.D.'s final appeals hearing was also not recorded.

427.   The final appeal took place on December 6, 2010.

428.   Representatives of the original HBSM and the Appeals Board defended the appropriateness of the decisions they made; yet, neither the original hearing audio nor a recording of the Appeals hearing was presented in support of their decisions.

429.   R.D., through his student advisor, made the argument that he was procedurally prejudiced by the HBSM's decision to proceed with the charges against

R.D. because without the ability to question K.S., the evidence as incomplete and necessarily insufficient.

430.   On December 14, 2010, Provost Smyer emailed R.D. and told him that his final appeal was denied.


## COUNT I

## FALSE ARREST

**R.D. v. Bucknell University, Officer Holtzapple, Officer Doe,
Officer Ulmer, Officer Middleton, Officer Fisher and Detective Ettinger**

432.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

433.   Under the Fourth Amendment, an arrest is unlawful when the officers lack probable cause.

434.   The police officers of the Bucknell Public Safety Department at Bucknell University are appointed and sworn police officers under 22 Pa.C.S.A. § 501.

435.   Bucknell University is a state-aided university under 71 P.S. §§ 646, 646.1.

436.   The Bucknell Public Safety Department police officers did not have probable cause to arrest R.D.  Specifically, the officers knew that the information upon which they based the arrest was false.

437.   The Bucknell Public Safety Department officers knew about contradictory, exculpatory evidence but ignored it.

438.   No reasonable officer would have believed that probable cause existed in this case.

439.   Officers Holtzapple, Ulmer, Middleton, Ettinger and Fisher first arrested R.D. without probable cause on September 7, 2010, and again on September 10, 2010 after amended the charges.

440.   In order to obtain the arrest warrant, the officers willfully and intentionally omitted material, exculpatory information which would have negated any perceived probable cause.

441.   As a direct and proximate result of the false arrest, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

442.   As a direct and proximate result of the false arrest of R.D., he has incurred attorneys fees and other costs associated with his defense.

## COUNT II

## MALICIOUS PROSECUTION

### R.D. v. Bucknell University, Officer Holtzapple, Officer Ulmer, Officer Middleton, Officer Fisher and Detective Ettinger

443.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

444.   As set forth above, Bucknell Public Safety Department police officers, including Officers Holtzapple, Ulmer, Middleton, Fisher and Ettinger knowingly submitted an Affidavit of Probable Cause containing false information to the District Justice in an effort to initiate criminal proceedings against R.D., when in fact no probable cause existed to effectuate an arrest.

445.   The Officers also provided knowingly false information to the Union County District Attorney's office in an effort to advance the criminal case against R.D.  The officers failed to bring exculpatory and contradictory evidence to the attention of the Union County District Attorney's office as such evidence surfaced.

446.   Ultimately, R.D.'s preliminary hearing was held in his absence and the charges against him were dismissed.

447.   The officers willfully, deliberately and maliciously assisted in the prosecution of R.D. knowing that they did not have probable cause to do so, and knowing of evidence within their possession that pointed toward his innocence.

448.   As a direct and proximate result of the actions of the Defendant officers' actions, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering.

449.   As a direct and proximate result of the false arrest of R.D., he has incurred attorneys fees and other costs associated with his defense.

## COUNT III

## SUPERVISORY LIABILITY

### R.D. v. Bucknell University, President Bravman, Dean Locher, Dean Badal, Dean Mararra, Captain Lauver and Chief Friedberg

450.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

451.   Defendant Bucknell University requested and received authorization from the State of Pennsylvania for its police officers to act with all the power and authority of a municipal police department, therefore effectively and completely

transforming Bucknell University into a state actor subject to liability under 42 U.S.C. § 1983.

452.   Defendant Bucknell University has been deliberately indifferent to the Constitutional rights and safety of individuals, including R.D., by failing to train its officers on how to properly investigate potential crimes, what constitutes malicious prosecution, and on what constitutes probable cause for an arrest.

453.   Additionally, the false arrest and malicious prosecution of R.D. were ratified by Chief Friedberg, Deans Locher, Badal, and Mararra and President Bravman of Bucknell University, who are final policymakers for day-to-day law enforcement activities.

