**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **REED C. DEMPSEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 4:11-cv-01679** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **BUCKNELL UNIVERSITY, et al.,** | ) | **(Judge Brann)** |
| | ) | |
| **Defendants.** | ) | **ELECTRONICALLY FILED** |

**Bucknell Defendants' Statement of Material**
**Facts in Support of Their Motion for Summary Judgment**

Now come the Bucknell Defendants (all defendants except Anthony J. Voci,

Jr., Esq.), by and through their undersigned counsel, to submit this statement of

material facts in support of their contemporaneously filed Motion for Summary

Judgment, as required by LR 56.1:

**A.    Statement of undisputed material facts related to Counts I-IV --**
**Reed's "Arrest Claims."**

1.    On the evening of Sunday, September 5, 2010, BUPS Officer Julie

Holtzapple received a call from Brian Stefanowicz.  (Exh. B at 5 (BUPS Incident

Report).)[1]

---

[1]    All exhibits are exhibits attached to the Bucknell Defendants'
contemporaneously filed brief in support of their Motion for Summary Judgment.

2.      Mr. Stefanowicz called to report that his daughter, Kelly -- who, at the time, was a second-year student at the University -- was assaulted by a male student early that morning.  (*Id.*)

3.      That evening, Kelly Stefanowicz reported to BUPS and was interviewed by BUPS Officer Holtzapple.  (*See id.* at 5-6.)

4.      When Ms. Stefanowicz arrived at BUPS, she had obvious and significant abrasions and bruising.  (Exh. D (photographs of Ms. Stefanowicz).[2])

5.      During this September 5, 2010 interview, Ms. Stefanowicz reported to Officer Holtzapple that while the two were alone together in Reed Dempsey's dorm room, Reed picked her up and put her on a futon, while she struggled against him.  (Exh. E at 1(transcript of Ms. Stefanowicz's September 5 BUPS interview).)

6.      Ms. Stefanowicz reported to Officer Holtzapple that Reed was on top of Ms. Stefanowicz on the futon, and put her hands above her head.  (*Id.*)

7.      Ms. Stefanowicz reported to Officer Holtzapple that at that point, she was "afraid that something was going to happen."  (*Id.*)

8.      Ms. Stefanowicz reported to Officer Holtzapple that Reed was "pinching" and "punching [her] in inappropriate places."  (*Id.* at 2.)

---

[2]      It is undisputed that photos of Ms. Stefanowicz were taken immediately following the field hockey game.  The Bucknell Defendants are also attaching photos labeled BU 02021-26 as part of Exhibit D, which were undisputedly taken by Ms. Stefanowicz's roommate, Raina Masand, in the early morning hours of September 5, immediately following the incident with Reed.

9.     Ms. Stefanowicz reported to Officer Holtzapple that Reed was "getting off to it" and was "hard."  (*Id.* at 6.)

10.     Ms. Stefanowicz told Officer Holtzapple that she was able to break away from Reed and rushed into the hallway.  (*Id.* at 1.)

11.     Ms. Stefanowicz told Officer Holtzapple that Reed followed her into the hallway and told her to "get back here, and [Ms. Stefanowicz] turned around and . . . five-starred [slapped] him right across the face," telling him to "leave me alone."  (*Id.* at 3.)

12.     Ms. Stefanowicz reported to Officer Holtzapple that Reed then grabbed Ms. Stefanowicz's arms and "tackled" her to the ground.  (*Id.*)

13.     Ms. Stefanowicz reported to Officer Holtzapple that being tackled caused a significant mark on Ms. Stefanowicz's face and shoulder "from when [she] was struggling on the ground."  (*Id.*)

14.     In addition, Ms. Stefanowicz told Officer Holtzapple that she had marks and bruises from Reed on her "inner thigh," "butt," and some marks on her breasts.  (*Id.* at 3-4.)

15.     Ms. Stefanowicz reported to Officer Holtzapple that after this interaction with Reed she went back to her room, where she was still in "shock" and "didn't know what [she] wanted to do."  (*Id.* 6.)

