**IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **REED C. DEMPSEY,** | **: NO:  4:11-CV-1679** |
| **Plaintiff** | **:** |
| | **: JUDGE BRANN** |
| **v.** | **:** |
| | **:** |
| **BUCKNELL UNIVERSITY,** *et al.* | **: CIVIL ACTION - LAW** |
| **Defendants** | **: JURY TRIAL DEMANDED** |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT,
<u>ANTHONY J. VOCI'S MOTION FOR SUMMARY JUDGMENT</u>**

**BOYLE LITIGATION**

**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Megan E. Schanbacher, Esquire**
Supreme Court I.D. No. 306958
4660 Trindle Road, Suite 102
Camp Hill, PA  17011
Phone:  (717) 737-2430
Fax:  (717) 737-2452
Email: deboyle@boylelitigation.com
        mschanbacher@boylelitigation.com

Counsel For:  Plaintiffs

Dated:  June 16, 2014

## <u>TABLE OF CONTENTS</u>

<u>Page:</u>

TABLE OF AUTHORITIES........................................... iii

I.    PROCEDURAL HISTORY....................................... 1

II.   COUNTERSTATEMENT OF FACTS.............................. 2

    A.    The Events During the Early Morning Hours of September 5, 2010............................................... 2

    B.    The Later Morning Hours of September 5, 2010................. 6

    C.    The Afternoon of September 5, 2010......................... 7

    D.    The BUPS Investigation.................................... 8

        1.    Kelly's First Interview with BUPS Officials Following the September 5, 2010 Incident.......................... 8

        2.    Reed's First Interaction with BUPS Officials Following the September 5, 2010 Incident.......................... 9

        3.    BUPS Receive Statements from Multiple Witnesses. ...... 10

    E.    Attorney Voci's Entry of Appearance on Behalf of the Stefanowiczs............................................. 11

        1.    Attorney Voci Meetings and Interview Sessions........... 11

        2.    Attorney Voci's Constant Communication with Bucknell University Officials:......................... 13

III.   ARGUMENT. ............................................. 15

A.     Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B.     Defamation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

      1.     Defendant Voci's statements were of a defamatory character... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      2.     Defendant Voci's statement were published. . . . . . . . . . . . . 20

      3.     Defendant Voci's statements apply to Reed Dempsey. . . . . . 20

      4.     Defendant Voci's defamatory statements were clear in meaning and understanding by the readers and listeners in this case to be in reference to Reed Dempsey... . . . . . . . . . 21

      5.     Reed suffered special harm due to Defendant Voci's statement, and the statements qualify as defamation per se.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.     Defendant Voci's statements are not conditionally privileged, as they were not made in the course of judicial proceedings, and they amount to an abuse of any potentially existing privilege because they were actuated by malice and negligence.. . . . . . . . . . 24

D.     Tortious Interference with Contract. . . . . . . . . . . . . . . . . . . . . . . . . 29

IV.   CONCLUSION:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## TABLE OF AUTHORITIES

**Statutes and Rules:**                                          **Page(s):**

42 Pa.Cons.Stat.Ann. § 8343(a)(1)-(7) (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. Rule Civ. Proc. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Fed. Rule Civ. Proc. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Cases:**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). . . . . . . . . . . . . . . . . . . . 16

*Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986). . . . . . . . . . . . . . . . . 15

*Bakare v. Pinnacle Health Hospitals, Inc.*,
469 F.Supp.2d 272, 294 (M.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) . . . . . . . . . . . . . . . . . . . . . . 15

*Clemente v. Espinosa*, 749 F.Supp. 672, 677
(E.D. Pa. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Corabi v. Curtis Publ. Co.*, 273 A.2d 899, 907 (Pa. 1971). . . . . . . . . . . . . . . . . . 17

*Corrections U.S.A. v. McNany*, 892 F.Supp.2d 626,
641 (M.D. Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 34, 36

*Cosgrove Studio & Camera Shop, Inc. v. Pane*,
182 A.2d 751, 753 (Pa. 1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Hopkins v. GNC Franchising, Inc.*, 288 Fed. Appx.
871, 873-74 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Krohcalis v. Insurance Co. of North America*,
629 F.Supp.1360, 1363 (M.D. Pa. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996). . . . . . . . . . . . . . 24, 26

*Rankin. v. Phillippe*, 211 A.2d 56, 58 (Pa. Super. Ct. 1965). . . . . . . . . . . . . . . 24

*Richmond v. McHale*, 35 A.2d 779 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 29

*Swartley v. Hoffner*, 734 A.2d 915, 919
(Pa. Super. Ct. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570,
579-580 (E.D. Pa. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21, 22

*Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Trivedi v. Slawecki*, No. 4:11–CV–02390, 2012 WL
5987410, at *1, *2 (M.D. Pa. November 28, 2012). . . . . . . . . . . . . . . . . . . . . 24, 26

*U.S. Healthcare, Inc. v. Blue Cross of Greater
Philadelphia*, 898 F.2d 914 (3d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Other Authorities:

Restatement, Torts § 596. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## I.   PROCEDURAL HISTORY:

On September 6, 2011, Reed Dempsey and Shelley Dempsey filed a Complaint in the United States District Court for the Middle District of Pennsylvania. (Compl., Doc. 1).   After Motions to Dismiss were filed by the Bucknell Defendants and Defendant Voci, respectively, the Honorable Judge Kane permitted Reed to pursue the following claims against Defendant Voci: Count VII: Defamation, Count XIV: Tortious Interference with Contract, and Count XVI: Intentional Infliction of Emotional Distress.  (Doc. 31, Mem. p. 47-48).   On May 29, 2014, Defendant Voci filed a Motion for Summary Judgment and a Memorandum of Law in Support of the Motion for Summary Judgment.   (Doc. 124).   In response to Defendant Voci's Memorandum of Law in Support of his Motion for Summary Judgment, Plaintiff submits this Brief in Opposition to Defendant Voci's Motion for Summary Judgment.

## II.   COUNTERSTATEMENT OF FACTS:

While the Bucknell Defendants and Defendant Voci have consolidated their versions of the "undisputed facts", Plaintiff does dispute some of the "undisputed facts" and therefore provides the Court with the following Counterstatement of Facts.

