IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


| | |
|---|---|
| **REED C. DEMPSEY,** | **: NO:  4:11-CV-1679** |
| **Plaintiff** | **:** |
| | **: JUDGE BRANN** |
| **v.** | **:** |
| | **:** |
| **BUCKNELL UNIVERSITY,** *et al.* | **: CIVIL ACTION - LAW** |
| **Defendants** | **: JURY TRIAL DEMANDED** |


**PLAINTIFF'S BRIEF IN OPPOSITION TO BUCKNELL
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

BOYLE LITIGATION

**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Megan E. Schanbacher, Esquire**
Supreme Court I.D. No. 306958
4660 Trindle Road, Suite 102
Camp Hill, PA  17011
Phone:  (717) 737-2430
Fax: (717) 737-2452
Email: deboyle@boylelitigation.com
         mschanbacher@boylelitigation.com

Counsel For:  Plaintiffs

Dated:  June 16, 2014

# **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  COUNTERSTATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The events during the early morning hours of September 5, 2010. . . 2

    B.  The later morning hours of September 5, 2010:. . . . . . . . . . . . . . . 6

    C.  The afternoon of September 5, 2010:. . . . . . . . . . . . . . . . . . . . . . . 7

    D.  The BUPS Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  Kelly's first interview with BUPS Officials following
            the September 5, 2010 Incident. . . . . . . . . . . . . . . . . . . . . 8

        2.  Reed's first interactions with BUPS Officers following
            the September 5, 2010 incident. . . . . . . . . . . . . . . . . . . . 10

        3.  BUPS receives statements from multiple witnesses. . . . . . . 11

            A.  Statement of Wade Payson-Denney (September 5,
               2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            B.  Statement of Gregory Fast (September 5, 2010). . . . . . 12

            C.  Statement of Andrew Watts (September 5, 2010). . . . . 13

            D.  Statement of Kristen Brundage (September 6, 2010). . 14

            E.  Statement of Morgan Slade (September 6, 2010). . . . . 15

F.    Statement of Demitri Carahalios (September 6,
      2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

G.    Statement of Gabriela Ors (September 6, 2010). . . . . . 16

H.    Statement of Michael Sena (September 6, 2010). . . . 17

4.   BUPS Officers file external criminal charges against Reed. . 19

5.   BUPS Officers conduct internal investigation. . . . . . . . . . . . 19

      A.    Internal Student Conduct Board. . . . . . . . . . . . . . . . 20

      B.    Appellate proceedings. . . . . . . . . . . . . . . . . . . . . . . . 21

6.   Disposition of external criminal charges against Reed. . . . . . 23

III.   ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

A.   Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.   False Arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      1.    BUPS Officers lacked factual information to support an
            Affidavit of Probable Cause to arrest Reed on September 7,
            2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      2.    BUPS Officers Lack of factual information to file
            additional charges against Reed on September 10, 2010. . . . 39

      3.    BUPS Officers are not entitled to qualified immunity because
            of willful omissions when applying for an arrest warrant. . . . 41

C.   Malicious Prosecution:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

D.      Supervisory Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

E.      False Imprisonment:. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

F.      Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

G.      Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV.   CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

# TABLE OF AUTHORITIES

**Statutes and Rules:**                                                                    **Page(s):**

22 Pa.C.S.A. § 501(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

22 Pa.C.S.A.§ 501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

71 P.S. § 646. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

71 P.S. § 646.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. Rule Civ. Proc. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fed. Rule Civ. Proc. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24


**Cases:**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). . . . . . . . . . . . . . . . . . . . . 25

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). . . . . . . . . . . . . . . . . . 24

*Baker v. Monroe Twp*., 50 F.3d 1186, 1190-91 (3d Cir. 1995). . . . . . . . . . . . 48, 52

*Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39
(Pa. Super. Ct. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 56, 58

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). . . . . . . . . . . . . . . . . . . . . . . . 24

*Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010). . . . . . . . . . . . . . . . . 41

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). . . . . . . . . . . . . . . . . . 53

*DiBella v. Borough of Beachwood*, 407 F.3d 599,
601 (3d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Dowling v. Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988). . . . . . . . . . . . . . . . . 26

*Flagg v. State Sys. Of Higher Educ*. 904 A.2d 1004,
1008 n.3 (Pa. Commw. Ct. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Griffiths v. CIGNA Corp*., 988 F.2d 457, 463
(3d Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hunter v. Bryant*, 502 U.S. 224, 228 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006). . . . . . . . . . . . . . . . . 60

*Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993). . . . . . . . . . 42, 43, 46, 56

*Maketa v. Kamoie*, 955 F.Supp.2d 345, 355
(M.D.P.A. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 37, 38

*Malley v. Briggs*, 475 U.S. 335, 345 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . 42

*Orsatti v. N.J. State Police*, 71 F.3d 480, 482
(3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pansy v. Preate*, 870 F. Supp. 612, 619 (M.D. Pa. 1994),
*aff'd*, 61 F.3d 896 (3d. Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 51

*Renk v. City of Pittsburgh*, 641 A.2d 289, 295 n.2 (Pa. 1994). . . . . . . . . . . . 25, 54

*Schneyder v. Smith*, 653 F.3d 313, 323 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . 36

*Sewak v. Lockhart*, 699 A.2d 755, 759 (Pa.
Super. Ct. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Smith v. Mensinger*, 293 F.3d 641, 650 (2002). . . . . . . . . . . . . . . . . . . . . . . . . 52

*Swartley v. Hoffner*, 734 A.2d 915, 919
(Pa. Super. Ct. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Wagner v. Waitleverch*, 774 A.2d 1247, 1253 (Pa.
Super. Ct. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*West v. Atkins*, 487 U.S. 42, 48 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . 32, 36

## Other Authorities:

Pennsylvania's Suggested Standard Civil Jury
Instructions § 13.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

I.     **PROCEDURAL HISTORY:**

On September 6, 2011, Reed Dempsey ("Reed") and Shelley Dempsey filed a Complaint in the United States District Court for the Middle District of Pennsylvania. (Doc. 1).   After Motions to Dismiss were filed by the Bucknell Defendants and Defendant Voci, respectively, the Honorable Judge Kane permitted Reed to pursue the following claims against the Bucknell Defendants:  Count I: False Arrest, Count II: Malicious Prosecution, Count III: Supervisory Liability, Count IV: False Imprisonment, Count VIII: Fraud, Count X; Breach of Contract, and Count XVI: Intentional Infliction of Emotional Distress.  (Doc. 31, Mem. P. 47-48).  On May 29, 2014, the Bucknell Defendants filed a Motion for Summary Judgment and a Memorandum of Law in Support of the Motion for Summary Judgment. (Doc. 124). In response, Reed submits this Brief in Opposition to the Bucknell Defendants' Motion for Summary Judgment.

## II.   COUNTERSTATEMENT OF FACTS:

While Reed does not dispute that statements and other information were provided to Bucknell University Police Safety ("BUPS") by Kelly Stefanowicz ("Kelly"), Reed does contest the content of those statements on the basis that they do not establish the "facts" surrounding the events that took place on September 5, 2010. Therefore, while the Bucknell Defendants and Defendant Voci have consolidated their versions of the "undisputed facts," Reed does dispute some of those "undisputed facts." Consequently, Reed provides the Court with the following counterstatement of facts.

### A.   The events during the early morning hours of September 5, 2010:

At approximately 2:00 a.m. on Sunday, September 5, 2010, Kelly and Reed engaged in "play-fighting" in Kelly's room in Smith Hall dormitory, while Kelly's roommate Raina Masand, Morgan Slade, and Demitri Carahalios were present. [1]Bucknell Defendants' Exh. S pp. 4-6.  Eventually, Raina asked everyone to leave the

---

[1]  All references to Bucknell Defendants Exhibits refer to the Exhibits filed in Support of their Motion for Summary Judgment previously filed with this Court.

2

room. [2]Exhibit "A", Reed's Dep. Tr. 2/20/13 p. 54:5-6. Kelly and Reed then carried their "play-fighting" over to Reed's room. *Id.* at p.54-55. When Kelly and Reed arrived at Reed's room, Reed's roommate, Wade Payson-Denney, and Wade's friend, Gabriella Ors, were already in the room. *Id.* at p. 56. At some point, Greg Fast came into Reed's room. *Id.* at p. 56.

While in Reed's room, Reed sat on the futon, and Kelly sat on his lap. *Id.* at p. 57. As Reed conversed with Wade and Gabriella about the night, Kelly "continued poking [Reed] in the arm, trying to get [him] to start back what was in [Kelly's] room." *Id.* at p. 58. At one point, while Wade, Gabriella, and Greg were still in the room, "[Kelly] pushed it even further and sat on top of [Reed] and pushed [his] arms down to [his] side against the futon." *Id.* at p. 60. As Kelly sat on top of Reed, he was "looking around her, trying to continue [his] conversation." *Id.* at p. 61.

At some point, Wade escorted Gabby home, leaving Greg, Reed, and Kelly together in Reed's room. *Id.* p. 62. Eventually, Greg left Reed's room, leaving Reed and Kelly alone, as Kelly sat on Reed's lap. *Id.* At this time, Reed and Kelly were "talking and joking around, being silly about the night." *Id.* Kelly pushed Reed over

---

[2] Exhibits referencing deposition transcripts only contain the pages specifically cited. Should the Court wish a complete copy of any transcript, one will be provided.

on the futon onto his back.  *Id.* 63.  "[Kelly] had her hands on [Reed's] hands . . . kind of hands on [his] wrists, pushing [him] down against the futon."  *Id.*  "After about a minute of [Kelly] being on top of [Reed]," Reed tried to move Kelly off of him.  *Id.* p. 65.  During this time, Greg came back into the room, and saw Kelly on top of Reed. Greg left when he realized neither Reed nor Kelly noticed him.  Bucknell Defendants' Exh. J, Statement of Gregory Fast.

As Reed attempted to push Kelly off of him, Kelly's leg knocked Reed's Brita water pitcher off of an adjacent coffee table, spilling it "all over the ground."  *Id.* Reed jumped up to clean the water, and asked Kelly to leave, which she did.  *Id.* at p.65-66.  Reed and Kelly proceeded into the hallway, where they conversed with several people.  *Id.* at p.66-67.  During these conversations, Kelly "tried to incite [play-fighting] again, this time a little more forcefully . . . [by] pok[ing] [Reed's] arm or kind of shov[ing] [him]."  *Id.* at p.68.  After Reed poked her back, "she pushed a lot harder, and [Reed] actually... ran down the hall, thinking [he] could kind of get away from it."  *Id.*  However, Kelly chased after him and began pushing Reed harder and then "hit [Reed] in the genitals."  *Id.* at p.69.