454.   Specifically, Chief Friedberg, Deans Locher, Badal, and Mararra, and President Bravman, who are final policymakers, personally knew of, encouraged and assisted in the malicious and reckless actions taken by the police officers of the Bucknell Public Safety Department against R.D.

455.   These final policymakers continued to ratify, encourage and assist the actions of the police officers against R.D. even though they were personally aware that much evidence, including a medical exam and witness statements, showed that the allegations of sexual assault were not credible.

456.     Captain Lauver had authority to stop the arrest and prosecutions of R.D. Captain Lauver knew that the arrest and prosecution lacked probable cause but failed to intervene to prevent the violation of R.D.'s Fourth Amendment rights.

## COUNT IV

## FALSE IMPRISONMENT

**R.D. v. Bucknell University, President Bravman, Dean Locher, Dean Badal, Dean Mararra, Chief Friedberg, Officer Holtzapple, Officer Doe, Officer Ulmer, Officer Middleton, Officer Fisher and Detective Ettinger**

457.     Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

458.     Bucknell University is liable for the actions of its employees, Officers Holtzapple, Doe, Ulmer, and Middleton.

459.     Officers Holtzapple, Doe, Ulmer, Middleton, Fisher and Ettinger acted with the intent to confine R.D. within an area of their control when they arrested him for crimes without probable cause.

460.     The Defendant officers' acts directly resulted in the unlawful confinement of R.D.

461.     R.D. was conscious of his confinement and was harmed by it.

462.   The Defendant officers acted intentionally in complete disregard for R.D.'s right to be free from false imprisonment.

463.   The Defendant officers engaged in aforesaid conduct for the purpose of violating R.D.'s right to be free from false imprisonment.

## COUNT V

## CIVIL CONSPIRACY TO COMMIT FALSE ARREST

**R.D. v. Bucknell University, President Bravman, Dean Locher, Dean Badal, Dean Mararra, Chief Friedberg, Officer Holtzapple, Officer Doe, Officer Ulmer, Officer Middleton, Officer Fisher, Detective Ettinger, <u>and Anthony J. Voci, Jr.</u>**

464.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

465.   Anthony J. Voci, Jr. conspired with Bucknell University officials, K.S., and others, to accomplish the unlawful act of false arrest.

466.   Specifically, he conspired with President Bravman, Dean Locher, Dean Badal, Dean Mararra, Chief Friedberg, Officer Holtzapple, Officer Doe, Officer Ulmer, Officer Middleton, Fisher, Ettinger and Wayne Bromfield.

467.    Anthony J. Voci, Jr. consistently worked with Bucknell officials to initiate the prosecution of R.D., and assented to his client K.S.'s desire that R.D. "have a record," though there was no credible evidence on which to arrest R.D.

468.    All these unlawful acts where done with the common purpose between Anthony J. Voci, Jr. and Bucknell University.

469.    As a direct and proximate result of this conspiracy between Anthony J. Voci, Jr. and Bucknell University, R.D. suffered criminal charges, attorneys fees and other costs associated with his defense.

470.    As a direct and proximate result of the actions of Defendants, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.


## COUNT VI

## CIVIL CONSPIRACY TO COMMIT MALICIOUS PROSECUTION

**R.D. v. Bucknell University, President Bravman, Dean Locher, Dean Badal, Dean Mararra, Chief Friedberg, Officer Holtzapple, Officer Ulmer, and Officer Middleton, Officer Fisher, Detective Ettinger, <u>and Anthony J. Voci, Jr.</u>**

471.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

472. Anthony J. Voci, Jr. conspired with Bucknell University officials to accomplish the unlawful act of malicious prosecution.

473. Specifically, he conspired with President Bravman, Dean Locher, Dean Badal, Dean Mararra, Chief Friedberg, Officer Holtzapple, Officer Ulmer, Officer Middleton, Officer Fisher, Detective Ettinger and Wayne Bromfield.

474. Anthony J. Voci, Jr. and Bucknell officials conspired to suppress exculpatory evidence, which resulted in R.D.'s malicious prosecution and false arrest.