16.     Ms. Stefanowicz also showed Officer Holtzapple text messages that

Reed had sent after this interaction, which Officer Holtzapple photographed:

- Sorry…I'm bleeding in several places and bruises all over...but that ` was unnecessary on my part (2:43:57 AM)

- I honestly feel horrible…I'm so sorry (3:35:45 AM)

- Are you alright? (5:11:17 PM)

(Exh. F (photographs of text messages Reed sent to Ms. Stefanowicz).)

17.     Immediately following this interview, Officer Holtzapple

accompanied Ms. Stefanowicz and her father to Evangelical Hospital in

Lewisburg.  A nurse took 27 photographs of injuries located all over Ms.

Stefanowicz's body.  (Exh. G (photographs of Ms. Stefanowicz's injuries taken at

Evangelical Hospital on September 5).)

18.     Around 11:00 p.m. on September 5, 2010, BUPS Officer Ulmer

contacted Reed and asked whether he would be willing to be interviewed about the

incident with Ms. Stefanowicz.  (Exh. H at 106:4-19 (R. Dempsey deposition

transcript).)

19.     Reed agreed to do so.  (*Id.*)  Officer Ulmer and a colleague picked

Reed up from Smith Hall and took him to the BUPS station for an interview.  (*Id.*)

20.     Officer Ulmer advised Reed that Reed "was not under arrest and that

anytime he felt that he wanted to stop the interview he could and that he was free

to go at any time."  (Exh. B at 7; *see also* Exh. H at 107:12-14.)

21.     During that interview on September 5, 2010, Reed told Officer Ulmer that he and Ms. Stefanowicz were alone in his room for at least a minute.  (Exh. B at 7)

22.     At his deposition, Reed testified that he was alone with Ms. Stefanowicz for "[s]omewhere between two and four" minutes.  (Exh. H at 112:1-18.)

23.     Raina Masand, who was a roommate of Ms. Stefanowicz's, reported to BUPS that in the early morning hours of September 5, 2010 she "heard Kelly screaming and yelling profanities in the hall at someone."  (Exh. I at 2.)

24.     Ms. Masand reported that she found Ms. Stefanowicz in the hall.  Ms. Stefanowicz, according to Ms. Masand, was "extremely upset," injured, and "seemed shaken and angry."  (*Id.*)

25.     According to Ms. Masand's statement to BUPS, Reed approached Ms. Stefanowicz, and Ms. Stefanowicz began to yell at him.  (*Id.*)

26.     According to Ms. Masand, Reed "said something about things getting out of hand and making a mistake."  (*Id.*)

27.     Ms. Masand advised BUPS that Ms. Stefanowicz, in tears, then told her what happened.  (*Id.*)

28.     According to Ms. Masand's statement, Ms. Stefanowicz advised Ms. Masand that Reed carried her to his room, where a few others were already in the room.  (*Id.* at 3.)

29.     Ms. Stefanowicz told Ms. Masand that everyone else left Reed's room, leaving Reed and Ms. Stefanowicz alone, and making Ms. Stefanowicz "uncomfortable."  (*Id.*)

30.     Ms. Stefanowicz told Ms. Masand that she and Reed continued with playful banter until Reed "tried to take advantage of her."  (*Id.*)

31.     Ms. Stefanowicz told Ms. Masand that she fought back and eventually escaped into the hall.  (*Id.* at 3-4.)

32.     Ms. Masand stated that she comforted Ms. Stefanowicz early in the morning of September 5, 2010, and took photos of her injuries.  (*Id.* at 5.)

33.     In his statement to BUPS, Gregory Fast—one of Reed's friends—noted that he was in the hallway discussing the events of the evening with friends. (Exh. J at 1.)

34.     Mr. Fast stated that at some point he went into Reed's room, where he saw Reed and Ms. Stefanowicz wrestling on Reed's futon.  (*Id.*)

35.     Mr. Fast advised that left the room, and about ten minutes later, Reed and Ms. Stefanowicz emerged.  (*Id.*)

36.     Mr. Fast believes he heard Ms. Stefanowicz crying as she walked past his room later that night.  (*Id.*)

37.     Mr. Fast stated that he later spoke with Reed, who "expressed sincere regret."  (*Id.*)

38.     Coach Jeremy Cook is the head coach of the University's women's field hockey team, of which Ms. Stefanowicz was a member.  (Exh. K.)