### A.   The Events During the Early Morning Hours of September 5, 2010.

At approximately 2:00 a.m. on Sunday, September 5, 2010, Kelly Stefanowicz ("Kelly") and Reed Dempsey ("Reed") engaged in "play-fighting" in Kelly's room in Smith Hall dormitory, while Raina Masand, one of Kelly's roommates, Morgan Slade, and Demitri Carahalios were present. [1]Bucknell Defendants' Exh. S pg. 4-6. Eventually, Raina Masand asked everyone to leave the room.  Exhibit "A", Reed's Dep. Trans. 2/20/13 p. 54:5-6.[2]  Kelly and Reed then carried their "play-fighting" over to Reed's room.  Exhibit "A" p.54-55.  When Kelly and Reed arrived at Reed's room, Reed's roommate, Wade Payson-Denney, and Wade's friends, Gabriella Ors,

---

[1] All references to Bucknell Defendants Exhibits refer to the Exhibits filed in Support of their Motion for Summary Judgment previously filed with this Court.

[2] Exhibits referencing deposition transcripts only contain the pages specifically cited.  Should the Court wish a complete copy of any transcript, one will be provided.

were already in the room.  Exhibit "A" p. 56.  At some point, Greg Fast came into Reed's room.  Exhibit "A" p. 56.

While in Reed's room, Reed was sitting on the futon, while Kelly sat on Reed's lap. *Id*. p. 57.  As Reed was talking to Wade and Gabriela about the night, Kelly "continued poking [Reed] in the arm, trying to get [him] to start back what was in [Kelly's] room." *Id*. p. 58.  At one point, while Wade, Gabriela, and Greg were still in the room, "[Kelly] pushed it even further and sat on top of [Reed] and pushed [his] arms down to [his] side against the futon."  As Kelly was sitting on top of Reed, he was "looking around her, trying to continue [his] conversation." *Id*. p. 61.

At some point, Wade escorted Gabby home, leaving Greg, Reed, and Kelly together in Reed's room. *Id*. p. 62.  Eventually, Greg left Reed's room, leaving Reed and Kelly alone, as Kelly sat on Reed's lap." *Id*.  At this time, Reed and Kelly were "talking and joking around, being silly about the night." *Id*..  Without resistance from Reed, Kelly turned and pushed Reed over on the futon onto his back. *Id*. 63.  "[Kelly] had her hands on [Reed's] hands . . . kind of hands on [his] wrists, pushing [him] down against the futon."  After about a minute of Kelly being on top of Reed, Reed Reed tried to move Kelly off of him. *Id*. p. 65.  In the meantime, Greg had returned to the room and saw Kelly on top of Reed.  Greg left after he realized neither Reed

nor Kelly was paying attention to him.  Bucknell Defendants' Exh. J, Statement of Gregory Fast.

As Reed attempted to push Kelly off of him, Kelly's leg knocked Reed's Brita water pitcher off of an adjacent coffee table, spilling it "all over the ground."  Exhibit "A" p.65.  Consequently, Reed asked Kelly to leave, which she did.  *Id*. p.65-66. After cleaning up the water, Reed followed Kelly into the hallway, where he began conversing with several people, including Kelly.  *Id*. p.66-67.  During these conversations, Kelly "tried to incite again, this time a little more forcefully . . . [by] pok[ing] [Reed's] arm or kind of shov[ing] [him]."  *Id*. p.68.  After Reed poked her back, "she pushed a lot harder, and [Reed] actually . . .ran down the hall, thinking [he] could kind of get away from it."  *Id*. p.68.  However, Kelly chased after him and began pushing Reed harder and then "hit [Reed] in the genitals."  *Id*. p.69.

In an effort to prevent Kelly from hitting him again, Reed gave her a "bear hug".  Bucknell Defendants' Exh. B, p. 7 of 24, item 5.  Kelly started to flail her arms. Kelly and Reed fell to the ground, causing a "brush burn to [Kelly's] face and shoulder from hitting the carpet."  Bucknell Defendants' Exh. B, p. 7 of 24, item 5. Once Kelly got up, "she tried to push [Reed] again" in a manner that Reed acknowledged as "still just playful" because "she had been laughing".  Exhibit "A"

p. 70.   At this point the Resident Advisor, Michael Sena ("R.A. Sena"), observed Kelly on the floor with red marks on her left eye, her shoulder, and one more on her left hand.   Bucknell Defendants' Exh. B pp. 10-11, item 11.   Kelly then ran up to Reed, slapped him again, and called him "pussy lips." *Id*.   R.A. Sena then instructed Reed to return to his room, while Kelly tried to fight through R.A. Sena in an attempt to get to Reed.   Consequently, R.A. Sena "restrained Kelly by holding both of her arms." *Id*.

R.A. Sena then escorted Kelly back to her room where Kelly's roommates met them. *Id*.   After walking back from Kelly's room, R.A. Sena observed Kelly pass by him in the hallway and jokingly shout, "Nobody makes me bleed my own blood!" *Id*. R.A. Sena again asked her what had happened.   *Id*.   Kelly responded by shouting "Reed [is] a 'Pussy Lips' and that he could suck [her] 'Big fat black cock.'"   *Id*.   As R.A. Sena was trying to get more information from Reed and Kelly, Kelly "slapped Reed hard on the face".   *Id*.

After Kelly told R.A. Sena that they had just been goofing around, Kelly said she didn't want to file a report and in fact specifically asked R.A. Sena to "shake her hand and promise not to fill out a report" "because she had a game today." *Id*.   R.A. Sena then spoke to Reed about what happened, at which point Reed apologized for

bruising Kelly, but explained, "this had been going on for a year or two, but that they were just playing around and neither of them had sustained any physical injury until tonight." *Id*. Reed then went to his room, where he remained and slept for the night, but not before texting Kelly apologizing for "the rug burn on her face". Exhibit "A" p. 78.