In an effort to prevent Kelly from hitting him again, Reed gave her a "bear hug".  Bucknell Defendants' Exh. B, BUPS Incident Report p. 7 of 24, item 5.  Kelly

4

started thrashing her body around.  Kelly and Reed fell to the ground, causing a "big brush burn to [Kelly's] face and shoulder from hitting the carpet." *Id.*  Once Kelly got up, "she tried to push [Reed] again" in a manner that Reed acknowledged as "still just playful" because "she had been laughing".  Exhibit "A" p. 70.  At this point the Resident Advisor, Michael Sena ("R.A. Sena"), observed Kelly on the floor.  Bucknell Defendants' Exh. B pp. 10-11, item 11.  Kelly then ran up to Reed, slapped him again, and called him "pussy lips." *Id.*  R.A. Sena stopped Kelly from hitting Reed and instructed Reed to return to his room, while Kelly tried to fight through R.A. Sena in an attempt to get to Reed. *Id.*  Consequently, Sena "restrained Kelly by holding both of her arms." *Id.*

R.A. Sena escorted Kelly back to her room where Kelly's roommates met them. *Id.*  After walking back from Kelly's room, R.A. Sena observed Kelly pass by him in the hallway and jokingly shout, "[n]obody makes me bleed my own blood!" *Id.*  R.A. Sena asked her what had happened. *Id.*  Kelly shouted "Reed [is] a 'Pussy Lips' and that he could suck [her] 'Big fat black cock.'" *Id.*  As R.A. Sena tried to get more information from Reed and Kelly, Kelly "slapped Reed hard on the face". *Id.*

After R.A. Sena restrained Kelly and again asked what was going on, Kelly said the play-fighting was friendly in nature and she didn't want to file a report. *Id.*

5

In fact, Kelly specifically asked R.A. Sena to "shake her hand and promise not to fill out a report." *Id.* Afterwards, R.A. Sena spoke to Reed, at which point Reed apologized for bruising Kelly and explained they had just been playing around and that play-fighting was a typical friendly game that had not previously resulted in physical injury. *Id.* Reed then went to his room, where he remained and slept for the night. Exhibit "A" p. 78.

### B.   The later morning hours of September 5, 2010:

At 7:45 a.m., on Sunday, September 5, 2010, Bucknell University's Field Hockey Team departed for an away game at Princeton University. Bucknell Defendants' Exh. K, Written Statement of Coach Jeremy Cook p.1. When Kelly was aboard the bus she told her teammates she received the marks on her face when she "hit [her] head on [her] ceiling." Exhibit "B", Audio recording of Kelly's first interview at 21:35-21:38.[3] It was not until the team's pregame meeting that Coach Cook noticed the scrapes and bruises on Kelly's "forehead down to her jaw line". Bucknell Defendants' Exh. K p.1. After the pregame meeting, Kelly told Coach

_____

[3] A CD of the audio recording will be provided to the Court and all counsel via mail.

Cook that "she had been assaulted by a male student in her dorm hall (Smith) the night before." *Id.* After the game, Kelly identified the male student as Reed, and said the incident occurred around 2 a.m. and "apparently their interaction began in a playful way, but escalated into physical violence". *Id.*

### C.   The afternoon of September 5, 2010:

Immediately following Kelly's field hockey game at Princeton University, her father approached her and inquired about the scrapes and bruises on her face. Bucknell Defendants' Exh. S p.14. Kelly initially told her father that she "got in a fight with a boy in [her] hall." *Id.* Kelly's father then took photographs of the marks on her face, wrist, shoulder, and knee.[4] *Id.* On the bus ride back to Bucknell, Coach Cook put Kelly in contact with Dean Amy Badal. Bucknell Defendants' Exh. K p.1. While on the phone, Kelly further exaggerated her version of events, stating the incident included "inappropriate sexual advances/contact". *Id.* Dean Badal

---

[4] It is undisputed that Kelly played in the field hockey game on September 5, 2010 at Princeton University; it is also undisputed that the photographs taken by Kelly's father on September 5, 2010 were taken after Kelly's participation in the field hockey game.

instructed Kelly to go to the Bucknell Department of Public Safety and the Lewisburg Police.  *Id.*


**D.     The BUPS Investigation:**

**1.     Kelly's first interview with BUPS Officials following the September 5, 2010 Incident:**

At approximately 8:00 p.m. on Sunday, September 5, 2010, Kelly was interviewed in Chief Friedberg's office at Public Safety.  Bucknell Defendants' Exh. B p.5, item 2.  The following people were present at this interview session: Officer Julie Holtzapple, Officer Darrell Fisher, Officer Robert Ulmer, Dean Badal, Christine Weiss (one of Kelly's teammates) and Kelly.  *Id.*  The interview was recorded.  *Id.* For the first time in Kelly's version of events, Kelly stated that while she and Reed were alone in Reed's room, "Reed's penis was erect under his clothes".[5]  *Id.*  Kelly also said that she screamed for Reed "to get off of her" and "just stop".  *Id.*  Kelly said

---

[5]  At no point prior to this interview did Kelly tell anyone that Reed's penis was erect or that he forcefully held her hands behind her back as she laid on top of his futon.  It is important for the Court to note that of the many witnesses who provided written statements to BUPS not one of them observed anything sexual about Kelly and Reed's interaction. (The various statements are referred to throughout this Brief).

she slapped Reed, wrestled him to the floor, landed on top of him, and then ran out of his room into the hallway to get away from him.  *Id.*

   While in the hallway, Kelly claimed that she tried to walk away from Reed, but he grabbed her arms and then tackled her to the ground.  *Id.*  Kelly told BUPS that she wanted "to proceed with external charges for this assault."  *Id.*  Officer Holtzapple told Kelly that Reed "was born this way," and that Kelly "could have saved somebody's life in the future."  Exhibit "B" at 19:16-:19:18; 19:56-19:58.  Officer Fisher then chimed in stating that Reed "obviously has a problem".  Exhibit "B" at 20:06-20:07).  The interview session concluded with Kelly being escorted by Dean Badal and Christine Weiss to Evangelical Hospital for photographs and treatment.[6] *Id.* Eventually, Officer Holtzapple and Officer Fisher arrived at Evangelical Hospital, where they obtained Kelly's consent to release the photographs taken of her at the hospital.  *Id.*, p.5-6, item 3.

---

   [6] BUPS officers did not document or photograph Kelly's scrapes and bruises at the initial interview prior to Kelly's visit to Evangelical Hospital, even though Kelly pointed out which bruises and scrapes resulted from the fall in the hallway, and which marks resulted from field hockey.

9

### 2.    Reed's first interactions with BUPS Officers following the September 5, 2010 incident:

At approximately 9:30 p.m. on Sunday, September 5, 2010, Officer Ulmer spoke with Reed on the phone and requested to meet him in front of Smith Hall. Bucknell Defendants' Exh. B p.6, item 4.  When Officer Ulmer met with Reed, he informed him that "he was a suspect in an ongoing criminal investigation" arising from the events that occurred in Smith Hall during the early morning hours of September 5, 2010.  *Id.*  Officer Ulmer instructed Reed not to have any contact with Kelly because "it could be considered 'Intimidation of a Witness' and he could be charged accordingly."  *Id.*

Around 11:00 p.m., roughly an hour and a half after Officer Ulmer's initial call to Reed, Officer Ulmer interviewed Reed.  *Id.* item 5.  The following individuals were present for this interview: Officer Ulmer, Detective Fisher, and Reed.  *Id.*  This interview session was not recorded.  *Id.*; see also, Exhibit "C", Ulmer Dep. Trans. p. 62:15-24.  Before beginning the interview, Reed submitted a written statement about the incident to Officer Ulmer.  *Id.*  Officer Ulmer read Reed his Miranda rights.  *Id.* During this interview, Reed provided names of multiple witnesses.  *Id.*

10

### 3.   BUPS receives statements from multiple witnesses:

After receiving statements from Kelly and Reed, the BUPS obtained both written and oral statements from multiple witnesses, including another statement from Kelly supplementing her initial interview.  *Id.*, p.7 items, 6 -11.  These statements were received between September 5, 2010 and September 6, 2010.  *Id.*

### A.   Statement of Wade Payson-Denney (September 5, 2010):

Wade Payson-Denney was Reed's roommate and, at the time, knew Reed for about one year.  Exhibit "D", Statement of Wade Payson-Denney pp.1-2.  From Mr. Payson-Denney's statement, BUPS officers obtained the following information:

·   "Reed and Kelly Stefanowicz started jokingly wrestling on the floor of our room, Smith 138." *Id.* p.1.

·   Kelly and Reed had jokingly wrestled "many times before and it didn't seem like anything out of the ordinary." *Id.*

·   Kelly and Reed then "had taken their horseplay to the hallway and continued to wrestle." *Id.*

·   Based on the events that Mr. Payson-Denney witnessed, "this was clearly the result of a little horseplay that got out of hand, not the result of a malicious attack." *Id.*

## B.      Statement of Gregory Fast (September 5, 2010):

Gregory Fast was Reed and Kelly's hall mate.  Bucknell Defendants' Exh. J, Gregory Fast Statement, 9/5/10, p.1.  From Mr. Fast's two-page statement, BUPS officers obtained the following information:

·      Mr. Fast was in the hallway "socializing with a few hallmates." *Id.*

·      Eventually, he went into Reed's room where he saw "Reed and Kelly Stefanowicz playfully wrestling on the futon." *Id.*

·      Neither Reed nor Kelly was "visibly causing the other harm.  In fact, both Reed and Kelly were laughing hard." *Id.*

·      Eventually, Mr. Fast left Reed's room while Reed and Kelly remained inside. *Id.* "A while later . . . Kelly and Reed came onto the hall.  They were still laughing and wrestling." *Id.*[7]

---

[7]      The amount of time Reed and Kelly were in Reed's room alone is unconfirmed because numerous people recalled conflicting time intervals.  In Reed's deposition, Reed stated that he and Kelly were alone in his room "[s]omewhere between two and four" minutes.  Exhibit "A" p.112:1-18.  In the "Incident Report", Officer Ulmer claimed that Reed told him that they were in the room alone for "about a minute".  Bucknell Defendants' Exh. B p. 6, item 5.  Kelly claimed that Reed and she were alone in his room for about "five to seven minutes," and in a different interview claimed she was attacked for 20 minutes.  Bucknell Defendants' Exh. S p. 10.  Mr. Fast stated that after he left Reed's room, Reed and Kelly came into the hallway after about "10-minutes give-or-take".  Bucknell Defendants' Exh. J  p.1.  However, earlier in Mr. Fast's statement, he eluded to the fact that his sense of time "is far from accurate".  *Id.*  This is significant to point out because Defendants claim that the amount of time that Reed and Kelly were alone in Reed's room was substantial.  This is relevant because the discrepancy in time should have been

- After a mutual agreement to stop play-fighting, "Kelly slapped Reed in the face." *Id.*

- After Reed contained Kelly and they fell to the ground, Kelly kept hitting Reed. *Id.*

- Reed then "grabbed a pitcher of some water and tossed some of it on her, so she ran laughing back to her room on the other end of the hall." *Id.* pp.1-2.