475. These unlawful acts where done with the common purpose between Anthony J. Voci, Jr. and Bucknell University to prosecute R.D. without probable cause, and to have R.D. removed from Bucknell University.

476. As a direct and proximate result of this conspiracy between Anthony J. Voci, Jr. and Bucknell University, R.D. was suspended from Bucknell University, subjected to criminal prosecution, and incurred attorneys fees and costs in defense of those charges.

477. As a direct and proximate result of the actions of Anthony J. Voci, Jr. and Bucknell University, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

## COUNT VII

## DEFAMATION

### R.D. v. Bucknell University, Officer Ulmer, Officer Middleton, Officer Holtzapple, Officer Fisher, Dean Locher, Dean Marrara, and Anthony J. Voci, Jr.

478.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

479.    Defendants Bucknell University, Ulmer, Middleton, Holtzapple, Locher, Marrara, Fisher and Voci all made communications about R.D. that were defamatory in character.

480.    Specifically, they referred to R.D. as the perpetrator of a sexual assault on K.S., even though they knew the allegations against R.D. to be false.

481.    The defamatory communications tended to harm and did harm the reputation of R.D. so as to lower him in the estimation of the community and to deter third persons from associating and dealing with him.

482.    Indeed, the defamatory communications were intended to (and did) convey R.D.'s guilt of crimes involving moral turpitude.

483.    These Defendants intended not only to deprive R.D. of his good name, and to bring him into scandal and disrepute among his neighbors and peers, but also to subject R.D. to prosecution and punishment for sexual assault.

484. The defamatory communications tended to and did blacken R.D.'s reputation and exposed him to public hatred, contempt, and ridicule.

485. R.D. was a purely private figure, and was not in any way a public figure.

486. The character of the subject matter of defamatory comment was not of public concern.

487. The allegations against R.D. were so inherently improbable that only a reckless and dishonest person would have conveyed them as there were obvious reasons to doubt the veracity of K.S. and the accuracy of her reports.

488. The defamatory communications were not statements of mere opinion.

489. The defamatory communications were published in that they were made to third parties.

490. Specifically, the following defamatory communications are known to Plaintiffs at this time:

a. On September 6, 2010, Officers Ulmer and Middleton typed up criminal charges and the supporting Affidavit of Probable Cause that accused R.D. of Simple Assault, Harassment, and Disorderly Conduct. Officer Holtzapple swore out and signed the Affidavit. These charges—filed on September 7, 2010—were public, and they were intended to be (and

were) reviewed by, *inter alia*, Magisterial District Judge Armbuster and the Union County District Attorney's office.

b.      On the evening of September 6, 2010, Dean Locher and Dean Lewis Mararra had R.D. temporarily suspended. Dean Locher issued R.D. a written temporary suspension order.

c.      Dean Locher then spoke of the phone with R.D.'s mother, Shelley, and told her that "R.D. must have a lot bottled up inside," and that he was "holding a lot in."

d.      On September 10, 2010, Office Holtzapple filed a second criminal complaint, charging R.D. with False Imprisonment, Simple Assault, Indecent Assault, Disorderly Conduct, and Harassment. These charges were public, and they were intended to be (and were) reviewed by, *inter alia*, the magisterial district judge and prosecutors' office. R.D. was arrested on the second criminal complaint. His preliminary arraignment occurred that same day.

e.      On or about September 15, 2010, in a conference call with Wayne Bromfield and Steve Becker, Anthony J. Voci, Jr. referred to R.D. as a dangerous, sexual offender.

f.    On September 21, 2010, Anthony J. Voci, Jr. sent a letter to Dean Conrad referring to R.D. as "the perpetrator of a sex crime" who was being allowed "to misuse the internal process to continue to victimize a student/victim."

g.    On September 29, 2010, Anthony J. Voci, Jr. wrote a letter to Wayne Bromfield repeatedly referring to R.D. as K.S.'s "attacker" in a "sex crime"; he further stated that R.D. tried "to force himself upon a female college student." Anthony J. Voci, Jr. claimed that this was a "very serious crime", and that Bucknell University had received a "credible report of a sexual assault." Anthony J. Voci, Jr. also sent the letter to the entire Bucknell Board of Trustees.