39.     The women's field hockey team had a game at Princeton University later in the day on September 5, 2010.  In a statement Coach Cook provided to BUPS, he indicated that at the team's pregame meeting at Princeton University on September 5, 2010, Ms. Stefanowicz "was in obvious distress physically and emotionally." (*Id.*)

40.     Coach Cook noticed that Ms. Stefanowicz had a large facial injury, "and she was visibly upset." (*Id.*)

41.     After Coach Cook questioned her, Ms. Stefanowicz said that she was "assaulted by a male student in her dorm hall (Smith) the night before." (*Id.*)

42.     After the game, Ms. Stefanowicz spoke in more detail with Coach Cook, identified Reed Dempsey as her assailant, and "revealed significant bruising in various other parts of her body (other than the very visible facial injuries)." (*Id.*)

43.     Ms. Stefanowicz also submitted a written statement to BUPS on September 6, 2010  (Exh. L (written statement of Ms. Stefanowicz).)

44.     In that written statement, Ms. Stefanowicz stated that after others who were in Reed's room with them left, things turned from "funny and joking" to "scary and dark":

> Reed pinned me down on his futon, pinning my arms above my head by the wrists, and this is when I noticed he was aroused.  I struggled to free myself as Reed repeatedly punched me with his closed fists in my groin and chest.  He had also been pinching and slapping/scratching my backside (butt) throughout our fight.  I began to slap, hit, punch, and knee Reed in the groin to fight him off.  He said "I wanted to" and that I was a "huge bitch" for resisting him.

(*Id.* at 2.)

45.     In her written statement, Ms. Stefanowicz indicated that she was able to free herself from Reed only after she and Reed fell to the floor.  (*Id.*)

46.     According to Ms. Stefanowicz's statement, Reed followed her into the hallway, where Ms. Stefanowicz "angrily slapped him and told him to leave [her] alone."  (*Id.*)

47.     According to Ms. Stefanowicz's statement, Reed then "forced [Ms. Stefanowicz's] arms behind [her] back and tackled [her] face-first to the ground."  (*Id.* at 3.)

48.     Ms. Stefanowicz's September 6, 2010 statement also said that Reed "pinned [her] to the ground."  (*Id.*)

49.     By September 7, 2010, BUPS had information from Kelly Stefanowicz, her coach, her father, her roommate, and others stating that she had

been assaulted by Reed.  Additionally, Ms. Stefanowicz had visible bruising and injuries, which were confirmed at Evangelical Hospital.  (Exh. B at 5-10; Exh. G.)

50.     On September 7, 2010, Officer Holtzapple filed a criminal complaint against Reed, charging him with the following crimes:

- Simple assault (18 Pa.C.S. § 2701(a)(1));

- Harassment (18 Pa.C.S. § 2709(a)(1)); and

- Disorderly conduct (18 Pa.C.S. § 5503(a)(4)).

(Exh. M (criminal complaint filed on September 7).)

51.     On September 7, 2010 Officer Holtzapple delivered the investigation file to Union County District Attorney Pete Johnson.  (Exh. N (e-mail chain from J. Holtzapple to J. Ettinger).)

52.     This file included the incident report and all witness statements.  (*Id.*; *see also* Exh. O (J. Friedberg Dep. at 118:2-6).)

53.     Officer Holtzapple delivered this material in advance of a meeting between DA Johnson and Ms. Stefanowicz.  (Exh. N.)

54.     On September 7, 2010, Ms. Stefanowicz met with DA Johnson.  (Exh. P at 40:19-24 (K. Stefanowicz deposition transcript).)

55.     During that meeting, DA Johnson discussed the criminal charges against Reed, and Ms. Stefanowicz recounted the incident that formed the basis of those charges.  (*Id.* at 41:1-8.)

56.     On September 9, 2010, Ms. Stefanowicz and her parents met with various University officials, including President John Bravman and BUPS Chief Jason Friedberg.  (*Id.* at 42:21-43:6.)

57.     During that meeting, Ms. Stefanowicz learned that Reed's temporary suspension from campus—which had been imposed earlier in the week—was lifted due to a "no-contact" condition of his bail.  In other words, Reed was ordered by the court to have no contact with Ms. Stefanowicz, but was permitted to return to campus.  (Exh. O at 89:7-17.)