### B.   The Later Morning Hours of September 5, 2010:

At 7:45 a.m. on Sunday, September 5, 2010, Bucknell University's Field Hockey Team departed for an away game at Princeton University. Bucknell Defendants' Exh. K, Written Statement of Coach Jeremy Cook p.1. When Kelly was on the bus she told her teammates that she "hit [her] head on [her] ceiling." [3]Exhibit "B", Audio recording of Kelly's first interview at 21:35-21:38. It was not until the team's pregame meeting that Coach Cook noticed the scrapes and bruises on Kelly's "forehead down to her jaw line". Bucknell Defendants' Exh. K p.1. After the pregame meeting, Kelly told Coach Cook that "she had been assaulted by a male student in her dorm hall (Smith) the night before." *Id*. After the game, Kelly

---

[3]  A CD of the audio recording will be provided to the Court and all counsel via mail.

identified this male student as Reed, and described that the incident occurred around

2 a.m. and "apparently their interaction began in a playful way, but escalated into

physical violence". *Id*. Kelly assured the Coach that "she had tried to defend herself

both vocally and physically." *Id*.


### C.  The Afternoon of September 5, 2010:

Following Kelly's field hockey game at Princeton University, her father

approached her and inquired about the scrapes and bruises on her face. Bucknell

Defendants' Exh. S p.14. Kelly told her father that she "got in a fight with a boy in

[her] hall." *Id*. Kelly's father then took photographs of the marks on her face, wrist,

shoulder, and knee.[4] *Id*. On the bus ride back to Bucknell, Coach Cook put Kelly in

contact with Dean Amy Badal. Bucknell Defendants' Exh. K p.1. While on the

phone, Kelly provided different information than she had to either Coach Cook or her

own father. *Id*. Kelly told Dean Badal that the incident included "inappropriate

sexual advances/contact". *Id*. Dean Badal instructed Kelly to go to the Bucknell

Department of Public Safety and the Lewisburg Police. *Id*.

---

[4] It is undisputed that Kelly played in the field hockey game on September 5, 2010 at Princeton University; it is also undisputed that the photographs taken by Kelly's father on September 5, 2010 were taken after Kelly's participation in the field hockey game.

**D.**    **The BUPS Investigation:**

     **1.**    **Kelly's First Interview with BUPS Officials Following the September 5, 2010 Incident.**

At approximately 8:00 p.m. on Sunday, September 5, 2010, Kelly was interviewed in Chief Friedberg's office at Public Safety. Bucknell Defendants' Exh. B p.5 item 2. The following people were present at this interview session: Officer Julie Holtzapple, Officer Darrell Fisher, Officer Robert Ulmer, Dean Badal, Christine Weiss, one of Kelly's teammates, and Kelly. *Id*. The interview session was recorded. *Id*. For the first time in Kelly's version of events, she stated that while her and Reed were alone in Reed's room, "Reed's penis was erect under his clothes".[5] *Id*. Kelly also said that she screamed for Reed "to get off of her" and "just stop". *Id*. Kelly alleged that she slapped Reed, wrestled him to the floor, landed on top of Reed, and then ran out of his room into the hallway. *Id*.

Kelly claimed that after she ran into the hallway she tried to walk away from Reed, but he grabbed her arms and then tackled her to the ground. *Id*. She said that

---

    [5] At no point prior to this interview did Kelly tell anyone that Reed's penis was erect or that he forcefully held her hands behind her back as she laid on top of his futon. It is important for the Court to note that of the many witnesses who provided written statements to BUPS not one of them observed anything sexual about Kelly and Reed's interaction. (The various statements are referred to throughout this Brief).

Reed stood up and she went to her room.  *Id*.  Kelly told BUPS that she wanted "to proceed with external charges for this assault."  *Id*.  During the interview, Officer Holtzapple told Kelly that Reed "was born this way".  Exhibit "B"at 19:16-:19:18. Officer Holtzapple continued by stating that Kelly "could have saved somebody's life in the future".  Exhibit "B"at 19:56-19:58.  Officer Fisher then chimed in stating that Reed "obviously has a problem".  Exhibit "B" at 20:06-20:07.  The interview session concluded with Kelly being escorted by Dean Badal and Christine Weiss to Evangelical Hospital for photographs and treatment.[6]  *Id*.  Eventually, Officers Holtzapple and Fisher arrived at Evangelical Hospital, where they obtained Kelly's consent to release the photographs taken of her at the hospital.  Bucknell Defendants' Exh. B p.5-6 item 3.

### 2.    Reed's First Interaction with BUPS Officials Following the September 5, 2010 Incident.

At approximately 9:30 p.m. on Sunday, September 5, 2010, Officer Ulmer spoke with Reed on the phone and requested to meet him in front of Smith Hall. Bucknell Defendants' Exh. B p.6 item 4.  When Officer Ulmer met with Reed, he

---

[6] BUPS officers did not document or photograph Kelly's scrapes and bruises at the initial interview prior to Kelly's visit to the Evangelical Hospital, despite being informed that some of the marks resulted from playing field hockey.

informed Reed that "he was a suspect in an ongoing criminal investigation" arising from the events that occurred in Smith Hall during the early morning hours of September 5, 2010. *Id*. Officer Ulmer then instructed Reed not to have any contact with Kelly, and that if he did, then "it could be considered 'Intimidation of a Witness' and he could be charged accordingly." *Id*.

Around 11:00 p.m., roughly an hour and a half after Officer Ulmer's initial call to Reed, Officer Ulmer interviewed Reed. Bucknell Defendants' Exh. B item 5. The following individuals were present for this interview: Officer Ulmer, Detective Fisher, and Reed. *Id*. This interview session *was not* recorded. *Id*.; *see also* Exhibit "C", Ulmer Dep. Trans. p.62:15-24. Before beginning, Reed submitted his written statement about the incident to Officer Ulmer. *Id*. Officer Ulmer read Reed his *Miranda* rights. *Id*. During this interview, Reed provided names of multiple witnesses. *Id*.

### 3.    **BUPS Receive Statements from Multiple Witnesses:**

After the interviews with Kelly and Reed, BUPS obtained both written and oral statements from multiple witnesses, including a written statement from Kelly supplementing her initial interview. Bucknell Defendants' Exh. B p. 7, items 6-11.