- After R.A. Sena got involved, "Reed and Kelly assured him that it was a friendly scuffle." *Id.*

## C.    Statement of Andrew Watts (September 5, 2010):

Andrew Watts is a friend of both Kelly and Reed.  Andrew did not witness any of the events that occurred during the incident; however, he spoke with Kelly "approximately fifteen minutes after the incident occurred."  Exhibit "E", Statement of Andrew Watts p.1.  From Mr. Watts's statement, BUPS officers obtained the following information:

- While Mr. Watts was speaking with Kelly after the incident, she told him "that she was hanging out with Reed and they began to playfully wrestle". *Id.*

---

factored into the BUPS's determination as to the veracity of Kelly's accusations that Reed sexually assaulted her.  Obviously, we have another material fact at issue.

13

· Being that Mr. Watt had known both Reed and Kelly prior to this incident, he explained that playful wrestling was "not uncommon in their relationship." *Id.*

· Kelly then mentioned to Mr. Watts that "the incident escalated because of their pride and she was sad because *she could have walked away before anything got out of hand*." *Id.* (emphasis added).

· Mr. Watts was willing to serve as a "character witness to both parties involved". *Id.* (Written on the back of p.1).

· Furthermore, Mr. Watts explained that "this was a very unfortunate and uncharacteristic incident." *Id.*

· Mr. Watts concluded by stating that he did "not believe Reed had any malicious intent prior to or during the incident." *Id.*

### D.   Statement of Kristen Brundage (September 6, 2010):

Kristen Brundage was Kelly's roommate at the time the incident occurred and was present in Smith Hall throughout the early morning hours of September 5, 2010. Exhibit "F", Statement of Kristen Brundage.   From Ms. Brundage's two-page statement, BUPS officers obtained the following information:

· On September 5, 2010, Kelly arrived in the hallway of 166 Smith Hall around 2am accompanied by a boy and a girl, and all of them went into Kelly's room.  Exhibit "F" p.1.

· "After a while, Reed Dempsey went into the room." *Id.*

14

·    From the room, Kristen could hear "loud laughing and some playful-sounding screams." *Id.*

·    "After a bit, Reed left the room carrying Kelly, who was laughing and hitting him in the butt with a shoe." *Id.*

·    Reed carried Kelly into his room. *Id.*

·    While in Reed's room, Kristen heard "laughing screams" coming from Reed's room. *Id.*

·    "After a while, they came out wrestling.  It seemed like play wrestling, with laughing and goofy insults." *Id.* p.2.

·    "Every time Reed would walk away, Kelly would chase after him, insulting him and egging him on." *Id.*

·    "When the RA came in, he stopped it with some effort." *Id.*

·    "Kelly stayed at Reed's door trying to call him back into the hallway." *Id.*

·    Ms. Brundage then brought Kelly back into their room, where they "put [N]eosporin on her rugburned face." *Id.*

**E.**    <u>**Statement of Morgan Slade (September 6, 2010):**</u>

Morgan Slade walked back from "frat row" around 1:00 a.m. on September 5, 2010 with Demitri Carahalios and Kelly.  Exhibit "G", Statement of Morgan Slade p.1.  According to Ms. Slade's statement, BUPS officers obtained the following information:

15

·     Morgan did not know Kelly or Reed well. *Id.*

·     Morgan, Demitri, and Kelly went to Kelly's loft in Smith Hall. *Id.*

·     During the early morning hours of September 5, 2010, the "interaction between [Kelly] and Reed was playful". *Id.*

### F.    Statement of Demitri Carahalios (September 6, 2010):

Demitri Carahalios accompanied Morgan and Kelly back to Smith Hall.

Exhibit "H", Statement of Demitri Carahalios p.1. According to Demitri's statement,

BUPS officers obtained the following information:

·     Demitri was in Kelly's room with Ms. Slade, Reed, and Kelly. *Id.*

·     While in Kelly's room, "it appeared as if [Reed and Kelly] were old friends". *Id.*

·     After a while, "Reed slapped Kelly on the butt as a seemingly playful joke." *Id.*

·     Kelly and Reed "proceeded to wrestle around for a while with the same idea of slapping each other on the butt". *Id.*

### G.    Statement of Gabriela Ors (September 6, 2010):

Gabriela Ors walked back to Smith Hall with Mr. Payson-Denney and Reed

during the early morning hours of September 5, 2010. Exhibit "I", Statement of

Gabriela Ors p.1.  According to Gabriela's statement, BUPS officers obtained the following information:

· At some point during the early morning hours of September 5, 2010, Ms. Ors was in Reed's room with Mr. Payson-Denney, Reed, and Kelly.  *Id.*

· "Kelly and Reed were fairly loud [and] horseplaying, though the situation never seemed violent."  *Id.*

### H.   <u>Statement of Michael Sena (September 6, 2010):</u>

Michael Sena was the Resident Advisor for both Reed and Kelly at the time this incident occurred.  Exhibit "", Statement of Michael Sena  His written statement was a copy of the incident report he filed after the September 5, 2010 incident.  *Id.* R.A. Sena emailed this report and its contents to Officer Ulmer.  *Id.*  Through R.A. Sena's incident report, BUPS officers obtained the following information:

· R.A. Sena observed Kelly on the floor with red marks on her left eye, her shoulder, and one more on her left hand.  *Id.*

· Kelly then slapped him and called him "pussy lips."  *Id.*

· R.A. Sena instructed Reed to return to his room, while "Kelly tried to fight [Mr. Sena] to get to Reed."  *Id.*

· R.A. Sena "restrained Kelly by holding both of her arms."  *Id.*

· R.A. Sena then escorted Kelly back to her room where Kelly's roommates met them.  *Id.*

· After walking back from Kelly's room, R.A. Sena observed Kelly again pass by him in the hallway and jokingly shout, "Nobody makes me bleed my own blood!" *Id.*

· R.A. Sena then asked her what had happened.  *Id.*

· Kelly responded by shouting "Reed [is] a 'Pussy Lips' and that he could suck [her] 'Big fat black cock.'"  *Id.*

· As R.A. Sena was trying to get more information from Reed and Kelly, Kelly "slapped Reed hard on the face".  *Id.*

· Kelly told R.A. Sena that she didn't" want to file a report because "Reed and her were just playing around, and neither of them meant for it to get out of hand."  *Id.*

· Before Kelly went to sleep in her room, R.A. Sena asked "again if she wanted to talk about this tomorrow, but Kelly declined . . . and asked [R.A. Sena] to "shake her hand and promise not to fill out a report" "because she had a game today".  *Id.*

· In a supplementary report provided to BUPS, Sena, he informed them that these playful interactions with Kelly and her hall mates occurred previously.  Specifically, R.A. Sena informed BUPS that "Kelly had also had play fights with Wes Pyron, the RF on Smith Hall 1D last year."  Bucknell Defendants' Exh. B  p.10, item 11.

18

### 4.    BUPS Officers file external criminal charges against Reed:

Despite the plethora of exculpatory information possessed by BUPS, charges were drafted and filed against Reed for assault, harassment, and disorderly conduct. Bucknell Defendants' Exh. B p.12, item 12 and p. 13, item 15; *see also* Exhibit "C" pp. 69-70.  Upon further investigation, BUPS officers did not receive any information after September 7, 2010 that contradicted the exculpatory information, and all information contradicted Kelly's version of events.  However, BUPS filed additional charges against Reed on September 10, 2010.  Bucknell Defendants' Exh. B p. 20, item 35.

### 5.    BUPS Officers conduct internal investigation:

While external criminal charges were pending against Reed, Kelly filed student-conduct violations against Reed.  Bucknell Defendants' Exh. V , 9/14/10 Letter from Kelly Stefanowicz to Dean Conrad.  The following day, Reed filed student-conduct violations against Kelly.  Bucknell Defendants' Exh. X, 9/15/10 Letter from Reed Dempsey to Dean Conrad.  Reed and his lawyer had also requested criminal charges be filed against Kelly for her role in the September 5, 2010 incident, but BUPS refused to look into the claims or entertain any charges against Kelly.

19

Exhibit "V", Affidavit of Anthony Voci.  Given the pending external criminal charges against Reed and the pending student-conduct violations against Reed, Chief Friedberg expressed concerns about the conflicting role BUPS was playing in trying to pursue a criminal case against Reed, while also serving as the investigative body for the internal operations and student conduct hearing.  Exhibit "K", Friedberg Dep. Tr. p.39-40; *see also,* Bucknell Defendants' Exh. "B" p. 24, item 47.

### A.     <u>Internal Student Conduct Board:</u>

Upon learning that Kelly and Reed filed student-conduct violations against each other, Dean Conrad, in her "capacity as Judicial Administrator for Sexual Misconduct for Bucknell University," informed Reed "that sufficient evidence exists for the complaint to be heard by the Hearing Board for Sexual Misconduct (HBSM)." Bucknell Defendants' Exh. W, 9/14/10 Letter from Dean Conrad to Reed Dempsey. Reed was also informed that the charges would be heard simultaneously and that "[a]ll relevant evidence, documents, witnesses or other information connected to the case [would] be included as a part of one process.  *Id.*

In preparation for the hearing, Reed requested various documents from Bucknell, in accordance with the Bucknell Student Handbook.  *See* Exhibit "AA" p.