h.    It is believed and therefore averred that Anthony J. Voci, Jr. also communicated with Pennsylvania state senators Robert M. Tomlison and Gene Yaw and informed them that R.D. had sexually assaulted K.S..

i.    Throughout the duration of the case, Anthony J. Voci, Jr. contacted multiple media outlets, such as the *Daily Item*, and made similar defamatory statements that R.D. had forcibly taken the K.S. from his room to hers, got on top of her and hit her in her breast and groin. Defendant Voci also referred to R.D. as K.S.' "attacker" in comments to

staff for the *Daily Item*, a newspaper, that were published on October 7, 2010 in an article entitled, "Teenager faces attack suspect for five hours".  Anthony J. Voci, Jr. directed and participated in the publication of the defamatory publication by the Daily Item.

j.     Bucknell University representatives were also quoted in many of the articles.   For every day of sexual misconduct hearing, University officials were quoted discussing the hearing.   Bucknell University directed and participated in the publication of the defamatory publication by the Daily Item.

k.     On October 7, 2010, at the conclusion of the hearing, the Bucknell University Hearing Board for Sexual Misconduct ("HBSM") found R.D. responsible for Disorderly Conduct.  As a result, R.D. was forced to change his on-campus residence, and he is not permitted to be on same the floor where K.S. resides at any time.   Bucknell University also issued a formal letter of censure detailing the results of the HBSM hearing, and its decision that R.D. committed Disorderly Conduct.  On October 20, 2010, the Appeals Board rejected R.D.'s initial appeal.  On December 14, 2010, Provost Smyer email R.D. and told him that his final appeal was denied.

491.   The defamatory communications continued to be re-published after these Defendants were made aware of the falsity of the allegations against R.D.

492.   The defamatory communication was maliciously, recklessly and negligently made.

493.   The defamatory communications were not justifiably published by any privilege.

494.   The defamatory communications referenced R.D. by name to ensure that every person receiving the communications knew that they were about R.D.. The defamatory communication also listed R.D.'s home address in Connecticut thereby spreading the defamatory message to R.D.'s home town.

495.   All persons receiving the communications understood the defamatory meaning of the communications.

496.   R.D. was specially harmed from the publication of these defamatory communications.

497.   R.D. suffered actual loss to his reputation and personal humiliation.

498.   R.D. is now subject to public hatred and contempt, and is the object of ridicule in the world.

499.   As a result of the defamatory communications, many people have declined to associate with R.D..

500.    The defamatory communications led the audience to conclude that R.D. lacked honor and integrity, and have grievously fractured his standing in respectable society.

## COUNT VIII

## FRAUD

### R.D. v. Bucknell University, Dean Conrad, Officer Ulmer and Officer Holtzapple

501.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

502.    On multiple occasions, Defendant Bucknell University misled both the Union County District Attorney's office and the Plaintiffs as to the true facts behind the series of events and allegations surrounding R.D. and K.S.

503.    Bucknell University misled prosecutors and R.D.'s family in order to cover up its incompetence and mishandling of the allegations against R.D..

504.    Due to Bucknell University's fraud, Plaintiffs were unable to quickly uncover the misconduct by Bucknell University surrounding its investigation of this matter.

505.    Bucknell University has committed multiple acts of fraud.

506.   On September 6, 2010, Officer Ulmer withheld K.S.'s written statement from R.D. claiming that she had not pressed charges against him yet, a fact that Officer Ulmer knew to be false.

507.   R.D. justifiably relied on this representation in not further seeking to obtain a copy of his statement, or in seeking to contest any statement K.S. made.

508.   In addition, Office Holtzapple was aware of an audio recording of K.S.'s September 5, 2010 statement, but failed to turn this statement over to R.D.

509.   R.D. was injured and damaged as the proximate cause of these misrepresentations because he could not contest the obvious falsity statements that he knew nothing about.