58.     Witnesses at the September 9 meeting reported that when Ms. Stefanowicz learned that Reed was being permitted to return to campus, she became hysterical.  (*Id.* at 43:15-44:15; Exh. C at 50:13-54:22.)

59.     President Bravman specifically testified that Ms. Stefanowicz was "extremely upset . . . sobbing, and we had to help her, you know, calm down." (Exh. Q at 45:1-8 (J. Bravman deposition transcript).)

60.     Ms. Stefanowicz went on to verbalize her fear of Reed, and further emphasize the sexual component of his conduct.  (Exh. O at 91:6-8; Exh. Q at 43:10-45; Exh. R at 50:24-51:25 (W. Bromfield deposition transcript).)

61.     Based on Ms. Stefanowicz's reaction -- and in the interest of the ongoing investigation -- Ms. Stefanowicz was asked to submit to another interview at BUPS.  (Exh. R at 55:2-16.)

62.     Chief Friedberg specifically explained that he asked Ms. Stefanowicz to be interviewed again that night because she expressed during the meeting, in no uncertain terms and in much more detail than she had expressed on September 5, that she feared Reed.  (Exh. O at 91:20-92:14.)

63.     Ms. Stefanowicz had not specifically expressed this fear of Reed during the September 5 interview. (*Id.*)

64.     On the evening of September 9, 2010, Detective Jeffrey Ettinger (BUPS) conducted a follow-up interview of Ms. Stefanowicz.  (Exh. S (transcript of Ms. Stefanowicz's September 9 interview).)

65.     The interview was both recorded and transcribed.  (*Id.*)

66.     During this second interview, Ms. Stefanowicz described her version of how the incident began in her room.  (*Id.* at 7.)

67.     Ms. Stefanowicz advised BUPS that Reed "was touching [Ms. Stefanowicz] in inappropriate places," and Ms. Stefanowicz was telling him to stop.  (*Id.*)

68.     Ms. Stefanowicz said that Reed "was pinching my rear end" her breasts, and "my inner thighs."

69.     Ms. Stefanowicz advised BUPS that after one of Ms. Stefanowicz's roommates, who was trying to sleep, made her presence known, Reed told Ms. Stefanowicz, "[Y]ou're coming with me."  (*Id.*)

70.     Ms. Stefanowicz advised BUPS that Reed then picked Ms. Stefanowicz up and took her down the hall to his room.  (*Id.*)

71.     Ms. Stefanowicz advised BUPS that once at his room, Reed "took me off his shoulders and sat me on his lap," placing his arms around Ms. Stefanowicz. (*Id.*)

72.     Ms. Stefanowicz advised BUPS that other students in the room then left, leaving Ms. Stefanowicz and Reed alone.  According to Ms. Stefanowicz, the mood changed and she "was really scared."  (*Id.*)

73.     Ms. Stefanowicz advised the BUPS that this shift in mood was quick: "The door was shut and it was boom, it happened."  (*Id.* at 18.)

74.     Ms. Stefanowicz told Detective Ettinger that once they were alone Reed put her on the futon, "pinn[ing] my wrists above my head."  (*Id.* at 7.)

75.     Ms. Stefanowicz advised BUPS that Reed was on top of Ms. Stefanowicz, and she that noticed Reed had an erection.  (*Id.*)

76.     Ms. Stefanowicz advised BUPS that she felt Reed's erection in her "stomach, slash, my vagina."  (*Id.* at 14.)

77.     Ms. Stefanowicz advised BUPS that during this interaction Reed said things like, "[Y]ou know you want it."  (*Id.*)

78.     Ms. Stefanowicz advised BUPS that when she noticed Reed's erection she was very concerned, wondering, "[W]hat the hell's going, happening here?" (*Id.* at 14-15.)

79.     Ms. Stefanowicz estimated the incident lasted "5 to 7 minutes." (*Id.* at 18.)

80.     Ms. Stefanowicz advised BUPS that she was able to free herself from Reed and leave the room, but Reed followed her, saying, "[G]et back here." (*Id.* at 8.)