10

These statements were received between September 5, 2010 and September 6, 2010. *See generally*, Bucknell Defendants' Exh. B (despite failing to document the receipt of Kristen Brundage's written statement, this Incident Report provides a general listing of witnesses contacted and statements filed).

### E.  **Attorney Voci's Entry of Appearance on Behalf of the Stefanowiczs:**

On September 7, 2010, Defendant Voci's law firm was contacted by Kelly's father, Mr. Stefanowicz, about events that occurred on September 5, 2010 between Reed and Kelly.  Exhibit "P", Voci Dep. Tr. p.13:17-25, p.14:1.  Defendant Voci was retained "to assist [the Stefanowicz family] in answering their questions and facilitating the process by which they would file criminal charges." *Id*. at p. 14:4-6.

### 1.  **Attorney Voci Meetings and Interview Sessions:**

Later on September 7, 2010, Defendant Voci drove to Bucknell University and met with Mr. Stefanowicz and Kelly. *Id*. at p. 21:17-19.  Defendant Voci, Mr. Stefanowicz, Mrs. Stefanowicz (via telephone), and Kelly then met with Pete Johnson, the District Attorney of Union County. *Id*. at p.21:10-23.  Defendant Voci and his clients then met with Bucknell University officials, including Chief Friedberg,

11

Bucknell University's then in-house counsel, Wayne Bromfield, and University President, John Bravman.  *Id*. at p. 26:1-12; *see also Id*. at p. 39:9-15.  Upon learning that Reed was permitted to return to campus,  Defendant Voci expressed his belief that is was "highly improper" for Bucknell University to "allow Mr. Dempsey to be in any proximity, let alone close proximity to Ms. Stefanowicz...." *Id*. at p. 44:9-13. General Counsel Wayne Bromfield then confronted Kelly and Voci with the witness statements contradicting Kelly's story, including R.A. Sena's report and statement. *Id.* at pp 82:22 - 83:9.

In response, Kelly became "emotional," and for the first time claimed that Reed had tried to sexually assault her.  Kelly's previous version of events and her previous interview and written statement did not support filing new sexual assault related charges, and none of the witnesses supported claims of an attempted sexual assault, so the Bucknell Defendants decided to have Kelly re-interviewed to bolster her claims.  At the request of those University officials present at this meeting, Kelly was re-interviewed by Detective Jeffrey Ettinger in the presence of Defendant Voci.  *Id*. at p. 26:11-19; *see also* Bucknell Defendants' Exh. B, p. 16, item 26.

### 2.    Attorney Voci's Constant Communication with Bucknell University Officials:

After the various meetings with Bucknell University Officials, Defendant Voci "was instructed to communicate with Mr. Bromfield and . . . Dean Conrad. *Id*. at p. 48:25, p. 49:1-2.

Throughout these communications, Defendant Voci stated that "the University [is] allowing the *perpetrator of a sex crime* to misuse the internal process to continue to victimize a student/victim. Exhibit "U", Letter from Def. Voci to Dean Conrad of 9/21/10; *see also*, Exhibit "S", Bromfield Dep. T. p. 52:14-18) (emphasis added). Additionally, in Defendant Voci's letter to Bucknell's then-in-house counsel, Wayne Bromfield, Defendant Voci communicated the following statements: (1) "Bucknell University's response . . . reeks of bias and discrimination towards *a female victim of a sex crime*."; (2) "simply to move *the offender* [of a sexual assault] to another dorm 1,000 feet from the victim."; (3) "the University then sought Kelly's approval to have her *attacker* return to campus so that he could take classes."; (4) Reed "has been permitted to file retaliatory charges against his victim, Kelly."; (5) "[b]y proceeding as planned, you will exacerbate the harm by allowing Kelly's *attacker* direct contact with his victim..."; and (6) "[h]ere's the unavoidable and unpleasant truth: when a

13

male college student tries to *force* himself upon a female college student, *it's a sex crime*;".  Exhibit "W",  Letter from Voci to Bromfield of 9/29/10 (emphasis added).

Moreover, Defendant Voci expressed that Bucknell was forcing Kelly to "be cross-examined by her *assailant* less than a month after her attack.  Exhibit "X", Email from Def. Voci to Dean Conrad of 9/29/10, 2:58 p.m. (emphasis added).

Finally, the Defendant then publicized his statements to *The Daily Item* when he stated that Kelly "was told her charges against her *attacker* would be thrown out". Exhibit "Y", *The Daily Item*, Article of 10/6/10 entitled "Teenager faces attack suspect for five hours". (emphasis added).  Collectively, it is the substance of these continual communications that give rise to Reed's defamation and tortious interference with contract claims, respectively.

14

## III.  ARGUMENT:

Defendant Voci's Motion for Summary Judgment should be denied because each of the remaining counts alleged against Defendant Voci involve material facts that are genuinely in dispute and Defendant Voci is not entitled to judgment as a matter of law.

### A.  <u>Summary Judgment Standard</u>:

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (referencing Fed. Rule Civ. Proc. 56(c)).

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (citing Fed. Rule Civ. Proc. 56(a)).  Material facts are those facts "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 248 (1986).

A genuine dispute of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan*, 134 S.Ct. at 1866 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

### B.   <u>Defamation:</u>

This Court should deny Defendant Voci's Motion for Summary Judgment as it relates to Reed's defamation claim because Defendant Voci made non-privileged, public, defamatory statements about Reed.  In the event this Court determines that Defendant Voci's communications were privileged, a reasonable juror could differ whether Defendant Voci abused that conditional privilege, and thus the Motion for Summary Judgement should be denied.

"Under Pennsylvania law, to prevail in a defamation action, the plaintiff has the burden of proving 1) the defamatory character of the communication; 2) its publication by the defendant; 3) its application to the plaintiff; 4) an understanding by the reader or listener of its defamatory meaning; 5) an understanding by the reader or listener of an intent by the defendant that the statement refer to the plaintiff; 6)

16

special harm resulting to the plaintiff from its publication; 7) abuse of a conditionally privileged occasion." *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 579-580 (E.D. Pa. 1999) (referencing 42 Pa.Cons.Stat.Ann. § 8343(a)(1)-(7) (1998)).