126.  The Student Conduct code provided Reed with the right to review the evidence. Exhibit "S" Bromfield Dep. Tr. p. 29:3-6.  Bucknell's then General Counsel Wayne Bromfield made the decision to withhold requested documents from Reed.  Exhibit "T", Kari Conrad Dep. Tr. p. 21:1-5, p. 13-21, pp. 26-27; *see also*, Exhibit "S" p. 67:6-9.  Specifically, Reed was not provided with an accurate version of the BUPS report, a copy of Kelly's recorded interview with BUPS, and notes related to Reed's interview with BUPS, and certain witness statements.

After a three-day hearing was conducted, the HBSM found Reed and Kelly jointly responsible for Disorderly Conduct, a Category I Violation under the Student Code of Conduct.  Bucknell Defendants' Exh. Y, 10/8/10 Letters from Dean Conrad to Kelly and Reed, respectively.  Reed was found not responsible for the assault claims brought by Kelly.


**B.     Appellate proceedings:**

On October 14, 2010, Reed notified Dean Conrad that he wanted to appeal and requested a copy of the hearing audio file.  On October 20, 2010, an appellate hearing was held, yet the hearing audio file was not produced.  Bucknell also refused to

record the appellate hearing.  Dean Conrad informed the appellate board that all procedures were appropriately followed by the HBSM throughout their hearings.

On October 27, 2010, Reed notified Dean Locher that he wanted a final appeal due to the procedural errors committed by the HBSM, including the failure to provide him with exculpatory evidence and finding him responsible when Kelly neither presented evidence nor testified.  On November 15, 2010, Dean Locher recused herself due to "[her] office's role in the prior history of this matter," and referred the appeal to Provost Mick Smyer.  On December 1, 2010, Reed emailed Provost Smyer to request the original hearing's audio tape, and that the final hearing be recorded. Provost Smyer denied Reed's requests.  At the final hearing on December 6, 2010, Reed's advisor argued that the evidence was insufficient, in large part because Kelly did not testify and because witnesses indicated Kelly was the disorderly party.  Again, Reed was not permitted to introduce evidence or any record of what occurred at the initial hearing, thus preventing him from showing what procedures were actually followed.  Ultimately, on December 14, 2010, the appeal was denied.

22

**6.      Disposition of external criminal charges against Reed:**

On October 29, 2010, District Attorney Peter Johnson withdrew all criminal charges against Reed.  Bucknell Defendants' Exh. BB, District Attorney Statement to *The Daily Item*, November 2, 2010.

## III.   ARGUMENT:

### A.   <u>Summary Judgment Standard</u>:

The Bucknell Defendants' Motion for Summary Judgment should be denied because each of the remaining counts involve material facts that are genuinely in dispute and the Bucknell Defendants are not entitled to judgment as a matter of law.

> "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (referencing Fed. Rule Civ. Proc. 56(c)).

"Summary judgment is appropriate only if 'the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (citing Fed. Rule Civ. Proc. 56(a)).  Material facts are those facts "that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "In making that

24

determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan*, 134 S.Ct. at 1866 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

### B.    False Arrest:

A genuine dispute of material fact exists in Reed's claim for false arrest because the evidence derived from numerous eyewitnesses, which was provided to BUPS before Reed's arrests, negates probable cause; thus, a reasonable juror could find that BUPS intentionally ignored exculpatory information and lacked probable cause to arrest Reed. Viewing the evidence in the light most favorable to Reed, a reasonable jury could find that BUPS lacked probable cause to arrest Reed and therefore return a verdict in Reed's favor.

"A false arrest is defined as 1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so." *Renk v. City of Pittsburgh*, 641 A.2d 289, 295 n.2 (Pa. 1994) (referencing Pennsylvania's Suggested Standard Civil Jury Instructions § 13.04).

Reed's false arrest claim is founded under Section 1983, where he must establish that persons acting under color of state law violated a right secured by the

Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988). In this case, the charges the Bucknell Defendants listed in Count I of the Complaint violated Reed's Fourth Amendment rights by executing Reed's arrest via an arrest warrant they knew lacked probable cause, all while acting under the laws of the Commonwealth of Pennsylvania.

"The central issue in determining liability in a Section 1983 action based on a claim of false arrest is 'whether the arresting officers had probable cause to believe the person arrested had committed the offense.'" *Wagner v. Waitlevertch*, 774 A.2d 1247, 1253 (Pa. Super. Ct. 2001) (citing *Dowling v. Philadelphia*, 855 F.2d 136, 141 (3d Cir.1988)). "Probable cause for arrest exists when the facts and circumstances are sufficient to warrant a reasonable person to believe that an offense had been or is being committed by the person to be arrested." *Id.* (citations omitted). A court must look at the totality of the circumstances and use a common sense approach to the issue of probable cause. *Id.*

Under the first element of false arrest, Defendants are not entitled to judgment as a matter of law because BUPS officials acted under color of Pennsylvania law when arresting Reed. In this case, BUPS officials, namely, Officer Holtzapple, Officer Rishel, Officer Ulmer, Officer Middleton, Officer Fisher, and Detective

26

Ettinger, were all acting under the laws of Pennsylvania.   The Bucknell public safety officers are appointed and sworn police officers under 22 Pa.C.S.A.§ 501.   More specifically, these officers "possess and exercise all the powers of a police officer in the Commonwealth, in and upon, and in the immediate and adjacent vicinity of, the property of the corporation…."  22 Pa.C.S.A. § 501(c).  Moreover, 71 P.S. § 646 provides full police power authority to, *inter alia*, campus police at all state-aided universities.  Bucknell University is a state-aided university under 71 P.S. §§ 646, 646.1.  Under these statutes, Pennsylvania courts have recognized that campus police have full police power.  *See, Flagg v. State Sys. Of Higher Educ*. 904 A.2d 1004, 1008 n.3 (Pa. Commw. Ct. 2006).  Therefore, BUPS officials were acting under color of Pennsylvania law when they arrested Reed.  Exhibit "K" p. 12:23-24.

Under the second element of false arrest, the Bucknell Defendants are not entitled to judgment as a matter of law because BUPS officials, while acting under color of Pennsylvania law, arrested Reed on September 7, 2010 and again on September 10, 2010.  Bucknell Defendants' Exh. "B" p.13, item 15; *see also,* Bucknell Defendants' Exh. M; Bucknell Defendants' Exh. B p.20, item 35; *see also*, Bucknell Defendants' Exh. U.

27

Under the third element of false arrest, the Bucknell Defendants have failed to establish that there is no genuine dispute of material fact because there are significant facts to support a finding of a lack of probable cause, facts that could cause reasonable jurors to return a verdict in Plaintiff's favor.

### 1.     BUPS Officers lacked factual information to support an Affidavit of Probable Cause to arrest Reed on September 7, 2010:

A genuine dispute of material fact exists as to whether BUPS had probable cause to arrest Reed on September 7, 2010 and again on September 10, 2010.  With regards to the charges that were filed against Reed on September 7, 2010, the Bucknell Defendants argue that probable cause existed because BUPS had the following information available to them: (1) "two detailed statements from Ms. Stefanowicz (Bucknell Defendants' Br. In Supp. Of Mot. For Summ. J., p. 45);  (2) "a detailed statement from [Kelly's] roommate, Ms. Masand…" (*Id.*); (3) "photographs of extensive bruising, scrapes, and injuries" (*Id.*); (4) a medical evaluation of Kelly confirming "that she had numerous injuries all over her body" (*Id.* p. 48); (5) statements indicating that "for some window of time, Reed and [Kelly] were alone together in his room" (*Id.* p. 45); (6) Kelly left Reed's room "hastily" (*Id.*);

(7) text messages from Reed following the incident (*Id.*); (8) a non-recorded interview with Reed (*Id.* p.45); and (9) "a number of written statements from witnesses" (*Id.* p. 48).

In sum, Defendants argue that BUPS had probable cause to arrest Reed on September 7, 2010 based on: (1) two biased statements from the alleged victim of the crimes charged, whose story became more elaborate and extreme with each telling[8]; (2) a statement from Kelly's roommate, who did not witness any of Kelly and Reed's "play-fighting," but instead heard "screaming, laughing, and a lot of noise in [her] room" while she was trying to sleep.  (Bucknell Defendants' Exh. I, Statement of Masand p.1); (3) some "photographs of extensive, bruising, scrapes, and injuries" that were taken after Kelly played in her collegiate field hockey game the same day that she claimed to have been sexually assaulted Bucknell Defendants' Exh. D Photographs of K. Stefanowicz taken following her field hockey game on the afternoon of September 5, 2010); (4) a medical report confirming that Kelly had bruises on her body after playing in a collegiate field hockey game and a medical

---

[8]  Kelly made no mention or claim of Reed having an erect penis while they were play-wrestling when she spoke to her coach, teammates, or her father hours after the alleged sexual assault; Kelly first mentioned that she remembered Reed "getting off to it" and having an erect penis when surrounded by multiple BUPS officers during her first interview, which was recorded.

report essentially characterizing her facial abrasions as superficial (Exhibit "L", Evangelical Hospital Report); (5) conflicting statements regarding the amount of time Reed and Kelly were alone in Reed's room; (6) a disputed claim that that Kelly left Reed's room "hastily", when in fact, BUPS had statements from multiple witnesses, including Kristen Brundage, Kelly's roommate, that Kelly was "laughing" as she exited Reed's room, and Reed and Kelly "seemed like play wrestling, with laughing and goofy insults." (Exhibit "F" p. 2); (7) text messages from Reed following the incident, apologizing for the rug burns on Kelly's face that were caused when numerous people witnessed Kelly cause the fall in the hallway after Reed bear hugged her so she would stop hitting him (Bucknell Defendants' Exh. F); (8) interview summary that was transcribed by Officer Ulmer "from memory" and without notes after his unrecorded interview with Reed (and that conveniently contain the exact same language Kelly used in her statement); and (9) numerous witness statements that contradicted essentially every aspect of Kelly's version of the events.[9]

Moreover, the Bucknell Defendants assert that "[i]t is hard to imagine a reasonably competent officer who would not find probable cause in this situation."