510.   Prior to his hearing, Bucknell University hid and did not provide several materials that would have aided in R.D.'s defense of the criminal prosecution and the University's disciplinary proceeding.

511.   Bucknell University, acting through its agents, representatives, and/or employees, knowingly made materially false representations by withholding exculpatory materials from R.D. prior to Bucknell's internal disciplinary hearing.

512.   Bucknell University intended to make these misrepresentations so that the Union County District Attorney's office would proceed with the criminal prosecution of R.D.

513.   R.D. justifiably relied on these misrepresentations in not taking action he otherwise could have to fully and immediately exonerate himself.

514.   The Union County District Attorney's office justifiably relied on these misrepresentations in beginning to prosecute R.D., until it realized the charges were baseless.

515.   As a direct and proximate result of the actions of Defendants Bucknell University, Dean Conrad, and Officers Ulmer and Holtzapple, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.


## COUNT IX

## CIVIL CONSPIRACY TO COMMIT FRAUD

## R.D. v. Bucknell University, Anthony J. Voci, Jr.

516.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

517.   Anthony J. Voci, Jr. conspired with Bucknell University officials to accomplish the unlawful act of fraud.

518.   Anthony J. Voci, Jr. and Bucknell officials conspired to suppress evidence pointing toward R.D.'s innocence, which resulted in his false prosecution and false arrest.

519.   Anthony J. Voci, Jr. on multiple occasions, including a conference call on September 15, 2010, referred to R.D. as a sexual predator and sexual offender in communications with Bucknell officials.

520.   These assertions are false, but Bucknell officials agreed to act on these assertions, to R.D.'s detriment.

521.   These unlawful acts were done with the common purpose between Anthony J. Voci, Jr. and Bucknell University of misleading R.D. and the prosecutors from knowing that the allegations of K.S. were false.

522.   As a direct and proximate result of this conspiracy between Anthony J. Voci, Jr. and Bucknell University, R.D. suffered criminal prosecution, suspension from Bucknell University, and attorneys fees and costs associated with his defense.

523.   As a direct and proximate result of the actions of Defendants, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

## COUNT X

## BREACH OF CONTRACT

## R.D. v. Bucknell University

524.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein..

525.   At all times relevant hereto, a contractual relationship existed between Bucknell University and R.D.. Bucknell's Student Handbook was deemed part of that contract.   Pursuant to that contract, Bucknell University was required to act in accordance with its Handbook in resolving complaints of misconduct and violations of the Handbook, in the investigation of those complaints, in the process of adjudicating the complaints before the Hearing Board for Sexual Misconduct, and in resolving appeals brought challenging a disciplinary panel's determination.

526.   Bucknell breached its contract with R.D. by failing to comply with the Handbook, a contract between R.D. and Bucknell University, in at least the following ways:

a.      failing to provide fair notice of the parameters of charged offenses;

b.      failing to adequately and impartially investigate the allegations against R.D.;

84

c.      failing to locate and/or preserve relevant information that would have
        established that K.S.' testimony and statements were false;

d.      failing to provide R.D. with requested, relevant information for the
        HBSM hearing;

e.      failing to compel the testimony of K.S., thereby denying R.D. the right
        to cross-examine and confront his accuser;

f.      failing to dismiss the claims brought by K.S. against R.D. after K.S.
        refused to participate in the hearing and answer any questions relating
        to the charges that she levied against R.D.;

g.      finding R.D. guilty of Disorderly Conduct, despite the complaining
        witness's refusal to answer any questions about the charge and a total
        lack of evidence to support the finding;

h.      failing to grant R.D.'s appeals; and

i.      failing to maintain a record of the HBSM proceedings, and the appellate
        proceedings.

527.    As a result of Defendant's breach, and as a direct and proximate cause
thereof, Plaintiff has been seriously and irreparably damaged.

528.   Accordingly, Bucknell University is liable to R.D. for breach of contract, and all damages stemming therefrom.


## COUNT XI

## VIOLATION OF TITLE IX

## R.D. v. Bucknell University

529.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

530.   Defendant Bucknell University violated Title IX in the manner in which is resolved the allegation of sexual assault by K.S. against R.D..