81.     Ms. Stefanowicz advised BUPS that after she tried to get away from Reed, Reed "just snapped, and he took my arms behind my back and tackled me to the ground, . . . face first." (*Id.*)

82.     Ms. Stefanowicz told Detective Ettinger that she was "[p]etrified during this encounter." (*Id.* at 10.)

83.     Given Reed's control of her and his sexual arousal, Ms. Stefanowicz told Detective Ettinger that she felt that Reed was going to rape her. (*Id.* at 11.)

84.     Later that same night -- September 9, 2010 -- Officer Holtzapple began preparing new charges against Reed based on the information provided during Ms. Stefanowicz's second interview. (Exh. B at 17.)

85.     Specifically, Officer Holtzapple added one count each of indecent assault and unlawful restraint to the charges already filed on September 7.  (*Id.* at 17-18.)

86.     On Friday, September 10, 2010, Chief Friedberg, Detective Ettinger, and Officer Holtzapple met with DA Johnson to discuss the case against Reed and the new information alleged by Ms. Stefanowicz.  (*Id.* at 19.)

87.     As a result of that meeting, DA Johnson accepted additional charges against Reed for indecent assault, but recommended that the charge of unlawful restraint be changed to false imprisonment.  (*See id.* at 18-20 (noting that Officer Holtzapple prepared a charge for unlawful restraint, but after meeting with the district attorney amended that charge to be false imprisonment); Exh. T at 73:1-3 (J. Holtzapple deposition transcript).)

88.     Later that day, Officer Holtzapple filed a new criminal complaint against Reed, charging him with one count of each of the following:

- False imprisonment (18 Pa.C.S. § 2903(a));

- Simple assault (18 Pa.C.S. § 2701(a)(1));

- Indecent assault (18 Pa.C.S. § 3126(a)(1));

- Disorderly conduct (18 Pa.C.S. § 5503(a)(4)); and

- Harassment (18 Pa.C.S. § 2709(a)(1)).

(Exh. U (criminal complaint filed September 10 (BAM000263-68).)

89.     On September 14, 2010, while the criminal charges were pending against Reed, Ms. Stefanowicz filed internal student conduct charges against him, including for sexual misconduct.  (Exh. V (letter of September 14 from Ms. Stefanowicz to Dean Conrad); Exh. W (letter of September 14 from Dean Conrad to R. Dempsey).)

90.     Reed responded in kind the next day (September 15) by filing internal, student-conduct charges for sexual misconduct against Ms. Stefanowicz.  (Exh. X (letter of September 15 from R. Dempsey to Dean Conrad).)

91.     Ms. Stefanowicz then filed a lawsuit against the University, seeking a preliminary injunction to suspend the student-conduct hearing given the pendency of the criminal charges against Reed.  *Stefanowicz v. Bucknell University*, No. 10-cv-2040 (Kane, C.J.).  The Court denied Ms. Stefanowicz's petition for preliminary injunction, and Ms. Stefanowicz later discontinued her suit against the University.  (*Stefanowicz* Docs. 12, 18.)

92.     The University held a hearing on both sets of student conduct charges from October 5-7, 2010.

93.     As a result of that hearing, both Reed and Ms. Stefanowicz were found "responsible" for disorderly conduct based on their conduct in the residence hall hallway.  (Exh. Y (letters of October 8 from J. Mickanis to Ms. Stefanowicz and R. Dempsey, respectively).)

94.     In addition to requiring that both students move to different (separate) residence halls, the University issued a letter of censure to both students.  (*Id.*; Exh. Z (letters of censure of October 19 from J. Mickanis to Ms. Stefanowicz and R. Dempsey, respectively)).

95.     Reed and Ms. Stefanowicz were found "not responsible" for all other student conduct charges filed by the other.  (Exh. Y).

96.     On October 29, 2010, DA Johnson withdrew the criminal charges against Reed.  (Exh. AA (e-mail from D. Surgala to Pres. Bravman and others).)

97.     In a public statement, DA Johnson stated, "The nature of the alleged crime and the surrounding circumstances make it difficult to prove what happened beyond a reasonable doubt."  (Exh. BB at 1 ("Sex case against BU student dropped," *The Daily Item*).)