### 1.      **Defendant Voci's statements were of a defamatory character.**

A statement or communication is defamatory if it "tends so to harm the reputation of another as to lower him [or her] in the estimation of the community or to deter third persons from associating or dealing with him [or her]." *Id*. (citing *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914 (3d Cir. 1990)). "It is for the court to determine whether the statement at issue is capable of a defamatory meaning." *Id*. at 580. When making its determination, "[t]he court should assess 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Id*. (citing *Corabi v. Curtis Publ. Co.*, 273 A.2d 899, 907 (Pa. 1971)). However, certain communications can be deemed as defamatory *per se*, which is "a question for the court." *Id*. "Defamation *per se* can be either "words imputing (1) *criminal offense*, (2) loathsome disease, (3) business misconduct, or (4)

17

*serious sexual misconduct*." *Id*. (citing *Clemente v. Espinosa*, 749 F.Supp. 672, 677 (E.D. Pa. 1990) (emphasis added)).

In this case, Defendant Voci's communications constitute defamation *per se*. Primarily, in his letter to Dean Conrad,  Defendant Voci expressed that "the University [is] allowing the *perpetrator of a sex crime* to misuse the internal process to continue to victimize a student/victim." Exhibit "U" (emphasis added).  Defendant Voci's use of the phrase "perpetrator of a sex crime" not only imputes Reed with a criminal offense, but more importantly, it associates Reed with a criminal offense involving serious sexual misconduct.  Since this phrase contains words that impute both a criminal offense and a serious sexual misconduct, this Court should find that Defendant Voci's communications in his September 21, 2010 letter to Dean Conrad constitutes defamation *per se*.

Furthermore, Defendant Voci continued to defame Reed through additional letters.   In his letter to Bucknell's then-in-house counsel, Wayne Bromfield, Defendant Voci communicated the following defamatory statements: (1) "Bucknell University's response . . . reeks of bias and discrimination towards *a female victim of a sex crime*."; (2) "simply to move *the offender* [of a sexual assault] to another dorm 1,000 feet from the victim."; (3) "the University then sought Kelly's approval to have

18

her *attacker* return to campus so that he could take classes."; (4) Reed "has been permitted to file retaliatory charges against his victim, Kelly"; (5) "[b]y proceeding as planned, you will exacerbate the harm by allowing Kelly's *attacker* direct contact with his victim..."; and (6) "[h]ere's the unavoidable and unpleasant truth: when a male college student tries to *force* himself upon a female college student, *it's a sex crime*;". Exhibit "W" (emphasis added). Defendant Voci further defamed Reed by sending an email to the Bucknell Board of Trustees accusing Reed of sexually assaulting Kelly, and attaching the September 29,2010 letter to Bromfield. Exhibit "Z", Email from Voci to Trustees of 9/30/10.

In addition, Defendant Voci expressed that Bucknell was forcing Kelly to "be cross-examined by her *assailant* less than a month after her attack. Exhibit "X" (emphasis added). Defendant Voci then publicized his statements to *The Daily Item* when he stated that Kelly "was told her charges against her attacker would be thrown out". Exhibit "Y". Defendant Voci's repeated, prejudicial statements that associate Reed with a sex crime as an "offender", "attacker", "assailant", and a "perpetrator" are highly defamatory as they harmed Reed's reputation not only to his friends, but to his fraternity, his family, and the Bucknell community. Moreover, at the time, these defamatory statements possessed an added prejudicial effect because they were

19

expressed to Bucknell's in-house counsel while Bucknell was conducting its own internal investigation about the allegations of sexual misconduct; and similarly, the statements were published publically while criminal charges were pending against Reed.  Defendant Voci also prejudiced Reed by poisoning the members of the student conduct board, and as a result negatively impacted the procedural rights afforded to Reed via Bucknell's hearing process.  Therefore, this Court should find that these statements are highly defamatory and constitute defamation *per se*.

**2.    Defendant Voci's statement were published**:

It is undisputed that these defamatory statements and remarks were published by Defendant Voci because both the letters and the emails are from "Anthony J. Voci, Jr." and contain his signature.  Exhibits "W", "X", "Y" and "Z".  Defendant Voci acknowledged drafting the documents and making the statements during his deposition.  *See, generally* Exhibit "P".

**3.    Defendant Voci's statements apply to Reed Dempsey:**

"A party defamed need not be specifically named, if pointed to by description or circumstances tending to identify him."  *Cosgrove Studio & Camera Shop, Inc. v.*

*Pane*, 182 A.2d 751, 753 (Pa. 1962).  In this case, the defamatory statements applied

to Reed because the emails and letters explicitly refer to Reed and his involvement

with Kelly during the September 5, 2010 incident.  Exhibit "U", *see also*, Exhibit

"W"and  Exhibit "X".

## 4. **Defendant Voci's defamatory statements were clear in meaning and understanding by the readers and listeners in this case to be in reference to Reed Dempsey.**

"[T]he issue of what the audience understood is normally an issue for the jury

. . . ."  *Synygy*, 51 F.Supp.2d at 583.  In this case, the emails and letters referred to

Reed and Kelly.  Kelly claimed that she was assaulted by Reed on September 5, 2010.

Defendant Voci served as Kelly's counsel and represented her throughout the internal

investigation and hearing board process.  Therefore, when Defendant Voci referred

to Reed as the "perpetrator of a sex crime," "the offender [of a sexual assault]," an

"attacker", and Kelly's "assailant"  (Exhibit "U", *see also*, Exhibit "W" and  Exhibit

"X"), Dean Conrad and Wayne Bromfield not only understood the defamatory

meanings of those statements, but also their reference and application to Reed.

Furthermore, Defendant Voci identified Reed to the Board of Trustees as the subject

of his statements, and the defamatory statements published by *The Daily Item* also identified Reed.

### 5. Reed suffered special harm due to Defendant Voci's statement, and the statements qualify as defamation per se.

"Once a court determines that the statement is capable of defamatory meaning . . . the plaintiff [must] prove that it suffered special harm." *Synygy*, 51 F.Supp.2d at 580. "Special harm requires proof of a specific monetary or out-of-pocket loss as a result of the defamation." *Id.* "While special damages need not be established with a mathematical certainty, they do require a showing of a specific item of damage resulting from the publication." *Id.* at 583. A plaintiff can be relieved of the requirement of proving special damages, however, spoken words constitute defamation *per se*. If the court determines that the statements constituted defamation *per se*, then plaintiff must only show general damages, or "proof that one's reputation was actually affected by the slander or that one suffered personal humiliation." *Id.* at 581.