---

[9] The contradictory nature of these statements will be explained in further detail in the "Lack of Probable Cause" section.

Bucknell Defendants' Br. In Supp. Of Mot. For Summ. J., p. 44. The Bucknell Defendants irrelevantly argue that Reed has not "obtained an expert report explaining why a reasonable police officer would not find all of this evidence enough" to establish probable cause." Bucknell Defendants' Br. In Supp. Of Mot. For Summ. J., p. 46. The Bucknell Defendants claim that probable cause was abundantly clear in this case where "expert testimony is likely unnecessary, because the "facts are compelling enough" *Id.*; yet, Bucknell felt compelled to hire an expert to produce a report "on the issues of probable cause and BUPS' actions here". *Id.*

Regardless, the standard for determining whether probable cause exists is not merely relying on the statements and information provided by the victim of the crimes alleged, but instead whether the "facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995). "To state a claim for false arrest based on a warrant, a plaintiff must establish that the defendant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and that "such statements or omissions are material, or necessary, to the finding of probable

31

cause." *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000). "[M]aterial omissions are made with reckless disregard for the truth if the affiant 'withholds a fact in his ken that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'" *Maketa v. Kamoie*, 955 F.Supp.2d 345, 355 (M.D.P.A. 2013).

The incident in this case occurred at around 2 a.m. on Sunday, September 5, 2010, and BUPS officials became involved at 6:19 p.m. on Sunday, September 5, 2010. Bucknell Defendants' Exh. B p. 1. Less than one day later, Officer Middleton, with the assistance of Officer Ulmer, typed up charges against Reed, and Officer Ulmer contacted a district justice to schedule an arraignment.[10]  *Id.* p.12; *see also,* Exhibit "C" pp. 69-70. By the time these charges were typed up, BUPS officials had Kelly's claim that she had been assaulted by Reed (Bucknell Defendants' Exh. B p. 5 item 1) and a  recorded interview with the alleged victim (Bucknell Defendants' Exh. B pp. 5-6, item 2); photographs following the incident and following Kelly's collegiate field hockey gam (Bucknell Defendants' Exh. B p. 6, item 3; *see also* Exhibit "D"); and text messages from Reed following the incident (Bucknell Defendants' Exh. F). BPSU also had various witness statements, including: Kristen

---

[10]  It should be noted that September 6, 2010 was Labor Day.

Brundage's statement that she heard "laughing screams" coming from Reed's room, and that Kelly was the aggressor.[11]  (Exhibit "F" pp. 1-2); Gabriela Ors's statement that Kelly and Reed were "horseplaying" and "the situation never seemed violent." (Exhibit "I" p.1); Morgan Slade's statement that the "interaction between [Kelly] and Reed was playful." (Exhibit "G" p.1); Demitri Carahalios's statement that Kelly and Reed were wrestling "for a while with the same idea of slapping each other on the butt." (Exhibit "H" p.1); Gregory Fast's statement that he witnessed "Reed and Kelly playfully wrestling on the futon", and that both "were still laughing and wrestling" after they came into the hall, (Bucknell Defendants' Exh. J p.1), and that he had walked into Reed's room while they were alone and saw Kelly on top of Reed, (Bucknell Defendants' Exh. B p.23, item 46); and Wade Payson-Denney's statement, which stated that "Reed and Kelly started jokingly wrestling on the floor of our room,

---

[11]   BUPS's Incident Report does not reflect that a statement was given to BUPS; the only interaction between BUPS and Ms. Brundage is reflected on p. 20, item 36 of the Incident Report (Bucknell Defendants' Exh. B ), which indicates that Ms. Brundage was interviewed three days after the filing of the initial charges. Numerous witness statements were taken on September 6, 2010 and are reflected on the Incident Report as being obtained by BUPS; however, Ms. Brundages's statement, which provides contradictory testimony to that given by Kelly, despite Kelly telling BUSP that Kristen would support her story, was not reflected on the Incident Report as being received.  Yet, the statement indicates that it was given on September 6, 2010.  *See* Exhibit "J".

Smith 138," Reed and Kelly had jokingly wrestled "many times before and it didn't seem like anything out of the ordinary," and Reed and Kelly "had taken their horseplay to the hallway and continued to wrestle."  Exhibit "D" p.1  None of the witnesses observed anything that would support criminal charges.

When evaluated as a whole, these statements illustrate and emphasize the contradictions in Kelly's version of events.  Not one witness supported Kelly's claims that Reed was punching her, was derogatory towards her, or tried to assault her. These statements were submitted throughout the night of September 5, 2010 and continued into the early morning hours of September 6, 2010.  Every single eye witness contradicted Kelly's claims that Reed was physically attacking her, that he tackled her and dragged her across the hallway, and that she was screaming for help.

In this case, Kelly's story was so contradicted by the other witnesses that no reasonable officer would have believed her.   The contradictory evidence was substantial: the officers interviewed numerous witnesses that refuted Kelly's story, and her allegations were continually changing and inconsistent. The statements from at least 8 witnesses, including witnesses Kelly specifically identified to the officers as supporting witnesses, refuted her story and supported Reed's statement that they were just "play-fighting."  The witnesses generally named Kelly as the aggressor and

34

instigator, and the students reported that they only observed friendly play-wrestling. No student observed Reed make any sexual advances, hit her in the head or vagina, call her any derogatory names or engaged in any other questionable behavior, as Kelly claimed.  On the other hand, many students witnessed Kelly continually hit Reed and scream profanity and names at him despite Reed's efforts to defuse the situation.

Even more indicative that BUPS lacked facts to proffer an Affidavit of Probable Cause is the exculpatory information that BUPS received from Michael Sena following the charges that were typed up against Reed.  Bucknell Defendants' Exh. B p. 10, item 11.  R.A. Sena's report further demonstrated that Reed and Kelly's interactions were joking in nature, and that Kelly was the aggressor, trying to slap and punch Reed, boasting about hitting Reed, screaming vulgarities and profanity throughout the halls, and assuring the R.A. that nothing more than horseplay had taken place.  R.A. Sena supplemented his initial report by informing BUPS that "Kelly had also had play fights with Wes Pyron, the RF on Smith Hall 1D last year." Bucknell Defendants' Exh. B p.10, item 11.  Despite receiving this additional exculpatory evidence, BUPS filed charges against Reed on September 7, 2010. Bucknell Defendants' Exh. B p.13, item 15.

Officer Holtzapple intentionally omitted all exculpatory information about Kelly's aggression, and all contradictory information about Kelly's story when obtaining the warrant.  Her deposition testimony demonstrates that she knew this information at the time she filed for a warrant, as did her supervisors and other officers, and that she intentionally omitted the information in an effort to further Reed's arrest and prosecution.  Exhibit "M", Holtzapple Dep. Tr. p 56:7-12.  "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."  *Wilson v. Russo,* 212 F.3d 781, 790 (3d Cir. 2000).  The Third Circuit has explained that independent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist.  *Id.*  Thus, an officer can only rely on "reasonably trustworthy" witnesses.  *Schneyder v. Smith*, 653 F.3d 313, 323 (3d Cir. 2011).  Kelly's story was so contradicted by the other witnesses that no reasonable officer would have believed her

As an aside, in *Mekata* this Court noted that "information related to the state of the relationship between a victim and an alleged assailant is information that any judge would want to know in making a probable cause finding for two separate but

equally important reasons." *Mekata*, 955 F.Supp.2d at 358.  In *Mekata*, the affiant

failed to include the following known facts in his Affidavit of Probable Cause: (1)

victim and assailant continued to live together after breaking off their relationship,

and (2) victim and assailant "frequently got into 'retarded arguments'" one in which

"police responded to the residence, [and] no charges were filed." *Id.* at 357.  The

Court held that because the affiant failed "to include this information in his Affidavit

of Probable Cause" he "acted with reckless disregard for the truth." *Id.* at 358.

In this case, Officer Holtzapple omitted known information about Kelly and

Reed's relationship in her Affidavit of Probable Cause.  More specifically, before the

Affidavit was proffered to the district justice, Officer Holtzapple possessed written

witness statements that provided information about Kelly and Reed's relationship.

Primarily, in Gregory Fast's written statement he stated "[a]fter all, this was not the

first time they play-fought."  Bucknell Defendants' Exh. J p.2; *see also,* Bucknell

Defendants' Exh. B p.23, item 46 ("Fast claimed that it is well known that Dempsey

and Stefanowicz have horsed around like this before.  Fast told [Officer Fisher] that

he has a video clip of Stefanowicz behaving in this manner with another male.")).[12]

---

[12] During the course of the investigation the Bucknell Defendants obtained a
video of Kelly play-fighting with another male student,  acting exactly as described
by Reed and the witnesses this case.  Exhibit "DD".

Furthermore, Andrew Watts informed BUPS that playful wrestling "is not uncommon in their relationship," and that he knew "both parties involved. Exhibit "E" p.1). Given that Reed was being charged with crimes involving conduct defined as "intentionally [causing] bodily injury to another" and "intend[ing] to harass," information about prior playful instances between Kelly and Reed was relevant information that a district justice would have wanted to know when making a probable cause finding. Similarly, information that Kelly engaged in the same behavior with other students was also relevant and materially informative. By omitting these material facts in her Affidavit of Probable Cause, this Court should find that Officer Holtzapple "acted with reckless disregard for the truth." *Mekata*, 955 F.Supp.2d at 358.

Despite the vast amount of exculpatory information, BUPS continued their pursuit to charge Reed when they officially filed the assault, harassment, and disorderly conduct charges against Reed on September 7, 2010. Bucknell Defendants' Exh. B p.13, item 15. Officers intentionally and improperly omitted all material facts that related to Reed's innocence and to Kelly's false testimony. Thus, BUPS lacked probable cause to effectuate Reed's arrest.

38

### 2.   BUPS Officers Lack of factual information to file additional charges against Reed on September 10, 2010:

Not only did BUPS lack probable cause to arrest Reed following the charges filed against him on September 7, 2010, but BUPS also lacked probable cause to arrest Reed on September 10, 2010 for additional charges.