531.   Bucknell University receives federal funding in the form of federal student loans given to students.

532.   In virtually all cases of campus sexual assault, the accused student is male and the accusing student is female.

533.   Bucknell University, in the manner in which it approaches the investigation, adjudication, and appeal of allegations of sexual assault, and related claims made in connection to sexual assault, creates an environment in which the accused is so fundamentally denied due process as to be virtually assured of a finding

of guilt.  Such a biased and one-sided process deprives male students of educational opportunities on the basis of their sex.

534.    R.D., as a male student at Bucknell University who has been subject to a school disciplinary action alleging a campus sexual assault, has been discriminated against by Bucknell University on the basis of his sex, and in violation of Title IX.

535.    As a result of the Title IX violation, and as a direct and proximate cause thereof, R.D. has been seriously and irreparably damaged.

536.    Accordingly, Bucknell University is liable to R.D. for violation of Title IX, and all injuries and damages stemming therefrom.

## COUNT XII

## NEGLIGENCE

## <u>R.D. v. Bucknell University</u>

537.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

538.    In its interactions with Plaintiff R.D., in its adoption of a Student Handbook, and the Handbook's inclusive Code of Conduct, and in conducting its investigation and adjudication of R.D.'s disciplinary proceedings, Defendant

Bucknell University owed a duty to Plaintiff R.D. to exercise reasonable care, with due regard for the truth, established procedures, fair notice of the scope of any charged offenses, and the important and irreversible consequences of its actions, as well as the Plaintiff's various liberty and property interests, including a safe place to live on campus.

539.   Through their acts set forth above, Defendant Bucknell University, acting through its agents, servants, and/or employees, breached said duty by carelessly, improperly, and negligently performing their assigned duties, miss-characterizing the truth, ignoring clear evidence of R.D.'s innocense, facilitating a process that violated the rights and other protected interests of Plaintiff R.D. and removing R.D. from campus and leaving him alone at night in a park by himself.

540.   As a direct and proximate result of Defendant Bucknell University's negligence, carelessness, and gross breach of due care, Plaintiff has and will suffer financial losses, including but not limited to the loss of his educational payments made for the time frame that he was not permitted to attend class or reside on campus.

# COUNT XIII

## NEGLIGENT HIRING, TRAINING, SUPERVISION & RETENTION

### R.D. v. Bucknell University

541.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

542.   At said times and places, as set forth above, Defendant Bucknell University, acting by and through its agents, servants and/or employees, had a continuing duty to reasonably, carefully, and conscientiously secure the services of qualified and well-trained agents, services, and/or employees, and to reasonably hire, train, supervise and retain their agents, servants and/or employees, so as to reasonably assure, inter alia, that they were trained in reasonable methods of investigation and the need for timely collection and impartial evaluation of evidence, the need to provide a fair and impartial disciplinary hearing, the need for disciplinary hearings to provide all basic rights to the accused students guaranteed in the Student Handbook, the need to provide a fair, impartial, and complete appeals process, and the need to provide all other obligations as set forth in the Student Handbook, and other procedural safeguards, and which Bucknell students have a right to expect.

543.   At all said times and places, Defendant Bucknell University, acting by and through its agents, servants and/or employees, breached these duties owed to Plaintiff R.D.. The violations illustrate deliberate indifference manifested by systemic and grossly inadequate instruction, training, and lack of adequate supervision, control, discipline, and/or policies on the part of Bucknell University.

544.   As a direct and proximate result of the aforementioned negligent hiring, training, supervision and retention by Defendant, Plaintiff R.D. has been injured as set forth above.

## COUNT XIV

## TORTIOUS INTERFERENCE WITH CONTRACT

### R.D. v. Anthony J. Voci, Jr.

545.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

546.   R.D. has the right to pursue his contractual relationships free from interference on the part of other persons.

547.   At said times and places, as set forth above, Defendant Voci did willfully, maliciously and improperly interfere with an existing contract between

Bucknell University and R.D. by repeatedly meeting and conferencing with Bucknell University agents, servants and/or employees and demanding R.D.'s removal and, ultimately, expulsion from the school.