98.     Steven Becker, Reed's criminal defense attorney, testified that in his view DA Johnson did not withdraw the charges for lack of probable cause or because he believed Reed was innocent:

> [B]y dismissing the case he [DA Johnson] wasn't saying that Reed was innocent, I think he was impliedly saying that he was dismissing the case because it would be a difficult case to prove, that it was at least that, you know, and he wasn't committing himself to the innocence part.

(Exh. CC at 114:9-14.)

**B.      Statement of undisputed material facts related to Reed's remaining state law claims.**

99.     Reed Dempsey has asserted a fraud claim.  Based on the Court's Memorandum and Order of May 3, 2012, Reed's pending fraud claim has been limited solely to his allegation that, on September 6, 2010, "Defendant Ulmer told Plaintiff Reed that [Ms. Stefanowicz] had not pressed charges against him."  (Doc. 31, at 30; *see also* Doc. 1 ¶ 506.)

100.    In fact, no criminal charges had been filed as of September 6, 2010. (Exh. M (charges filed on September 7, 2010).)

101.    When asked about this fraud allegation at his deposition, Reed confirmed that no criminal charges had been filed against him as of September 6, 2010.  (Exh. H at 200:12.)

102.    Reed Dempsey also asserts a breach of contract claim.  Judge Kane narrowed this claim as well, ruling that the only breach of contract theory that could move forward toward summary judgment was Reed's claim that "Defendant Bucknell breached the Student Handbook by failing to turn over some of the information that Plaintiff Reed requested" before the student conduct hearing to move forward.  (Doc. 31, at 35; *see also* Doc. 1 ¶ 526(d).)

103.    Bucknell's Student Handbook does not entitle a student to receive all information he requests before a student conduct hearing.  Rather, the Handbook explains that students shall receive "[a] copy of the charge(s) *and supporting*

*information*, including the Public Safety Information Report, Police Report, Housing and Residential Life Information Report, and statements from any witnesses." (*See* Exh. EE (emphasis added) (excerpt from the University's 2010-11 Student Handbook).)

104.   This information "will be released [to the student parties] when appropriate, generally not more than five (5) days prior to the hearing." (*Id.*)

105.   When Reed was first notified of the charges against him on September 14, Reed was provided with a copy of Ms. Stefanowicz's "statement of charges." (Exh. FF (letter of September 14 from Dean Conrad to R. Dempsey).)

106.   On September 23, almost two weeks before the hearing, Reed received the following documents from the University:

- Copies of his and Ms. Stefanowicz's written statements;

- The relevant portion of BUPS's incident report (redacted in part because of the Family Educational Rights and Privacy Act (FERPA));

- Photographs of Ms. Stefanowicz; and

- Written witness statements of 11 other witnesses.

(Exh. GG (memo of September 23 from Dean Conrad to R. Dempsey).)

107.   Reed acknowledged at his deposition that he received all of this information. (Exh. H at 170:1-4.)

108.   Apart from the information Reed himself received, the University's General Counsel provided Reed's attorney with an unredacted version of the

incident report (as of September 7).  (Exh. HH (incident report received and produced by S. Becker).)

109.   On September 30, 2010, five days before the hearing, Reed received the following additional documents:

- Transcription of Ms. Stefanowicz's September 9 interview (with Det. Ettinger);

- Written statement of Rebecca Neubauer;

- DVD of the September 5 field hockey game between Bucknell University and Princeton University;

- Additional photographs of Ms. Stefanowicz; and

- A copy of the report from Ms. Stefanowicz's September 5 medical evaluation at Evangelical Hospital.

(Exh. II (memorandum of September 30 from Dean Conrad to R. Dempsey).)

110.   Reed testified that although he received all of the foregoing information before the student conduct hearing, he did not receive requested audio recordings of interviews, additional photographs of Ms. Stefanowicz, and handwritten notes of Officer Fisher.  (Exh. H at 172:13-173:23.)

111.   Reed also testified that he was not entitled to everything he requested, including Officer Fisher's notes.  (*Id.* at 176:8-11.)

112.   Reed has also asserted a claim for intentional infliction of emotional distress ("IIED").

113.   Reed has not "received any sort of medical, psychological, or other treatment as a result of th[e] incident" between him and Ms. Stefanowicz or the criminal and student conduct charges that followed.  (*Id.* at 218:11-14.)