As discussed above, the Court should find that Defendant Voci's statements rose to the level of defamation *per se*. If the Court finds that the statements were

defamatory *per se*, then Reed's general damages lie within the damage to his reputation. Not only was Reed's reputation tarnished within the Bucknell University community, but it was also damaged among his friends, family, and the general public. Reed was suspended, forced to transfer dormitory halls and adjust to new living arrangements. After being publically called a "perpetrator of a sex crime," "the offender [of a sexual assault]," an "attacker," and Kelly's "assailant," Reed was fighting, and will continue to fight, an uphill battle among his peers, as the prejudicial nature of these statements made it undesirable for students and others to affiliate, communicate, or associate with Reed. Moreover, these statements were also electronically published, and an internet record of these statements and false allegations will exist forever.

If the Court finds that the statements were not defamatory *per se*, then Reed's special damages include Reed's lost earnings as a result of discrimination due to his "sexual predator" label, and due to refused employment by employers, admission by law schools, and opportunities through other gainful employment. *See* Bucknell Defendants' Exh. QQ, Expert Report of Joseph E. Ankus, Esq., "Conclusions", p. 14-15.

### C.     Defendant Voci's statements are not conditionally privileged, as they were not made in the course of judicial proceedings, and they amount to an abuse of any potentially existing privilege because they were actuated by malice and negligence.

"Communications made on a proper occasion, form a proper motive, in a proper manner, and based upon reasonable cause are privileged." *Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996) (internal citations omitted).  "'An occasion is conditionally privileged when the circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know.'" *Rankin. v. Phillippe*, 211 A.2d 56, 58 (Pa. Super. Ct. 1965) (citing Restatement, Torts § 596).  "The court determines whether the occasion upon which the [defendant] published the defamatory matter was privileged." *Id.*  "The defendant carries the burden to prove the privileged character of the occasion on which a defamatory communication was published . . . ." *Trivedi v. Slawecki*, No. 4:11–CV–02390, 2012 WL 5987410, at *1, *2 (M.D. Pa. November 28, 2012).

In this case, Defendant Voci contends that "all letter and/or emails sent by Attorney Voci advocating on behalf of his client must [] enjoy privileged status . . . because all were sent in support of his zealous representation of Kelly in her criminal

24

case as well as the proceeding initiated by Bucknell against Reed."  Def. Voci's Br. In Supp. Of Mot. For Summ. J., p. 26-27.   However, Defendant Voci's statements are not privileged because they were not made "in the course of or pertinent to any stage of judicial proceedings." *Richmond*, 35 A.3d at 784.   Defendant Voci was hired "as an advisor to the Stefanowiczs' with respect to the entire process."  Exhibit "P" p. 18:10-11.  Defendant Voci was not hired by the Stefanowiczs' to serve as an advisor to Kelly during the hearing process because attorneys and members not "within the University community" are prohibited from serving as advisors.   Exhibit "AA", Excerpts from Student Handbook: 2010-11, "Assistance of an Adviser", p. 130. Additionally, the internal hearing process was not even a subject of discussion at that point.    Regardless,  Defendant  Voci's  statements  went  beyond  the  internal investigation and the hearing process, and were ultimately a direct attack on Reed's character.

Defendant Voci's role "was to advise [the Stefanowiczs'] and explain to them what the *criminal process* looked like and assist them."  Exhibit "P" p. 19:10-11. These defamatory statements clearly fall outside the scope of Defendant Voci's representation in the criminal process because the September 21, 2010 letter, September 29, 2010 letter, and September 29, 2010 email all pertain to the internal

hearing board process.  *See* Exhibits "U", "W", "X", "Z".  As all officers of the court are aware, or at least should be aware, being retained as counsel does not provide the unchecked right to say and do whatever counsel wants in the name of "zealous representation."  Defendant Voci was able to represent his client's interests and zealously present her case without publicly defaming Reed. Therefore, Defendant Voci's defamatory statements should not be afforded a privilege because they were not made "in the course of or pertinent to any stage of judicial proceedings.

In the end, "it is the plaintiff's burden to show abuse of a conditionally privileged occasion." *Trivedi*, 2012 WL 5987410 at *2.  "A defendant . . . abuses and, thus, waives the privilege when the 'publication is actuated by malice or negligence, is made for a purpose other than that for which the privilege is given or to a person not reasonably believed to be necessary to the accomplishment of the purpose of the privilege.'" *Id*. (citing *Miketic v. Baron*, 675 A.2d 324, 329 (Pa. Super. Ct. 1996)).

In *Krochalis v. Insurance Co. of North America*, the Mr. Krochalis was a former employee of an insurance company.  Krochalis claimed that after he was terminated his supervisor made defamatory comments about him during a meeting among current employees.  *Krohcalis v. Insurance Co. of North America*, 629

26

F.Supp.1360, 1363 (M.D. Pa. 1985).  The defendants claimed "that [the supervisor's] statements were made for valid business purposes" and thus were subject to a qualified privilege.  *Id*. at 1367.  Mr. Krochalis claimed "that there was an excessive publication constituting an abuse of the qualified privilege because many employees were present at the meeting and heard Malling's comments...."  *Id*.  The court held that the defendants were "not entitled to summary judgment because there are material issues of fact as to whether the privilege was abused."  *Id*.  Specifically, the defendants were not entitled to summary judgment on the ground of qualified privilege because "[w]hether there was an excessive publication is matter of factual dispute for the jury to resolve in determining whether a qualified privilege was abused.  *Id*.