According to the Bucknell Defendants, Kelly's description of the incident "was strong enough evidence supporting the additional charges of false imprisonment and unlawful restraint."  Bucknell Defendants' Br. In Supp. Of Mot. For Summ. J., p. 53. However, the Bucknell Defendants have ignored, as did BUPS Officers, the vast amount of exculpatory evidence.  Not only did witness statements establish a different version of events for September 5, 2010, they contradicted Kelly's story almost entirely.  While alone with Reed in his room, Kelly claimed that she screamed "stop", "get off of me," and that she would not allow Reed to take advantage of her, just as he had done to Rebecca.  Bucknell Defendants' Exh. E, p. 3).  She also claimed to "have said 'no' and 'stop' and 'leave me alone' a thousand times throughout our entire encounter."  Bucknell Defendants' Exh. L, p.3.  However, not one student standing outside of Reed's room in the hallway heard Kelly screaming "stop", "get off of me", "no", "leave me alone" or anything about Rebecca.  Witness statements

do, however, establish that other students heard laughing and playful screams.   No

student witnessed Reed make any sexual advances, punch Kelly in the vagina[13], or

call her any derogatory names.   Students indicated that Kelly exited Reed's room

while still play wrestling with Reed, "with laughing and goofy insults."   Exhibit "F"

p.2.   Students said that if someone had been screaming, they would have heard it and

come in to help.   Moreover,  Rebecca, who Kelly told BPSU was assaulted by Reed,

refuted Kelly's story that she had been sexually assaulted, told officers that Reed

never assaulted her or took advantage of her, and provided a written statement saying

that Kelly's allegations about her were false and irrelevant to whatever had happened

with Kelly and Reed.   Exhibit "N", Statement of Rebecca Neubauer p. 1; *see also,*

Bucknell Defendants' Exh.  p. 14, item 20.

Ultimately, BUPS ignored significant evidence exculpating Reed and evidence

contradicting Kelly's story.   BUPS based its case and warrant application solely on

information from a clearly unreliable witness.   BUPS deliberately withheld all other

information that a judge would reasonably want and need to know before making a

proper probable cause determination.   These facts not only refute the Bucknell

---

[13] Kelly's medical examination also did not support her claims that she was being punched and "pummeled" in the breasts and vagina.

Defendants' claim that BUPS had probable cause to arrest Reed, but they also create a genuine issue of material fact, namely whether BUPS had probable cause to arrest Reed on September 7, 2010 and again on September 10, 2010.

When viewed in the light most favorable to the Plaintiff, shows that a jury could easily find in Plaintiff's favor. Therefore, the Court should deny the Bucknell Defendants' Motion for Summary Judgment because they have failed to prove that they are entitled to judgment as a matter of law on elements 1 and 2, and have also failed to prove that there is no genuine dispute of material fact on element 3, and therefore, Plaintiff's False Arrest claim in proper.

### 3. BUPS Officers are not entitled to qualified immunity because of willful omissions when applying for an arrest warrant:

"In the context of a claim of false arrest . . . by a police officer, the officer is entitled to qualified immunity when 'a reasonable officer could have believed that probable cause existed to arrest' the plaintiff." *Ciardiello v. Sexton*, 390 F. App'x 193, 199 (3d Cir. 2010) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). Government officials are entitled to qualified immunity as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable

41

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

However, "if a police officer submits an affidavit containing statements he knows to

be false or would know are false if he had not recklessly disregarded the truth . . .

[then] he is not entitled to qualified immunity. *Lippay v. Christos*, 996 F.2d 1490,

1504 (3d Cir. 1993) (*See also, Malley v. Briggs*, 475 U.S. 335, 345 (1986); *Olson v.*

*Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)).  On top of omitting the fact that Kelly and

Reed had engaged in play fighting prior to this incident, Officer Holtzapple and the

BUPS officers who drafted and approved the Affidavit of Probable Cause, omitted

material information from witnesses and misled the district justice.

It is widely known and clearly established that an arrest made without probable

cause violates the arrestee's Fourth Amendment right to be free from unreasonable

seizures.  In this case, based on the aforementioned discussion of BUPS's lack of

probable cause, BUPS arrested Reed without probable cause and thus violated Reed's

Fourth Amendment right.  The Bucknell Defendants are not entitled to qualified

immunity because it is clearly established law that an arrest made without probable

cause violates the arrestee's Fourth Amendment right to be free from unreasonable

seizures.

### C.    **Malicious Prosecution:**

There is a genuine dispute as to whether the Bucknell Defendants knowingly prosecuted Reed when they lacked probable cause. Therefore, this Court should deny summary judgment as to the Bucknell Defendants on Count II, Malicious Prosecution.

"Under Pennsylvania law, the elements of a malicious prosecution claim are that the defendant[s] (1) instituted the proceedings (2) without probable cause with (3) actual malice and (4) that the proceedings terminated in favor of the plaintiff." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993). "Malice may be inferred from the absence of probable cause." *Id.*; *See also, Griffiths v. CIGNA Corp.*, 988 F.2d 457, 463 (3d Cir. 1993).

As explained above, any reasonable officer would have known that Kelly lacked credibility, as every witness refuted her account. In this case, Plaintiff can easily show the elements of a malicious prosecution. The Bucknell Defendants initiated a criminal proceeding against Reed; the criminal proceeding ended in Reed's favor; the proceeding was initiated without probable cause; the Bucknell Defendants acted maliciously, knowing they lacked probable cause and knowing the overwhelming evidence supported Reed's innocence; and Reed suffered a deprivation

of liberty through two arrests, bookings and arraignments.  *See, DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005).

In this case, Officer Ulmer and Officer Middleton collaborated in typing up and filing the charges against Reed.  Bucknell Defendants' Exh. B  p.12, item 12; Bucknell Defendants' Exh. B p. 13, item 15; *see also,* Exhibit "C" pp. 69-70.  Officer Ulmer also contacted "District Magistrate Jack Robinson . . . to see if he would arraign Reed Dempsey on the charges of Simple Assault, Disorderly Conduct and Harassment."  Bucknell Defendants' Exh. B p.12, item 12.  Officer Middleton contacted multiple witnesses to inquire about filing written statements.  Bucknell Defendants' Exh. B pp. 8-9, items 6-9.  Officer Fisher interviewed Gregory Fast. Bucknell Defendants' Exh. B p. 23, item 46.  Detective Ettinger emailed digital copies of Kelly's first recorded interview "to the entire command staff and to Officers Julie Holtzapple and James Middleton.  Bucknell Defendants' Exh. B pp.13-14, item 16.  Detective Ettinger left a voicemail message with Reed and also spoke with Reed's attorney Stephen Becker about criminal charges related to the September 5, 2010 incident.  Bucknell Defendants' Exh. B p.15, item 24.  Detective Ettinger conducted a second, recorded interview of Kelly in the presence of her Attorney, Anthony Voci.  Bucknell Defendants' Exh. B p. 26, item 26; *see also,* Bucknell

44

Defendants' Exh. S.  On September 7, 2010 around 10:00 a.m., Officer Holtzapple filed criminal charges against Reed, with her Affidavit of Probable Cause attached. Bucknell Defendants' Exh. B p. 13, item 15; *see also,* Bucknell Defendants' Exh. M. Captain Lauver and Chief Friedberg approved the charges before filing.  Exhibit "C" p. 79:10.

Additionally, Officer Holtzapple interviewed witnesses, and met with District Attorney Johnson.  Bucknell Defendants' Exh. B  pp.14-15, items 20, 22, and 23, respectively.  Officer Holtzapple then typed up new charges against Reed.  (*Id.* p. 17, item 28).  After Chief Friedberg, Detective Ettinger, and Officer Holtzapple met with District Attorney Johnson on September 10, 201 at 10:00 a.m., the new charges were amended.  (*Id.* p. 18-19, item 31).  At approximately 11:30 a.m., new charges were filed against Reed.  (*Id.* p. 20, item 35). Collectively, the Defendants instituted the proceedings against Reed on September 7, 2010 and September 10, 2010.

As previously exemplified in the analysis relating to false arrest, probable cause did not exist when the Bucknell Defendants charged Reed with multiple crimes on September 7, 2010 and September 10, 2010.  Reed Dempsey incorporates that analysis and discussion here.

As aforementioned, "[m]alice may be inferred from the absence of probable cause." *Lippay*, 996 F.2d at 1502; *see also, Griffiths v. CIGNA Corp.*, 988 F.2d 457, 463 (3d Cir. 1993). Given the discussion on the Bucknell Defendants' lack of probable cause to arrest Reed on either occasion, the Court should infer the Bucknell Defendants' malicious intent based on the numerous witness statements that refuted Kelly's version of events, and the intentional omission of that information from the warrant application.

A reckless disregard for the truth was exhibited by the Bucknell Defendants during their pursuit for false imprisonment and indecent assault charges to supplement Reed's September 7, 2010 charges. Specifically, BUPS had a complete lack of evidence to support any charges of a sexual nature; BUPS had multiple eyewitnesses that refuted Kelly's story; and BUPS had video evidence of Kelly engaging in "play-fighting" and using profane name calling on other occasions with other students, which complimented and confirmed Kelly's behavior as described by Reed and the other witnesses. Bucknell Defendants' Exh. J p.2; *see also,* Bucknell Defendants' Exh. B p.23, item 46. Even more indicative of malicious intent are statements by investigating officers confirming that the charges against Reed were factually unsupported. Specifically, Officer Ulmer, an officer involved in witness

46

interviews and the filing of charges against Reed, stated that he knew the whole time that this incident should only have been a disorderly conduct.  Exhibit "A" pp. 182-183; *see also*, Exhibit "C" pp. 84:4-10.

Therefore, given Bucknell Defendants' lack of probable cause to charge Reed and their blatant disregard for the truth and Reed's rights, a reasonable jury can find that the Bucknell Defendants acted with malice during their prosecution of Reed.[14]

Therefore, this Court should deny summary judgment as to the Bucknell Defendants on Count IV, Malicious Prosecution.

### D.   <u>Supervisory Liability:</u>

Given the exculpatory evidence known to the Bucknell Defendants, there is a genuine dispute as to whether the Bucknell Defendants participated and/or acquiesced in allowing the subordinate BUPS officers to proceed with a criminal prosecution that lacked probable cause.  Therefore, this Court should deny summary judgment as to the Bucknell Defendants on the Supervisory Liability count.

---

[14] Lastly, it is undisputed that the proceedings were terminated in Reed's favor. On October 29, 2010, District Attorney Johnson withdrew all criminal charges against Reed.  Bucknell Defendants' Exh. AA , email from Mr. Surgala to President Bravman and others.