548.   Defendant Voci had no privilege, justification or legitimate interest for interfering with the contract between Bucknell University and R.D..

549.   Defendant Voci, who intentionally and improperly interfered with the performance of this contract, is subject to liability.

550.   In demanding R.D.'s removal and expulsion, Defendant Voci was giving false information to Bucknell University, that Defendant Voci knew to be false.

551.   As a direct and proximate result of defendant Voci's intentional interference of contract, R.D. suffered suspension from Bucknell University, and financial harm stemming therefrom.

## COUNT XV

## CIVIL CONSPIRACY TO COMMIT TORTIOUS INTERFERENCE WITH CONTRACT

### R.D. v. Bucknell University, Anthony J. Voci, Jr.

552.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

553.   Anthony J. Voci, Jr. conspired with Bucknell University officials to commit the unlawful act of tortious interference with contract.

554.   In addition, at said times and places, as set forth above, Anthony J. Voci, Jr. did conspire with K.S. and her father to willfully and maliciously interfere with an existing contract between Bucknell University and R.D. by repeatedly meeting and conferencing with Bucknell University agents, servants and/or employees and demanding R.D.'s removal and expulsion from the school.

555.   Specifically, Anthony J. Voci, Jr. conspired with Wayne Bromfield to not allow R.D. back on campus, in interference with and direct violation of his contractual rights with Bucknell University.

556.   In a telephone call between Anthony J. Voci, Jr., Wayne Bromfield, and Steve Becker, Anthony J. Voci, Jr. demanded that R.D. not be allowed to finish his

studies at Bucknell, an unlawful demand that interfered with R.D.'s contract with Bucknell.

557.   At said times and places, as set forth above, Anthony J. Voci, Jr. did conspire to willfully and maliciously interfere with an existing contract between Bucknell University and R.D. by repeatedly meeting and conferencing with Bucknell University agents, servants and/or employees and demanding R.D.'s removal and expulsion from the school.

558.   Defendant Voci had no privilege or justification for interfering with the contract between Bucknell University and R.D..

559.   All these unlawful acts where done with the common purpose between Anthony J. Voci, Jr. and Bucknell University.

560.   As a direct and proximate result of this conspiracy between Anthony J. Voci, Jr. and Bucknell University, R.D. suffered suspension from Bucknell University, and financial harm stemming therefrom.

561.   As a direct and proximate result of the actions of Anthony J. Voci, Jr. and Bucknell University, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

## COUNT XVI

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## R.D. v. Bucknell University, Anthony J. Voci, Jr.

562.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

563.   At said times and places, as set forth above, Defendant Anthony J. Voci, Jr. and Defendant Bucknell University, acting by and through its agents, servants and employees, did by extreme, outrageous, intentional, willful, malicious and reckless conduct humiliate, embarrass, shock, and scar R.D.

564.   Bucknell University officials and Anthony J. Voci, Jr. made public statements that were not true and took actions based on false information to falsely portray R.D. as a cruel sex offender, which was not true and caused him severe distress.

565.   Bucknell University officials and Anthony J. Voci, Jr. made public statements that were not true and took actions based on false information that caused R.D. extreme distress as the result of unjustly being expelled from school and not being able to participate in the campus life he had looked forward to.

566.   Defendants' actions further distressed R.D. due to the possibility of permanently being barred from campus and never being able to participate in the college experience he had looked forward to.

567.   Defendants' actions further distressed R.D. when as a result of their actions he faced criminal charges and being accused of a crime he never committed.

568.   As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful and malicious and conduct of Defendant Anthony J. Voci, Jr. and Defendant Bucknell University and its agents, servants and/or employees, Plaintiff R.D. suffered, and will continue to suffer <u>inter alia</u>, severe emotional distress, mental anguish, embarrassment and humiliation, all of which are permanent in nature.

## COUNT XVII

## CIVIL CONSPIRACY TO COMMIT INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### <u>R.D. v. Bucknell University, Anthony J. Voci, Jr.</u>

569.   Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

570.   Anthony J. Voci, Jr. conspired with Bucknell University officials to accomplish the unlawful act of intentional infliction of emotional distress.