114.   Reed has not "suffer[ed] any physical injury."  (*Id.* at 218:17-18.)

115.   Reed has not produced any medical evidence, or any evidence at all, to support his IIED claim.

116.   The incident underlying this case occurred at the beginning of Reed's second year at the University.  (*See id.* at 12:4-6.)

117.   Reed graduated from the University *cum laude* in May 2013. (Exh. JJ (undergraduate transcript of R. Dempsey).)

118.   Throughout each of his four years, Reed was active in various extra-curricular activities, including honors societies and club organizations.  (Exh. H at 16:4-45:16.)

119.   Reed also was an active member of the Phi Kappa Psi fraternity, which he pledged and was initiated into in the fall of 2010.  (*Id.* at 18:8-11, 25:20-26:9.)

120.   Just months after the incident with Ms. Stefanowicz, Reed participated in "Legacy Links," which is a University-recruitment program aimed at connecting with children of University alumnae.  (*Id.* at 21:21-22:6, 27:18-28:10.)

121.    In January 2011, Reed's fraternity named him as the kitchen manager, where he managed "an $80,000 budget per semester" in addition to other supervisory duties. (*Id.* at 23:8-23, 27:6-17.)

122.    In Reed's third year (2011-12), he became president of the club lacrosse team. (*Id.* at 36:11-37:16.)

123.    Reed was offered a job with the University's Recreation Services and Club Sports office, which Reed accepted. (*Id.* at 43:13-44:14.)

124.    For calendar year 2012, Reed served as the treasurer of his fraternity. (*Id.* at 37:17-38:8.)

125.    Reed was also elected as president of the International Relations Honor Society at Bucknell. (*Id.* at 40:5-42:6.)

126.    In the summer of 2012, Reed studied at the London School of Economics. (*Id.* at 38:19-39:21.)

127.    During his final year at the University, Reed served as the co-director of the Senior Gift Drive, in which he "tr[ied] to convince students to give their first financial contribution, you know, before they graduate." (*Id.* at 44:18-45:13.)

128.    Reed has not applied to any law schools, and does not have any intention of doing so in the near term. (*Id.* at 12:19-13:15.)

129.    Reed has testified that he needs "to take a break . . . from school," for reasons unrelated to this litigation. (*Id.* at 13:16-20; 15:3-7.)

Case 4:11-cv-01679-MWB Document 127 Filed 05/29/14 Page 22 of 23

130.   Just over a month after his deposition concluded -- and before he graduated from Bucknell -- Reed successfully landed a full-time job as a legal assistant at the Washington office of Covington & Burling LLP, Reed's top choice. (Exh. KK (letter of March 29, 2013, from Covington & Burling LLP to R. Dempsey); Exh LL at 17:23-19:13 (J. Dempsey deposition transcript).)

                              Respectfully Submitted,

Dated:  May 29, 2014          /s/ Amy C. Foerster
                              Amy C. Foerster, Esquire  (PA77986)
                              Bucknell University
                              1 Dent Drive
                              Lewisburg, Pennsylvania 17837
                              acf012@bucknell.edu – (570) 599-1149

                              James A. Keller, Esquire (PA78955)
                              Cory S. Winter, Esquire (PA306552)
                              Saul Ewing LLP
                              2 North Second Street, Seventh Floor
                              Harrisburg, Pennsylvania 17101
                              jkeller@saul.com – (215) 972-1964
                              cwinter@saul.com – (717) 257-7562
                              *Counsel for the Bucknell Defendants*

208946.4 05/29/2014

## <ins>CERTIFICATE OF SERVICE</ins>

I hereby certify that on the date set forth below I caused a true and correct

copy of the forgoing *Statement of Material Facts* to be served upon the following

via the Court's ECF system:

Dennis E. Boyle, Esquire
Megan E. Schanbacher, Esquire
Boyle Litigation
4660 Trindle Road, Suite 200
Camp Hill, Pennsylvania 17011
*Counsel for Plaintiff*

Mark T. Perry, Esquire
Timothy J. Holland, Esquire
The Perry Law Firm, LLC
305 Linden Street
Scranton, Pennsylvania 18503
*Counsel for Anthony J. Voci, Jr.*

Dated:  May 29, 2014                    /s/ Cory S. Winter
                                        Cory S. Winter