In this case, Defendant Voci abused his privilege by repeatedly defaming Reed to Bucknell officials, Trustees, and the public. His actions amount to excessive publication. More specifically, Defendant Voci  elicited multiple defamatory statements in approximately one week.  See Exhibits "U" , "W" and "Z".[7]  Not only were these defamatory statements published by Defendant Voci through letters emails, and phone calls, Defendant Voci also provided a statement to *The Daily Item*,

---

[7] This is not to say that his defamatory statements were limited to just this time frame, but rather to show the frequency of the defamatory statements.

a newspaper.  The continual references to Reed as a "perpetrator of a sex crime", "the offender [of a sexual assault]", an "attacker", and Kelly's "assailant" evidences malice on behalf of  Defendant Voci.  As in *Krochalis*, this Court should find that these repeated defamatory statements communicated to University officials and the general public should be heard by the jury, and the jury should determine whether Defendant Voci abused his privilege.

Additionally, Defendant Voci was aware that Kelly's story was contradicted by all witnesses.  The witness statements provided by Kelly and Reed's hall mates, including statements from witnesses Kelly said would confirm her story, actually confirmed Reed's version of events.  Additionally, R.A. Sena's report gave a detailed account of what was said and observed on September 5, 2010, and the report also contradicts Kelly.[8]  Kelly and Defendant Voci were confronted with the R.A.'s statement and with her story's inconsistencies, and yet Defendant Voci only intensified his verbal attacks on Reed.  Exhibit "P" pp 82:22 - 83:9.

As Defendant Voci points out, the purpose of the privilege is to enable counsel "'to best represent his client's interests.'"  Def. Voci's Br. In Supp. Of Mot. For

---

[8] In her statement Kelly also claimed that R.A. Sena did not speak to her that evening and refused to get involved, an obviously untrue statement, as a report was filed and R.A. Sena did in fact investigate immediately following the fall in the hallway.

Summ. J., p. 21 (citing *Richmond v. McHale*, 35 A.2d 779 (2012)).  In his deposition, Defendant Voci stated that he was retained by Kelly and the Stefanowiczs "to advise them and explain to them what the criminal process looked like and assist them [with it]."  Exhibit "P" p. 19:5-11.  However, Defendant Voci's defamtory statements had no relationship to navigating the criminal justice system.  As explained above, these statements were highly prejudicial because they imputed Reed with criminal activity and sexual misconduct an before a formal student conduct board weighed the evidence and issued a decision, and before the state criminal justice system could objectively evaluate the claims. Ultimately, this prejudicial impact evidences an abuse of conditional privilege.

Consequently, this Court should deny Defendant Voci's Motion for Summary Judgment as it relates to Reed's defamation claim because a genuine dispute remains as to whether Defendant Voci abused his conditional privilege.

### D.    Tortious Interference with Contract:

This Court should deny Defendant Voci's Motion for Summary Judgment as it relates to Reed's tortious interference with contract claim because a genuine dispute remains as to whether Defendant Voci's actions were purposefully aimed at harming

Reed's existing relationship with Bucknell University and whether Defendant Voci

was afforded a privilege.

"Under Pennsylvania law, the elements of a tortious interference with contract

claim are:

> (1)　the existence of a contractual ... relation between the
> [plaintiff] and a third　party;
>
> (2)　purposeful action on the part of the defendant,
> specifically intended to harm the existing relation ...;
>
> (3)　the absence of privilege or justification on the part
> of the defendant; and,
>
> (4)　the occasioning of actual legal damage as a result of
> the defendant's conduct.

*Bakare v. Pinnacle Health Hospitals, Inc.*, 469 F.Supp.2d 272, 294 (M.D. Pa. 2006)

(internal citations omitted).　"[T]he relationship between a private educational

institution and an enrolled student is contractual in nature...."　*Swartley v. Hoffner*,

734 A.2d 915, 919 (Pa. Super. Ct. 1999).

In this case, Bucknell's Student Handbook created the contractual relationship

between Reed, the Plaintiff, and Bucknell University, the third party.　*See* Exhibit

"AA" p. 1; *see also* Doc. 31,　Doc. 31, p. 33 ("the Court is satisfied that Plaintiffs

have sufficiently pleaded the existence of a contract between Plaintiff Reed and

Defendant Bucknell . . . as contained in the Student Handbook."). This contractual relationship commenced in the Fall of 2009 when Reed began his undergraduate career at Bucknell University. *See* Bucknell Defendants' Exh. JJ , Reed's Undergraduate Transcript. Therefore, the existing contractual relationship element is satisfied.

"The Pennsylvania Supreme Court has held the second and third elements of a tortious interference claim are intertwined: '[t]he absence of privilege or justification in the tort under discussion is closely related to the element of intent.'" *Corrections U.S.A. v. McNany*, 892 F.Supp.2d 626, 641 (M.D. Pa. 2012) (citing *Hopkins v. GNC Franchising, Inc.*, 288 Fed. Appx. 871, 873-74 (3d Cir. 2008)). A standard of whether the defendant's conduct "was 'proper' under the circumstances, rather than whether it was 'privileged'" has been adopted by Pennsylvania under the Restatement (Second) of Torts. *Id.*

In this case, Defendant Voci repeatedly met with and communicated with Bucknell University officials during their internal investigation and throughout the hearing process. These repeated communications with Bucknell University officials caused Reed to be temporarily suspended and interfered with the procedural rights afforded to Reed under the Student Handbook. *See generally*, Exhibit "AA",

31

"Procedure for Adjudicating Alleged Category I Violations", p. 124.  Defendant Voci caused Reed to be suspended, and continually attempted to interfere with Reed's contractual rights by contacting state officials, the Board of Trustees, and various administrators.  Through the multiple communications, Defendant Voci also jeopardized the integrity of the Hearing Board.  *See* Exhibit "AA", "Communication with the Hearing Board", p.127.