A plaintiff will prevail on a claim for supervisory liability by proving that a supervisor "participated in violating their rights, or that he directed others to violate them, or that he . . . had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). "[P]ersonal involvement of a supervisor can be demonstrated through allegations of personal direction or of actual knowledge or acquiescence in the alleged wrongs." *Pansy v. Preate*, 870 F. Supp. 612, 619 (M.D. Pa. 1994), *aff'd*, 61 F.3d 896 (3d. Cir. 1995).

The Bucknell Defendants claim that "Reed cannot maintain an underlying claim for false arrest or malicious prosecution against any defendant" and thus "his supervisory liability claim fails." Bucknell Defendants' Br. In Supp. Of Mot. For Summ. J., p. 60. However, as illustrated throughout both the False Arrest and Malicious Prosecution analyses in this Brief, Reed can maintain each claim respectively because sufficient facts exist to support a finding that BUPS did not have probable cause to arrest Reed. Therefore, the claim for supervisory liability does not fail and must remain.

In this case, the Bucknell Defendants had knowledge of exculpatory evidence, had knowledge of evidence contradicting Kelly's story, and despite possessing this knowledge, ratified the law enforcement activities of subordinate BUPS officers.

48

Reed's arrest and prosecution were ratified by Chief Friedberg, President Bravman, Deans Locher, Badal and Marrara, and Attorney Bromfield, who are final policymakers for day-to-day law enforcement activities. These policymakers personally knew of, encouraged and assisted the officers' actions.

The Bucknell administration knew that contradictions existed in Kelly's story. Exhibit "K" p. 115:19-25 Specifically, Chief Friedberg acknowledged that there were "contradictory statements throughout" Kelly's story. *Id.* These contradictory statements were not provided or stated to the Court in the Affidavit of Probable Cause. *Id.* p. 113:2-6; see also p. 116:1-8. Officer Holtzapple drafted and presented the Affidavit of Probable Cause to Chief Friedberg. *Id.* p. 113:1-6. After reviewing the charges and supporting Affidavit of Probable Cause, Chief Friedberg approved the Affidavit of Probable Cause. Exhibit "K" p. 117:6-16. When asked who "decided what information would be stated in the Affidavit of Probable Cause," Chief Friedberg responded that "[i]t had to be [him]" because "the buck stops with [him]." *Id.* p. 122:2-7.

These policymakers personally knew of, encouraged and assisted the officers' actions. Emails exchanged among the Bucknell Defendants, and the meetings held to discuss the various stages of this case, show that supervisors knew of and were

involved in the decision making throughout this case, including the decision to charge Reed and to suspend him.   Exhibit "O", Email from President Bravman. Then Bucknell General Counsel Wayne Bromfield took custody of the case file during the course of the investigation, and was fully aware of the evidence in this case, including the overwhelming exculpatory evidence.   Exhibit "K" p. 24: 17-24.   The administrators even went so far as to confront Kelly about the contradictory witness statements, but rather than stop the malicious prosecution, they directed Kelly to be re-interviewed so that her story could bolster the charges.   Exhibit "P", Voci Dep. Tr. pp 82:22 - 83:9.

Dean Locher ratified the investigation of the BUPS and participated in the decision to have Kelly re-interviewed and have more serious charges filed against Reed.   *Id.*   She further ratified the investigation and malicious prosecution when she temporarily suspended Reed from Bucknell University.   Exhibit "Q", 9/6/10 Letter from Linda Locher to Reed.   Specifically, in her capacity as "Interim Dean of Student," Dean Locher stated "that based on a review of the evidence provided to Bucknell's Public Safety Office concerning events occurring from 09/04/2010 to 09/05/2010, you have been temporarily suspended from the University.   *Id.*   Since Dean Locher reviewed the evidence presented against Reed, she was aware of the

contradictory statements of Kelly. Similarly, Dean Badal facilitated the initial investigation, encouraged Kelly to file criminal charges, attended Kelly's initial interview with BUPS officers, and participated in the decision to suspend Reed. Additionally, BUPS indirectly reports to President Bravman (Exhibit "R", Bravman Dep. Tr. p. 14:11-25), and Bravman made the ultimate decision to have Reed arrested and removed from campus, all after having consulted with the other Bucknell Defendants. Exhibit "DD". Finally, Chief Friedburg and Captain Lauver approved the filing of criminal charges. Exhibit "C" p. 79:10.

"[P]ersonal involvement of a supervisor can be demonstrated through allegations of personal direction or of actual knowledge or acquiescence in the alleged wrongs." *Pansy v. Preate*, 870 F. Supp. 612, 629 (M.D. Pa. 1994) *aff'd*, 61 F.3d 896 (3d Cir. 1995). The evidence clearly shows that the Bucknell administration and Public Safety supervisors were aware of information that exculpated Reed and directly contradicted Kelly's story. They even confronted Kelly about the falsity of her story. However, they chose to forgo a proper investigation, pursue the false arrest and malicious prosecution against Reed, and actually increase the severity of the charge.

51

Bucknell administrators and BPSU officers and supervisors ignored copious amounts of exculpatory evidence and allowed harmful false allegations to develop into a criminal prosecution. The Bucknell Defendants were aware that Kelly's ever-changing story lacked support and credibility. They even confronted her about the contradicting witness statements and evidence. However, they not only ignored this information, but assisted Kelly in tidying her story and embellishing her statement so that even more severe charges could be filed against Reed. By participating in and/or acquiescing the false arrest, malicious prosecution, and overall disparate treatment of Reed, the Bucknell Defendants caused irreparable harm to Reed's reputation and future. *See* Bucknell Defendants' Exh. QQ, Expert Report of Joeseph Ankust.

Furthermore, under the theory of bystander liability, Captain Lauver is subject to liability for failing to terminate Reed's arrest and prosecution. Under bystander liability, if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation . . . takes place in his presence, the officer is directly liable under Section 1983." *Smith v. Mensinger*, 293 F.3d 641, 650 (2002); *see also Baker v. Monroe T*ownship, 50 F.3d 1186, 1195 (3d. Cir. 1995) (holding a senior police officer liable for standing by while executing a search warrant as excessive force was used by subordinate police officers).

52

In this case, as the senior officer on duty when charges were filed, Captain Lauver had authority to stop the arrest and prosecution of Reed.  The arrest and prosecution clearly lacked probable cause but Captain Lauver failed to intervene to prevent the violation of Reed's Fourth Amendment rights.  Therefore, Captain Lauver stood by as BUPS officers proffered a faulty Affidavit of Probable Cause and obtained an arrest warrant that lacked probable cause.

Ultimately, Bucknell University is subject to liability for the actions of Chief Friedberg, Captain Lauver, Dean Mararra, Dean Badal, Dean Locher, and President Bravman, as they were all aware that Kelly's story lacked support, yet they approved the criminal prosecution of Reed.  (*See, i.e., City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.")).   In sum, the exculpatory evidence and contradictory statements within the possession and knowledge of the Bucknell Defendants create a genuine dispute that the Bucknell Defendants participated and/or acquiesced in allowing the subordinate BUPS officers to proceed with a criminal prosecution that lacked probable cause.  Therefore, this Court should deny summary judgment to the Bucknell Defendants on Count III, Supervisory Liability/Bystander Liability.

53

E.    **False Imprisonment:**

In order to prevail on a claim for false imprisonment, a plaintiff must prove the following: "(1) the detention of another person, and (2) the unlawfulness of such detention." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994). The unlawfulness of the detention is determined by whether the officer had probable cause to arrest plaintiff. *Id.* As discussed above, a genuine dispute of material fact exists in this case as to whether, based on the facts and information available to BUPS officers, the Bucknell Defendants had probable cause to arrest Reed. Therefore, this Court should deny summary judgment to the Bucknell Defendants on Count IV, False Imprisonment.

In Pennsylvania, "[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment." *Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. Ct. 2000). In this case, Reed was detained, at the behest of Bucknell Defendants, when he was arrested on September 7, 2010, and again on September 10, 2010. Bucknell Defendants' Exh. B p. 13, item 15; *see also* Bucknell Defendants' Exh. M and Bucknell Defendants' Exh. B , p. 20, item 20; *see also*, Bucknell Defendants' Exh. U. At the time Officers Ulmer and Middleton typed up and compiled the

September 7, 2010 charges, they were acting within the scope of their employment as officers for the Bucknell University Public Safety/Police.  Exhibit "C" pp. 69-70; *see also,* Bucknell Defendants' Exh. B  p. 12, item 12.   Similarly, at the time Officer Holtzapple filed the September 7, 2010 charges, she was working in her capacity and during the scope of her employment as an officer for the Bucknell University Public Safety/Police.  Exhibit "M" p. 41:15-21; *see also,* Bucknell Defendants' Exh. B  p. 13, item 15.  Thus, Bucknell is liable for its public safety officers' actions.

After the September 7, 2010 charges were filed against Reed, other BUPS officers became involved with the filing of the September 10, 2010 charges.  On September 9, 2010, Detective Ettinger, in his capacity as a Detective for Bucknell University Public Safety, met with Officer Holtzapple and District Attorney Johnson. Bucknell Defendants' Exh. B  p. 15, item 22.  During this meeting, "aggravated assault" and "unlawful restraint" charges were suggested as charges to be added to "Reed's list of charge against him."   *Id.*   After meeting with District Attorney Johnson, Officer Holtzapple began drafting new charges.  *Id.* p. 17, item 28.  On September 10, 2010, Chief Friedberg, Detective Ettinger, and Officer Holtzapple met with District Attorney Johnson, where the charges of False Imprisonment and

Indecent Assault were "accepted".[15]  *Id.* p. 18-19, item 31.  Later that day, Officer Holtzapple filed the additional charges.  *Id.* p. 20, item 35.

Plaintiff has already established that he was detained, and that his detention was unlawful, the two elements required to maintain a false arrest claim under Pennsylvania law.  In a state-law false imprisonment claim against a police officer, as in a federal false arrest claim, the relevant inquiry is whether the officer had probable cause to arrest the plaintiff.  The Pennsylvania tort of false imprisonment operates under the general rule that "[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment." *Brezenski v. World Truck Transfer, Inc*., 755 A.2d 36, 39 (Pa. Super. Ct. 2000).  Immunity does not extend to willful acts of employees, and a false arrest claim can constitute willful conduct.  *See e.g., Lippay v. Christos*, 996 F.2d 1490 (3d Cir. 1993).