571.   Anthony J. Voci, Jr. and Bucknell officials conspired to defame and inflict emotional distress on R.D. by taking action such as barring him from campus that portrayed him in a defamatory light for alleged sexual misconduct, when charges of sexual misconduct against him were completely false.

572.   All these unlawful acts where done with the common purpose between Anthony J. Voci, Jr. and Bucknell University.

573.   As a direct and proximate result of this conspiracy between Anthony J. Voci, Jr. and Bucknell University, R.D. suffered suspension from Bucknell University, and financial harm stemming therefrom.

574.   As a direct and proximate result of the actions of Defendants, R.D. suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

# COUNT XVIII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Shelley v. Bucknell University, Anthony J. Voci, Jr.

575.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as though fully set forth herein.

576.   At said times and places, as set forth above, Defendant Anthony J. Voci, Jr. and Defendant Bucknell University, acting by and through its agents, servants and employees, did by extreme, outrageous, intentional, willful, and malicious conduct humiliate, embarrass, shock, and scar Shelley.

577.   Bucknell University officials and Anthony J. Voci, Jr. made public statements that were not true and took actions based on false information to falsely portray R.D. as a cruel sex offender, which was not true and caused Shelley severe distress as a result of these false allegations of despicable behavior being leveled at her son.

578.   Bucknell University officials and Anthony J. Voci, Jr. recklessly made public statements that were not true and took actions based on false information that caused Shelley extreme distress at the result of her son being unjustly being expelled

from school and not being able to participate in the campus life he had looked forward to.

579.   Defendants' actions further distressed Shelley due to the possibility of her son being permanently being barred from campus and never being able to participate in the college experience he had looked forward to.

580.   Defendants' actions further distressed Shelley when as a result of their actions her son faced criminal charges and was accused of a crime he never committed.

581.   As of September 14, 2010, Bucknell officials were aware of Shelley's condition.

582.   Shelley was damaged as a result of these unlawful acts.  As a direct and proximate result of the actions of Defendants, Shelley suffered and will continue to suffer physical and psychological harm, pain and suffering, some or all of which may be permanent.

583.   Shelley actually suffered physical injury as the result of these outrageous actions of the defendants, and grew frail and ill due to Defendants' actions.

584.   After R.D. was falsely arrested again after being invited back on campus, Shelley was so ill and distressed she could not physically drive by car to pick up R.D.,

after which the Bucknell police officers dumped him off in a random park out in town and drove away.

585.   As a direct and proximate result of the aforementioned extreme, outrageous, intentional, willful, and malicious conduct of Defendant Anthony J. Voci, Jr. and Defendant Bucknell University and its agents, servants and/or employees, Plaintiff R.D. suffered, and will continue to suffer *inter alia*, severe emotional distress, mental anguish, embarrassment and humiliation, and physical illness, all of which are permanent in nature.

## **PRAYER FOR RELIEF**

**WHEREFORE** the Plaintiffs, Reed C. Dempsey and Shelley Dempsey,

hereby demand judgment in their favor and against all Defendants as follows:

A.      Declaratory Relief against Bucknell University and all Bucknell

University Public Safety Officers and Anthony J. Voci, Jr.;

B.      Nominal Relief against all Defendants;

C.      Compensatory Damages against all Defendants;

D.      Punitive Damages against all individual Defendants;

E.      Attorney fees and costs as authorized by law; and,

F.      Such other relief as this Court deems necessary and appropriate.


**BOYLE, AUTRY & MURPHY**

*/s/  Dennis E. Boyle*
**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Joshua M. Autry, Esquire**
Supreme Court I.D. No. 208459

**Megan E. Schanbacher, Esquire**
Supreme Court I.D. No. 306958
4660 Trindle Road, Suite 200
Camp Hill, PA  17011
Phone:  (717) 737-2430
Fax:  (717) 737-2452
Dated: September 3, 2010          Email:  deboyle@dennisboylelaw.com
                                             jmautry@dennisboylelaw.com
                                     mschanbacher@dennisboylelaw.com