Defendant Voci met with Kelly, her parents, Chief Friedberg, Wayne Bromfield, and President Bravman in order "to gain an understanding of what the university's response was going to be in light of the events that had occurred...." Exhibit "P" p. 39:9-20.  Upon learning that Reed was allowed to return to campus after being temporarily removed, Defendant Voci spoke with President Bravman and stated that "any decision by the university that would allow Mr. Dempsey to be in any proximity, let alone close proximity to Ms. Stefanowicz . . . was highly improper." *Id*. at p. 44:9-13.  Defendant Voci continued to interfere with the hearing process and internal investigation through letters, phone conferences, and emails to Wayne Bromfield, Dean Conrad, and the Bucknell administration.  *See* Exhibits "U", "W" and "Z".  Defendant Voci "made inquiries about what would be the outcome of the internal charges," where Dean Conrad explained "that there was processes laid out

in the student handbook and that there would be a hearing." Exhibit "P" pp. 49:22-25, 50:1. When Dean Conrad told Defendant Voci that the "hearing would not take place until after Mr. Dempsey's criminal preliminary hearing," Defendant Voci expressed concern "that that process would disrupt, if not negatively impact, the criminal process by the Union County officials." *Id*. at p. 50:5-19. When Defendant Voci did not like how internal process played out (in accordance with the Student Handbook contract) he repeatedly interfered by contacting the Board of Trustees, making public defamatory statements, and contacting various Bucknell administrators. He even threatened "adverse publicity" and litigation if Reed was not removed from Bucknell. Exhibit "S", Bromfield Dep. T. p. 53:2-7.

Defendant Voci's continual interferences with the internal hearing process and Reed's contractual rights were a clear manipulation designed to have Reed removed from Bucknell and to bolster the external criminal charges, despite his client's obvious lack of credibility. Defendant Voci maintained contact with BUPS to ensure that criminal charges would not be filed against Kelly. Exhibit "V". Furthermore, Defendant Voci magnified his interference with Reed's procedural rights by attempting to postpone the hearing. *See* Exhibit "BB", Voci Affidavit in Support of Plaintiff's Emergency Motion for Preliminary Injunction filed October 2, 2010; *see*

33

*also* Exhibit "CC" Letter from Voci to Bromfield of 10/1/10.  Ultimately, Defendant Voci's conduct was improper under the circumstances and should not be afforded a privilege or any other justification for his harmful actions.

When evaluating "whether a particular course of conduct lacked privilege or justification", the Court considers the following factors:  (1) the nature of the actor's conduct; (2) actor's motive; (3) interests of the other with which the actor's conduct interferes; (4) the interested sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to the interference; and (6) the relations between the parties.  *Corrections U.S.A.*, 892 F.Supp.2d at 641 (internal citations omitted).

In sum, (1) Defendant Voci's conduct was continual and persistently aggressive as he communicated with Bucknell University officials both in-face and via letters and emails; (2) Defendant Voci was motivated to delay University procedures, taint the perception of Reed to Bucknell University officials and the public, and ultimately suspend Reed from Bucknell University; (3) Reed wanted to proceed with the hearing so that he could return to campus, continue taking classes, and continue his extracurricular campus involvements.  Reed also wanted  fair and unbiased members of the Hearing Board while they adjudicated his case.  Reed did not want to be expelled or suspended from Bucknell University because of his positive community

34

involvement and academic successes thus far in his collegiate career; (4) Defendant

Voci, as he stated in his deposition, was solely interested in proceeding with external

criminal charges against Reed and did not want the hearing process to "disrupt, if not

negatively impact, the criminal process by the Union County officials." Exhibit "P",

p. 50:18-19; (5) Defendant Voci's constant communication with Bucknell University

officials began on September 21, 2010 and continued throughout September 2010.

The Hearing Board was set to, and did convene on October 5, 2010. Therefore,

Defendant Voci's conduct and interference with the hearing process and the actual

hearing was fairly proximate; and (6) Defendant Voci and Reed were adversaries as

Defendant Voci was acting on Kelly's behalf and his goal was to verbally attack Reed

and to terminate Reed's relationship with Bucknell.   Defendant Voci's conduct in

this matter lacked privilege or justification.   Therefore, by knowingly violating

University policy, a reasonable jury can find that Defendant Voci's actions lacked a

privilege or justification and were specifically intended to harm Reed's existing

relationship with Bucknell University and its ongoing internal hearing process.

"Under the fourth element, a plaintiff claiming interference with an existing

contractual relationship in Pennsylvania must demonstrate 'lost pecuniary benefits

flowing from the contract itself; other losses, such as emotional distress and loss of

reputation, are consequential harms.'" *Corrections U.S.A.*, 892 F.Supp.2d at 642. In this case, as a result of the continual pressure by Defendant Voci on President Bravman and other Bucknell University officials, Reed was suspended from Bucknell University. Exhibit "Q", Letter from Dean Locher to Reed of 9/6/10. As a result of this suspension, Reed missed classes, was forced to find alternative living off-campus, and was not permitted to participate in extracurricular activities or other school-sponsored events, all of which he had paid for in tuition. Additionally, Reed had to hire counsel for both the criminal case and to protect his interests in terms of his relationship with Bucknell, and counsel to file a response in federal court to contest the Injunction sought by Defendant Voci.

Overall, this Court should deny Defendant Voci's Motion for Summary Judgment as it relates to Reed's tortious interference with contract claim because a genuine dispute remains as to whether Defendant Voci's actions were purposefully aimed at harming Reed's existing relationship with Bucknell University and whether Defendant Voci was afforded a privilege.

## IV.    CONCLUSION:

For the reasons set forth above, the Plaintiff, Reed Dempsey, respectfully requests this Honorable Court deny the Defendant, Anthony J. Voci's, Motion for Summary Judgment.


**BOYLE LITIGATION**

/s/ *Megan E. Schanbacher*
**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Megan E. Schanbacher, Esquire**
Supreme Court I.D. No. 306958
4660 Trindle Road, Suite 102
Camp Hill, PA  17011
Phone:  (717) 737-2430
Fax:  (717) 737-2452
Email: deboyle@boylelitigation.com
        mschanbacher@boylelitigation.com

Counsel For:  Plaintiffs

Dated:  June 26, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date listed below I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following person(s) at the following email address(es):

Amy C. Foerster, Esquire
amy.foerster@bucknell.edu

Mark T. Perry, Esquire
mtp@theperrylawfirm.com

Corey S. Winter, Esquire
cwinter@saul.com

Timothy Holland, Esquire
tholland@theperrylawfirm.com

James Keller, Esquire
jkeller@saul.com

/s/ *Penny A. Rogers*
Penny A. Rogers, Pa.C.P.
Senior Paralegal

Dated:  June 26, 2014