As detailed above, the false arrest claim clearly involves willful and malicious conduct.  Here, the Bucknell Defendants knowingly arrested Reed without probable cause, and intentionally withheld exculpatory information in order to effect the arrests

---

[15]   These charges were previously discussed with various members of the Bucknell administration at the meeting with the Stefanowicz family and Attorney Voci, immediately prior to Kelly providing a second statement.

on September 7, 2010 and September 10, 2010. Bucknell University is liable for the acts of its employees.

Contrary to the Bucknell Defendants' assertion that "probable cause existed to arrest Reed," Reed has presented a significant exculpatory facts that were available to BUPS officers before they decided to detain him. Through the presentation of these facts and circumstances, Plaintiff has satisfied the burden of showing a genuine dispute of material fact exists, and a reasonable juror could find that, based on the facts and information available to BUPS officers, the Bucknell Defendants lacked probable cause to arrest Reed. Therefore, this Court should deny summary judgment to the Bucknell Defendants on Count IV, False Imprisonment.


### F.    Fraud:

There is a genuine dispute as to whether Officer Ulmer's false representation was intended to mislead Reed; therefore, this Court should deny summary judgment on Count VIII, Fraud.

In order to prevail on a claim for fraud, a plaintiff must prove that the following: (1) a representation; (2) which is material; (3) which was made falsely, either knowingly or recklessly; (4) with intent to mislead another into relying on it;

(5) justifiable reliance; and (6) resulting injury (proximate causation). *Sewak v. Lockhart*, 699 A.2d 755, 759 (Pa. Super. Ct. 1997).  In addition, "[a]n employer is vicariously liable for the wrongful acts of an employee if that act was committed during the course of and within the scope of employment." *Brezenski*, 755 A.2d at 39.

In this case, Reed "requested a copy of the incident report" from Officer Ulmer. Exhibit "C" p. 81:23; Exhibit "A" pp. 142-143.  Officer Ulmer did not release the incident report to Reed. *Id.*  Instead, Officer Ulmer assured Reed that Kelly was not pursuing charges against him.  However, on September 5, 2010, Officer Ulmer was present during Kelly's first interview with BUPS, where he learned that Kelly wanted "to proceed with external charges for this assault."  Bucknell Defendants' Exh. B  p. 6, item 2.  Officer Ulmer was aware that BUPS was attempting to obtain an arrest warrant, as he had  helped draft the criminal complaint.  Exhibit "C" p. 69:23.

Reed justifiably relied on this material statement in not seeking to contest Kelly's false statements, and in not assuring that his statement to BUPS covered the issues at hand.  The false statement limited Reed's ability to defend himself from criminal charges, and further interfered with his ability to defend himself against the student misconduct charges.  Officer Ulmer's representation was intended to mislead

Reed into relying on the assertion that criminal charges against him were not being pursued, and similarly, that internal charges at Bucknell, along with a suspension and Reed's removal from campus, were not imminent.

Reed's reliance on Officer Ulmer's fraudulent representation convinced Reed not to obtain a copy of his statement or seek to contest any statement made by Kelly; it stunted his defense and access to witnesses; and led to two sets of criminal charges filed against him. Ultimately, since Officer Ulmer made this fraudulent representation to Reed during and within the scope of his employment with Bucknell University as a BUPS officer, then Bucknell University is vicariously liable for Reed's injuries as a result of his justified reliance on this fraudulent representation.

Despite the Bucknell Defendants' contention that "Reed cannot prove his claim of fraud against Officer Ulmer and the University with any evidence," Reed has proffered facts to show that Officer Ulmer made fraudulent statements on which Reed relied, to his detriment.  To the extent the Bucknell Defendants argue that Officer Ulmer's intentions were not to mislead Reed, this shows that a genuine issue of fact exists for this claim, and, therefore, the Court should deny summary judgment as to the Bucknell Defendants on Count VIII, Fraud.

### G.    Breach of Contract:

A genuine dispute remains as to whether Bucknell University breached its contractual obligations to Reed by withholding mandatory information from Reed prior to his student conduct hearing.  Given the material nature of the disputed facts, a reasonable juror can find that Bucknell University did breach the existing contract between itself and Reed.  Therefore, this Court should deny summary judgment as to the Bucknell Defendants on Count X, Breach of Contract.

In order to prevail in a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resulting damages.  *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006).  "[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract."  *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999).

In this case, Bucknell's Student Handbook created the contractual relationship between Reed and Bucknell University.  Exhibit "AA", Excerpt from Student Handbook: 2010-2011, p. 1; *see also* Doc. 31 p. 33 ("the Court is satisfied that

Plaintiffs have sufficiently pleaded the existence of a contract between Plaintiff Reed and Defendant Bucknell . . . as contained in the Student Handbook.").   According to Bucknell's Student Handbook: 2010-2011, and in relation to the "PROCEDURES FOR ADJUDICATING ALLEGED CATEGORY I VIOLATIONS", the HBSM was required to provide Reed "with the following information, materials, and opportunities:" (a)  A copy of the charge(s);    (b) supporting information; (c) the Public Safety Information Report; (d) the Police Report; (e) the Housing and Residential Life Information Report; and (f) *statements from any witnesses*.  Exhibit "AA" p. 126 (emphasis added). These obligations of the HBSM created the essential terms relevant to the breached contractual relationship.

In this case, Reed was provided with a copy of the charges, copies of his and Kelly's written statements, an incomplete version of the BUPS Incident Report, photographs of Kelly, and some witness statements.  Exhibit "II", September 23, 2010 Letter from Dean Conrad to Reed.  However, Reed was not provided with supporting information and statements from certain witnesses.  Among materials withheld from Reed, included the audio recording of Kelly's first interview, the complete and accurate BUPS report, notes related to his interview with BUPS, and certain witness statements.  In terms of the audio recording of Kelly's first interview, this interview

ultimately led to the filing of criminal charges, and was clearly material. This audio recording file and its contents qualified not only as supporting information related to the charges filed against Reed, but also a witness statement and impeachment material against Kelly. Therefore, HBSM's failure to provide Reed with it constituted a breach of contract.

The complete BUPS Incident Report was also not provided, despite representations by the Bucknell Defendants that the full report was supplied. The Incident Report was a piece of evidence that the HBSM used to determine if alleged student-conduct violations warranted adjudication by the hearing board. By providing Reed with an incomplete, redacted version of the BUPS Incident Report, Reed was unaware and could not contest information that the HBSM relied on when deciding that adjudication of violations was warranted. The Bucknell Defendants claim that Reed was provided with the "relevant portion of BUPS's incident report"; however, relevancy is a subjective determination and thus what may be deemed relevant to the Bucknell Defendants may not be deemed relevant to Reed and his then-counsel. Furthermore, relevant portions of the police report *were* withheld, and Plaintiff now knows multiple versions of the report exists. While Bucknell provided Reed with a report that was only 10 pages long, the full report, at least to Plaintiff's

knowledge, is twice that length. Therefore, HBSM's failure to provide Reed with a complete BUPS Incident Report - and its fraudulent representation that the full report was actually supplied - constituted a breach of contract.

Finally, Reed was not provided notes related to his interview with BUPS. Officer Ulmer's report about the interview did not accurately reflect what Reed said during his interview. Reed knew that Officer Fisher took notes during the interview, and requested Fisher's notes or report. Reed was falsely told that no were taken, so there was nothing to turn over. Exhibit "S" p. 104:11-15. Similarly, exculpatory information related to witness statements. For example, Reed was not aware that witness Greg Fast entered Reed's dorm room and witnessed Kelly on top of Reed pinning him to the futon during play-wrestling, just as Reed had described. Bucknell Defendants' Exh. J p.1. It was not until Discovery in this case that Reed realized an eye witness had entered his dorm room during the time frame that Kelly claimed she was being assaulted, and that BUPS was aware of this witness throughout the investigation.

Ultimately, Bucknell breached its duty to provide these materials to Reed under the Student Handbook. Because Reed was not provided with the aforementioned information, he was unable to adequately prepare and contest the content of that

63

information at the hearing.  But for this breach, Reed would not have been found responsible for Disorderly Conduct, as the withheld information contradicted Kelly's story and proved Reed was actually the victim of Kelly's aggressive actions. Furthermore, the withheld evidence exculpated Reed in the criminal case, and provided an eye witness for the time that Kelly claimed she was being assaulted.

A genuine dispute remains as to whether Bucknell University breached its contractual obligations to Reed.  Given the aforementioned facts, a reasonable juror can find that Bucknell University did breach the existing contract between itself and Reed.  Therefore, this Court should deny summary judgment as to the Bucknell Defendants on Count X, Breach of Contract.

Overall, the Bucknell Defendant's Motion for Summary Judgment should be denied because each of the remaining counts alleged against the Bucknell Defendants involves material facts that are genuinely in dispute and the Bucknell Defendants are not entitled to judgment as a matter of law.

## IV.   CONCLUSION:

For the reasons stated above, the Plaintiff, Reed Dempsey, respectfully requests this Honorable Court deny the Bucknell Defendants' Motion for Summary Judgment.

**BOYLE LITIGATION**

/s/ *Megan E. Schanbacher*
**Dennis E. Boyle, Esquire**
Supreme Court I.D. No. 49618

**Megan E. Schanbacher, Esquire**
Supreme Court I.D. No. 306958
4660 Trindle Road, Suite 102
Camp Hill, PA  17011
Phone:  (717) 737-2430
Fax:  (717) 737-2452
Email: deboyle@boylelitigation.com
          mschanbacher@boylelitigation.com

Counsel For:  Plaintiffs

Dated:  June 26, 2014

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date listed below I electronically filed the foregoing with the Court using the CM/ECF system, which sent notification of such filing to the following person(s) at the following email address(es):


Amy C. Foerster, Esquire
amy.foerster@bucknell.edu

Mark T. Perry, Esquire
mtp@theperrylawfirm.com


Corey S. Winter, Esquire
cwinter@saul.com

Timothy Holland, Esquire
tholland@theperrylawfirm.com


James Keller, Esquire
jkeller@saul.com


 /s/ *Penny A. Rogers*            
Penny A. Rogers, Pa.C.P.
Senior Paralegal


Dated:  June 26, 2014