IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

REED C. DEMPSEY and           :
SHELLEY DEMPSEY,              :      Case No. 4:11-cv-1679
                             :
    Plaintiffs,              :
                             :
    v.                      :      (Judge Brann)
                             :
BUCKNELL UNIVERSITY,         :
JOHN C. BRAVMAN,             :
LEWIS A. MARARRA,            :
AMY A. BADAL,                :
LINDA LOCHER,                :
KARI M. CONRAD,              :
CHIEF JASON FRIEDBURG,       :
OFFICER JULIE HOLTZAPPLE,     :
OFFICER DARRELL FISHER,       :
OFFICER ROBERT ULMER,        :
OFFICER JAMES MIDDLETON,      :
DETECTIVE JEFFREY ETTINGER,:
CAPTAIN DOUGLAS LAUVER,       :
and ANTHONY J. VOCI, JR.     :
                             :
    Defendants.             :

**MEMORANDUM**
January 5, 2015

Pending before this Court are two Motions for Summary Judgment (ECF

Nos. 123 and 125), one filed by Defendant Anthony Voci and one filed by the

remaining Defendants.[1] Both motions seek to dismiss all claims remaining against

---

[1] Defendant Voci has also filed a Motion for Joinder (ECF No. 130) in which he requests to join the Bucknell Defendants' Motion for Summary Judgment. The Court interprets this motion to request that all arguments asserted by the Bucknell Defendants be applied to his own pending Motion for Summary Judgment. The Court makes its own determination of the issues presented based on thorough research of the state of the law, including but not limited to the research submitted by the parties. The Court has considered all possible arguments in its

them, of which there are a total of nine.  The matter has been fully briefed and is now ripe for disposition.

In accordance with the following reasoning, Defendants' Motions for Summary Judgment are granted in part and denied in part.  Counts I, II, III, IV, VIII, X, XIV and XVI are dismissed in their entirety.  Summary judgment is denied with respect to Count VII for defamation as asserted against Defendant Voci.

## I. BACKGROUND

This case arises out of a sexual assault allegation by Ms. Kelly Stefanowicz against Plaintiff Reed C. Dempsey, and Bucknell University's response to that allegation, including the conduct of Bucknell University Public Safety officers and University officials.  Moreover, several claims relate to the conduct of Ms. Stefanowicz's attorney, Defendant Anthony Voci, Esq., in the course of his legal representation, including the statements he made both to University officials and to a local journalist.  Most of the facts underlying the following claims are undisputed; where the facts are disputed, the Court will acknowledge those discrepancies and will give credence to the evidence favoring the Plaintiff, as the nonmovant, as long as that evidence is properly supported. *See infra*, section II.

---

determination of Defendant Voci's Motion for Summary Judgment.  As such, Defendant Voci's Motion for Joinder is denied as moot.

1.  Facts Pertaining to Bucknell Defendants

On the evening of Sunday, September 5, 2010, Bucknell University Public Safety officer (hereinafter, "BUPS") and defendant Julie Holtzapple received a call from Brian Stefanowicz, father of Kelly Stefanowicz, who reported that his daughter had been assaulted earlier that morning. Defs.' Statement of Facts ¶ 1-2, May 29, 2014, ECF No. 127 (hereinafter "Defs.' SOF").  He had noticed extensive bruising on his daughter when he saw her play in a collegiate field hockey game earlier that day, and he took photographs of her injuries after the game. Pl.'s Statement of Facts ¶ 30-31, June 26, 2014, ECF No. 138 (hereinafter "Pl.'s SOF").

When Ms. Stefanowicz was interviewed by BUPS officers, she reported that Mr. Dempsey was her assailant and that he "pinched" and "punched" her in inappropriate places while the two were alone together in his room[2]; moreover, she alleged that Mr. Dempsey was "hard" and "getting off to it".[3] Defs.' SOF ¶ 5-9; Pl.'s SOF ¶ 34.  She further reported that the altercation continued even after she was able to leave Mr. Dempsey's room; in the hallway she slapped Mr. Dempsey and he subsequently tackled her to the ground, causing some of her more substantial injuries. Defs.' SOF ¶ 11-13.  She then showed the Defendant officers

---

[2] There is a dispute of fact regarding how long the two were alone in Mr. Dempsey's room while the "assault" was occurring, but the Court gathers that it was sometime between one and ten minutes. Pl.'s SOF ¶ 5 n.1.

[3] The facts as stated in this paragraph describe only what Ms. Stefanowicz reported to Defendant Holtzapple when she was interviewed on the night of September 5, 2010.  The Court recognizes that Mr. Dempsey disputes the accuracy of Ms. Stefanowicz recitation; however, it is undisputed what was said at the interview, regardless of ultimate truth.

some of the text messages that Mr. Dempsey had sent to her after the "assault" which stated, "Sorry. . .I'm bleeding in several places and bruises all over. . .but that was unnecessary on my part"; "I honestly feel horrible. . .I'm so sorry"; and "Are you alright?" *Id.* at ¶ 16; Pl.'s SOF ¶ 26.

Later that night, BUPS officer and Defendant Robert Ulmer contacted Mr. Dempsey and asked him for an interview regarding the incident with Ms. Stefanowicz, and Mr. Dempsey agreed to the interview. Defs.' SOF ¶ 18-19; Pl.'s SOF ¶ 45.  Mr. Dempsey further provided BUPS officers with a written statement and the name of witnesses to the "assault." Pl.'s SOF ¶ 47-48.  BUPS officers did in fact request and receive statements from numerous witnesses recommended by Mr. Dempsey between September 5, 2010 and September 6, 2010, including Wade Payson-Denney, Gregory Fast, Andrew Watts, Kristen Brundage, Morgan Slade, Demitri Carahalios, Gabriela Ors, and Michael Sena. Pl.'s SOF ¶ 49.  BUPS officers also had in their possession the statement of Ms. Stefanowicz's roommate, Raina Masand, which seemingly corroborated Ms. Stefanowicz's version of the events by detailing Ms. Stefanowicz's present-sense impression of what had occurred between her and Mr. Dempsey immediately afterwards. Defs.' SOF ¶ 23-32.

Ms. Stefanowicz also subsequently provided a written statement to BUPS officers on September 6, 2010. *Id.* at ¶ 43.  In her statement she wrote that:

> Reed pinned me down on his futon, pinning my arms above my head by the wrists, and this is when I noticed he was aroused.  I struggled to free myself as Reed repeatedly punched me with his closed fists in my groin and chest. He had also been pinching and slapping/scratching my backside (butt) throughout our fight.  I began to slap, hit, punch, and knee Reed in the groin to fight him off.  He said "I wanted to" and that I was a "huge bitch" for resisting him.

*Id.* at ¶ 44. She went on to state that she was finally able to free herself from Mr. Dempsey and run out into the hall where she slapped him, and then Mr. Dempsey forced her arms behind her back and tackled her to the ground. *Id.* at ¶ 45-49.

On September 6, 2010, Mr. Dempsey requested that he be provided a copy of the incident report[4] and was told by Defendant Ulmer that Ms. Stefanowicz had not pressed charges against him and that he could not obtain a copy of the incident report until charges were filed.[5] *Id.* at ¶ 99-100.  That day, Defendant Dean Locher temporarily suspended Mr. Dempsey from Bucknell University. Pl.'s SOF ¶ 52. On September 7, 2010, Defendant Holtzapple filed a criminal complaint against Mr. Dempsey, charging him with simple assault, harassment, and disorderly conduct. Defs.' SOF ¶ 50.

Two days later Ms. Stefanowicz met with university officials and was told that Mr. Dempsey's temporary suspension had been lifted as a result of the no-contact condition of his bail on the criminal charges. *Id.* at ¶ 56-57.  Following this

---

[4] In the Complaint, Plaintiff alleges that he requested a copy of Ms. Stefanowicz's written statement; however, in his Brief in Opposition to the Bucknell Defendants' Motion for Summary Judgment, he claims that he actually requested a copy of the incident report.

[5] Mr. Dempsey does not discuss this occurrence in his statement of facts; however, he does argue in his Brief in Opposition to the Bucknell Defendants' Motion for Summary Judgment that Defendant Ulmer told him that Ms. Stefanowicz was not pursuing charges against him.  The Court finds no support for this latter statement in the record.

meeting, BUPS officials decided to re-interview Ms. Stefanowicz and were given further information regarding her assault, including a more specified sexual component. *Id.* at ¶ 61-83.  On the basis of this new information, Defendant Holtzapple filed a new criminal complaint against Mr. Dempsey charging him with false imprisonment and indecent assault, in addition to the original charges. *Id.* at ¶ 88; Pl.'s SOF ¶ 64.

Though Mr. Dempsey does not dispute that Ms. Stefanowicz gave these statements and the trajectory of the ensuing events, he does dispute its accuracy and the implications of the witness statements, which he alleges to be exculpatory information that should have cast serious doubt on Ms. Stefanowicz's credibility. He argues that, rather than an assault, what occurred while he and Ms. Stefanowicz were alone together in his room was merely "play-fighting.[6]"  Specifically, Mr. Dempsey testified that while alone in his room, "[Kelly] had her hand on [Reed's] hands . . . kind of hands on [his] wrists, pushing [] [him] down against the futon." *Id.* at ¶ 8.  When he attempted to move Ms. Stefanowicz off of him, her leg knocked over his Brita water pitcher and spilled it on the ground.  *Id.* at ¶ 10.  After that encounter, Ms. Stefanowicz left the room and Mr. Dempsey emerged shortly afterwards. *Id.* at ¶ 11-12.  While conversing in the hallway, Ms. Stefanowicz allegedly attempted to begin "play-fighting" once more by poking Mr. Dempsey's

---

[6] While the Court is not entirely sure what this activity is, "play-fighting" appears to be a type of consensual fighting/wrestling in which all parties to the activity are joking and the fight is in jest.

arm and shoving him. Pl.'s SOF ¶ 13.  Moreover, after chasing Mr. Dempsey down

the hall, Ms. Stefanowicz hit him in his genitals, causing Mr. Dempsey to give her

a "bear hug" in order to stop her from hitting him. *Id.* at ¶ 14-16.  In the course of

that bear hug, the pair fell to the ground, causing many of Ms. Stefanowicz's

injuries. *Id.* at ¶ 16-17.

Regarding the allegedly exculpatory witness statements, Mr. Dempsey

contends that they clearly demonstrate that Ms. Stefanowicz was lying in her

statement to BUPS officers and that because of their possession of these witness

statements the officers reasonably should have known that Ms. Stefanowicz lacked

credibility.  These witness statements do corroborate the fact that Mr. Dempsey

and Ms. Stefanowicz were acting playfully before and after they were alone

together in Mr. Dempsey's room; however, no witness statement discusses what

happened in the room when the pair were alone together.

On September 14, 2010, while the criminal charges were still pending, Ms.

Stefanowicz initiated internal student conduct charges against Mr. Dempsey and, in

response, Mr. Dempsey filed student conduct charges against Ms. Stefanowicz.

Defs.' SOF ¶ 89-90; Pl.'s SOF ¶ 65-66.  Two weeks prior to the hearing, Mr.

Dempsey received various documents from the University as required by the

Student Handbook, including copies of his and Ms. Stefanowicz's written

statements, a redacted version of the BUPS's incident report, photographs of Ms.

Stefanowicz's injuries, and written witness statements of eleven witnesses. Defs.'

SOF ¶ 106.  Five days before the hearing he was subsequently provided with the

transcription of Ms. Stefanowicz's September 9, 2010 interview, the written

statement of Rebecca Neubauer, a DVD of the September 5, 2010 field hockey

game in which Ms. Stefanowicz played, additional photographs, and a copy of the

report from Ms. Stefanowicz's September 5, 2010 medical evaluation at

Evangelical Hospital. *Id.* at ¶ 109.

Mr. Dempsey further requested from the University but did not receive, an

audio recording of Ms. Stefanowicz's first interview, a complete copy of the BUPS

incident report, the handwritten notes of Defendant Officer Fisher, and additional

exculpatory witness statements. Pl.'s SOF ¶ 70; Defs.' SOF ¶ 110.  The Bucknell

Student Handbook provides that students shall receive "[a] copy of the charge(s)

and supporting information, including the Public Safety Information Report, Police

Report, Housing and Residential Life Information Report, and statements from any

witnesses." Bucknell Defs.' M. for Summ. J., Ex. EE, ECF No. 126-31.

Bucknell University held a hearing on both sets of charges from October 5-

7, 2010. Defs.' SOF ¶ 92.  Both Mr. Dempsey and Ms. Stefanowicz were found

guilty of disorderly conduct based on their conduct in the residence hall on the

night of September 4-5, 2010, and were exonerated on all other filed charges. *Id.* at

¶ 93; Pl.'s SOF ¶ 69.  Both received letters of censure and were required to move

to separate residence halls. Defs.' SOF ¶ 94.  On October 29, 2010, Union County,

Pennsylvania District Attorney Peter Johnson withdrew the criminal charges

against Mr. Dempsey. *Id.* at ¶ 96; Pl.'s SOF ¶ 71.  Mr. Dempsey was subsequently

reinstated to the University and graduated in May 2013. Defs.' SOF ¶ 117.

### 2. Facts Pertaining to Defendant Voci

On September 7, 2010, after the first set of criminal charges were filed

against Mr. Dempsey, Defendant Voci's law firm was contacted by Mr.

Stefanowicz regarding the incident and to assist the family through the process.

Pl.'s SOF ¶ 53.  After Bucknell University officials lifted Mr. Dempsey's

temporary suspension, Defendant Voci engaged in a telephone call with Steven

Becker, Esq., Mr. Dempsey's attorney, and Wayne Bromfield, Esq., counsel for

Bucknell University, to protest the lifting of the suspension.  Def. Voci's Statement

of Facts ¶ 30, May 29, 2014, ECF No. 124-22 (hereinafter "Def. Voci's SOF");

Pl.'s SOF ¶ 55.  During that call, Defendant Voci referred to Mr. Dempsey as

something akin to a "sexual assaulter." Def. Voci's SOF ¶ 30.

On September 21, 2010, Defendant Voci wrote a letter to Defendant Dean

Conrad, seeking to stop the student conduct hearing until the criminal charges

against Mr. Dempsey had run their course and, further, seeking dismissal of Mr.

Dempsey's student conduct charges against Ms. Stefanowicz. *Id.* at ¶ 29.  That

letter stated that "the University [is] allowing the perpetrator of a sex crime to

misuse the internal process to continue to victimize a student/victim." Pl.'s SOF ¶ 57.  On September 29, 2010, Defendant Voci authored two separate pieces of correspondence, one an email to Defendant Conrad and the other a letter to Mr. Bromfield, which Defendant Voci also forwarded to the Bucknell University Board of Trustees. Def. Voci's SOF ¶ 32-33.  The first related to his concerns over the failure of the University to postpone the student conduct hearing; in it he referred to Mr. Dempsey as Ms. Stefanowicz's "assailant." Pl.'s SOF ¶59.  The latter was sent for the same purposes, and referred to Mr. Dempsey throughout as "the offender," Ms. Stefanowicz's "attacker," and the perpetrator of a "sex crime." *Id.* at ¶58.

Later, Defendant Voci spoke with Joseph Deinlein, a reporter from *The Daily Item* newspaper, based in Sunbury, Pennsylvania. Def. Voci's SOF ¶ 18-20. He was quoted only twice in Mr. Deinlein's articles, once on October 5, 2010 and again on October 6, 2010. *Id.* at ¶ 18-20.  Specifically, in the October 5, 2010 article, Defendant Voci stated, "Our client did not request this hearing date. . . . She instituted the internal charges at the suggestion of university officials who advised her in the aftermath of incident.  As you can imagine, this is a shaken 19-year-old girl reaching out to the university." *Id.* at ¶ 18.  On October 6, 2010, he is quoted as saying, "She was told her charges against her attacker would be thrown out if she did not attend the hearing. . . . And the charges against her would be tried in

abstentia." *Id.* at ¶ 20.  Defendant Voci does not dispute that he made these statements to Mr. Deinlein.[7]

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  *In re Bressman*, 327 F.3d 229, 237 (3d Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  The moving party may satisfy this burden by either (i) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (ii) demonstrating to the Court that the nonmoving party's evidence is

---

[7] Defendant Voci does argue that "[t]he reference to Reed as an 'attacker' in the October 6, 2010 article was not attributed to statements made by Attorney Voci." Def. Voci's SOF ¶ 28.  However, this Court does not believe that he is arguing that he never made the above-referenced statement to Mr. Deinlein which is quoted in the article. However, if he does intend to argue this point, the affidavit submitted by Mr. Deinlein would tend to prove otherwise, and Defendant Voci offers no evidence to support any assertion that Mr. Deinlein is lying.  The fact that Mr. Deinlein could have received the information from elsewhere does not negate the fact that he actually received it from Defendant Voci.

insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Where the moving party's motion is properly supported, the nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "materials in the record" that go beyond mere allegations, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); see also *Anderson*, 477 U.S. at 248–50.

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).  Furthermore, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. *BWM, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III. DISCUSSION

### A. False Arrest (Count I)

Mr. Dempsey has asserted a false arrest claim, pursuant to 42 U.S.C. § 1983, against Defendants Holtzapple, Ulmer, Middleton, Fisher, and Ettinger. He alleges, primarily, that the officers did not have probable cause to arrest him because they knew that the information upon which they had secured his arrest warrant was materially misleading.  Specifically, he argues that they omitted contradictory, false, and exculpatory information, including numerous contradictory witness statements and that they failed to acknowledge the contradictions inherent in Ms. Stefanowicz's own statements to the officers.  He argues further that probable cause is an issue of fact to be determined by a jury and that therefore summary judgment should be denied on that basis alone.  Defendants contend instead that an analysis of probable cause is based on consideration of all of the information that the officers had in their possession at the time the arrest warrant was issued and

that in this case no reasonable officer could have concluded that probable cause did not exist; therefore, summary judgment is warranted as a matter of law.

In order to prevail on a claim brought pursuant to § 1983, a plaintiff must demonstrate that the defendants engaged in conduct under color of state law that deprived the plaintiff of rights, privileges, or immunities protected by the U.S. Constitution or laws of the United States. 42 U.S.C. § 1983; *see also Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  In a § 1983 claim based upon false arrest, the proper inquiry is "whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Dowling v. Philadelphia*, 855 F.3d 480, 482 (3d Cir. 1995).

A false arrest is one in which either the arrest is made without probable cause or the arrest was made by a person without privilege to do so. *Renk v. City of Pittsburgh*, 641 A.2d 289, 295 n.2 (Pa. 1994).  To state a claim for false arrest based on a warrant, the plaintiff must establish that the defendants: (1) "knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).

1.     Omissions

Mr. Dempsey contends that the officers omitted numerous witness statements within their Affidavit of Probable Cause which were contradictory to Ms. Stefanowicz's own statement and which, moreover, tended to exculpate him of the crimes alleged, including those of Kristen Brundange, Gabriela Ors, Morgan Slade, Demitri Carahalios, Gregory Fast, and Wade Payson-Denney.  Defendants respond to this argument only to call attention to the fact that in his deposition, Mr. Dempsey could not recall any exculpatory evidence that was omitted from the Affidavit of Probable Cause.

The Third Circuit has explained that material omissions are made with reckless disregard for the truth if the affiant "withholds a fact in his ken that 'any reasonable person would have known [] was the kind of thing the judge would wish to know.'" *Wilson*, 212 F.3d at 787 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).  The witness statements at issue were undeniably exculpatory, even if not directly applicable to the question of what happened in Mr. Dempsey's room while the pair was alone, because they provide circumstantial evidence as to what may have occurred between the pair in a way that could exonerate Mr. Dempsey and, additionally, as to the state of mind of the parties involved; therefore, a judge would have wished to be aware of the statements when issuing the arrest warrant.

It is an issue of fact, however, as to whether all of the witness statements were provided along with the Affidavit of Probable Cause.  In his deposition, Defendant Friedberg noted that the District Attorney had endorsed the criminal charges of September 10, 2010 even after having access to "every single tape, witness statement, audio recording, everything."  However, it is not clear whether these witness statements were provided to the judge in issuing the arrest warrant, and nothing in the record suggests that this was also the case at the time that the September 7, 2010 criminal charges were brought. Thus, construing the facts in a light most favorable to the nonmoving plaintiff, this Court holds that Defendants recklessly omitted the witness statements and the first prong of the analysis is satisfied.

2.    Materiality

The second prong of the analysis requires the Court to assess whether the omission of the witness statements was material or necessary towards the finding of probable cause. *Wilson*, 212 F.3d at 789.  A court, "when confronted with a false affidavit used to obtain a search warrant, must remove a falsehood created by an omission by supplying the omitted information to the original affidavit." *Sherwood*, 112 F.3d at 400.

Probable cause is measured by a very low standard, requiring only a fair probability that the person have committed the crime. *See Wychunas v. O'Toole*,

16

252 F.Supp.2d 135, 142 (M.D.Pa. 2003) (Mannion, M.J.).  "[P]robable cause to arrest exists when the facts and circumstance within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  As such, there can be no liability on the part of the arresting officer unless "no reasonably competent officer" would conclude that probable cause existed. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Though the existence of probable cause is customarily an issue of fact to be determined by a jury, a court can conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to the plaintiff, would not reasonably support a contrary factual finding. *See Sherwood*, 113 F.3d at 401 (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995)).

In this case, Mr. Dempsey was first charged on September 7, 2010 with simple assault pursuant to 18 Pa.C.S. § 2701(a)(1), harassment pursuant to 18 Pa.C.S. § 2709(a)(1), and disorderly conduct pursuant to 18 Pa.C.S. § 5503(a)(4). He was subsequently charged on September 10, 2010 with false imprisonment pursuant to 18 Pa.C.S. § 2903(a) and indecent assault pursuant to 18 Pa.C.S. § 3126(a)(1).  In charging him with such, Defendant officers had at their disposal numerous pieces of evidence tending to implicate Mr. Dempsey as the perpetrator

17

of these crimes against Ms. Stefanowicz. Specifically, they had: (1) multiple statements by Ms. Stefanowicz, both written and audiotaped[8]; (2) photographs of significant injuries to Ms. Stefanowicz that she claimed were a result of the assault by Mr. Dempsey; (3) a corroborating statement from Ms. Stefanowicz's roommate who, though she did not see the alleged attack, repeated what Ms. Stefanowicz had relayed to her directly after the attack which tended to inculpate Mr. Dempsey; and (4) text messages sent from Mr. Dempsey to Ms. Stefanowicz in which he apologized for the events that had transpired. All of this evidence in the officers' possession, considered together, created a fair probability that he committed the crimes alleged, such that probable cause for the officers to arrest Mr. Dempsey existed.  Moreover, the same evidence still existed three days later upon the filing of additional charges, with the addition of a subsequent interview in which Ms. Stefanowicz further detailed the assault.

While the officers also had access to the variety of witness statements which could have potentially exculpated Mr. Dempsey of the crimes alleged, the availability of these witness statements did not negate probable cause.  Rather, all of the statements alluded to by Mr. Dempsey neither exonerated him of the offenses charged, nor directly impugned upon Ms. Stefanowicz's credibility.

---

[8] Mr. Dempsey also argues that Ms. Stefanowicz's statements to the officers were substantially unreliable because her testimony changed throughout the course of the proceedings.  However, this Court believes that it is a mischaracterization to say that her account of the incident "changed"; rather, she appears to have added detail to her story as the proceedings progressed.  While such conduct may demonstrate unreliability, it is a stretch to label her testimony "substantially unreliable" based on these additions, so as to outweigh her statement that Mr. Dempsey assaulted her.

Rather, these statements related only to events that occurred before the alleged assault or after the alleged assault, or related to the pair's relationship generally. Because, however, Mr. Dempsey and Ms. Stefanowicz were undisputedly alone in Mr. Dempsey's room for a period of time, none of the witness statements bears directly on the alleged assault so as to explicitly contradict Ms. Stefanowicz's statement to the officers.  As such, though the statements were exculpatory in that the actions of the two parties may have tended to prove that Mr. Dempsey was free from guilt, they could not negate the probable cause which existed in the forms described above.  Consequently, this Court finds that the evidence cannot reasonably support a contrary factual finding and summary judgment is granted in favor of Defendants on Count I for false arrest.

## B. Malicious Prosecution (Count II)

To state a claim for malicious prosecution, a plaintiff must demonstrate that: (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (4) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *See Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003).  Mr. Dempsey argues that there is a genuine dispute of material fact as to whether the Defendants knowingly

prosecuted Mr. Dempsey when they lacked probable cause.  Defendants, on the other hand, argue again that probable cause did exist and therefore as a matter of law Mr. Dempsey's malicious prosecution claim cannot stand.

"[I]t is axiomatic that, in order to prevail on this claim, the Plaintiff must establish an absence of probable cause." *Mekata v. Kamoie*, 955 F.Supp.2d 345 (M.D.Pa. 2013) (Jones, J.).  As discussed previously, *see supra* section III.A, probable cause to arrest Mr. Dempsey and initiate criminal proceedings did exist as a matter of law at the time the Affidavit of Probable Cause was filed.  Consequently, summary judgment is granted on Count II as against all charged Defendants.[9]

## C. Supervisory Liability (Count III)

Mr. Dempsey has asserted a claim of supervisory liability against Defendants Bucknell, Friedberg, Locher, Badal, Marrara, and Bravman as final policymakers who ratified the false arrest and malicious prosecution of Mr. Dempsey.  He further asserts a claim of bystander liability against Defendant Captain Lauver for his failure to stop the arrest and prosecution of Mr. Dempsey, despite having the authority to do so and the knowledge that the officers lacked probable cause.

---

[9] Remaining defendants on this claim are Officers Ettinger, Holtzapple, Ulmer, Middleton, and Fisher.

In order to establish supervisory liability, a plaintiff must show that a supervisor "participated in violating their rights, or that he directed others to violate them, or that he . . . had knowledge of and acquiesced in his subordinates' violations." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995). Moreover, to demonstrate a claim of bystander liability a plaintiff must establish that the officer, whether supervisory or not, failed to intervene when a constitutional violation was taking place within his or her presence. *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002). If an officer does not intervene to stop the occurrence of a constitutional violation in his or her presence, he will only be liable if there was a "realistic and reasonable opportunity to intervene." *Id.*

As is logically implied by these two causes of action, in order to assert a claim under Section 1983 of either supervisory liability or bystander liability, a violation of that section must have occurred. Because this Court has already held that Mr. Dempsey's claims for false arrest and malicious prosecution fail as a matter of law, by logical extension, there was no constitutional violation and there can be no supervisory liability. As such, summary judgment is granted for all moving Defendants on this claim.

## D. False Imprisonment (Count IV)

A claim for false imprisonment under Pennsylvania law requires a plaintiff to establish: (1) the detention of another person; and (2) the unlawfulness of that

21

detention. *See Renk*, 641 A.2d at 293 (Pa. 1994).  As with a claim for false arrest

under federal law, the relevant inquiry in a claim for false imprisonment under

state law is whether the officers lacked probable cause in arresting the plaintiff. *See*

*id.* The analysis of probable cause under this state law claim is identical to that

under federal law. *See id.* ("Probable cause exists when 'the facts and

circumstances which are within the knowledge of the police officer at the time of

the arrest, and of which he has reasonably trustworthy information, are sufficient to

warrant a man of reasonable caution in the belief that the suspect has committed or

is committing a crime.'") (quoting *Commonwealth v. Rodriguez*, 585 A.2d 988,

990 (1991)). Thus, for the same reason that Mr. Dempsey's false arrest claim

brought pursuant to Section 1983 fails as a matter of law, this claim must also fail

based on the existence of probable cause.

## E. Defamation (Count VII)

The only defamation claim remaining in this litigation is asserted against

Defendant Voci for statements he made to *The Daily Item* regarding Mr. Dempsey

and his role in the incident, two letters that he sent to Dean Conrad concerning the

student conduct hearing, a teleconference between him, Mr. Dempsey's counsel,

and Bucknell University counsel, and a letter to Pennsylvania state senators.

Defendant Voci argues first that he did not actually make the defamatory

statements at issue and therefore he cannot be considered to have published the

statements as required to state a claim for defamation and further, that the statements were neither untrue nor unjustifiable.  He argues next that the statements that he did make were privileged because of his role as an attorney for Ms. Stefanowicz.  Finally, Defendant Voci contends that the letter received by Bucknell from State Senators Yaw and Tomlinson is not relevant to a defamation claim against him because he did not contact the senators with the details surrounding Ms. Stefanowicz's assault; rather, it was the Stefanowicz family that reached out to the senators on their own initiative.

Mr. Dempsey responds that he has met all of the elements for proving a cause of action for defamation and that the statements were not privileged because Defendant Voci was acting only as an advisor to Ms. Stefanowicz, not as her attorney.  Moreover, even if privilege did apply to Defendant Voci's statements, he abused and therefore waived the privilege because he published defamatory statements about Mr. Dempsey excessively and he acted with malice in doing so.

A claim for defamation requires a plaintiff to establish: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of the defamatory meaning; (5) the understanding by the recipient that the statement refers to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a constitutionally privileged occasion. 42 Pa. Cons. Stat. § 8343. "A

23

publication is defamatory if it 'tends to blacken a person's reputation or expose him to public hatred, contempt or ridicule or injure him in his business or profession.'" *Dunlap v. Phila. Newspapers, Inc.*, 448 A.2d 6, 10 (Pa. Super. Ct. 1982) (quoting *Cosgrove Studio & Camera Shop, Inc. v. Pane*, 182 A.2d 751, 753 (Pa. 1962)).  "In order to be actionable, the words must be untrue, unjustifiable, and injurious to the reputation of another." *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008).  An action involving "words imputing a criminal offense, a loathsome disease, business misconduct, or serious sexual misconduct" is considered slander per se; in such an action the plaintiff need not prove special damages. *Chicarella v. Passant*, 494 A.2d 1109, 1115 n.5 (Pa. Super. Ct. 1985) (citing Restatement (Second) of Torts § 570 (1997)).

However, communications pertinent to any stage of a judicial proceeding are accorded an absolute privilege. *See Binder v. Triangle Publications, Inc.*, 275 A.2d 53, 56 (Pa. 1971). That is, the holder of the privilege cannot waive the privilege and it cannot be destroyed by abuse. *See id*; *see also Post v. Mendel*, 507 A.2d 351, 355 (Pa. 1986) ("Importantly, the existence of the privilege does not depend upon the motive of the defendant in making the allegedly defamatory statement.").  The policy behind this privilege is "to afford freedom of access to the courts, to witnesses to encourage their complete and unintimidated testimony in court, and to counsel to enable him to best represent his client's interests." *Id.*

"Moreover, the privilege extends not only to communications made in open court, but also encompasses pleadings and even less formal communications such as preliminary conferences and correspondence between counsel in furtherance of the client's interest." *Richmond v. McHale*, 35 A.3d 779, 785 (Pa. Super. Ct. 2012). However, the privilege afforded to counsel in their role as advocates is not limitless. Rather, only "those communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought" are protected from claims of defamation. *Post*, 507 A.2d at 355. Any doubt as to whether the defamatory statement was actually "pertinent and material to the redress or relief sought" must be resolved in favor of pertinency and materiality. *See Richmond*, 35 A.2d at 785. Whether a statement is privileged is a matter of law for the court to decide. *See id.*

   1. Letter and Emails sent by Defendant Voci

Mr. Dempsey alleges that Defendant Voci defamed him through several communications with Bucknell University officials and counsel, and with the Bucknell University Board of Trustees. The first of these communications was a teleconference between Defendant Voci, Steven Becker, Esq., counsel for Mr. Dempsey, and Wayne Bromfield, Esq., counsel for Bucknell, regarding the lifting of the temporary suspension of Mr. Dempsey. On this conference call, Defendant

Voci referenced Mr. Dempsey as something akin to a "sexual assaulter." Becker

Aff. 134.

The next communication occurred on September 21, 2010 when Defendant

Voci wrote a letter to Dean Conrad, the Associate Dean of Students, seeking to

stop the Hearing Board for Sexual Misconduct and the dismissal of Mr. Dempsey's

student conduct charges against Ms. Stefanowicz.  In this letter, Defendant Voci

referred to Mr. Dempsey as the "perpetrator of a sex crime." Voci M. for Summ. J.,

Ex. M, ECF No. 124-13 (hereinafter "Def. Voci M.S.J").

On September 29, 2010, Defendant Voci authored an email, again to Dean

Conrad, regarding the denial of his request for postponement of the student

conduct hearing.  In this email he referred to Mr. Dempsey as Ms. Stefanowicz's

"assailant." *Id.*, Ex. O, ECF No. 124-15.  Finally, on that same day Defendant Voci

wrote a letter to Wayne Bromfield, counsel for Bucknell, regarding his

dissatisfaction with Bucknell's handling of the internal process and the harm that it

was doing to Ms. Stefanowicz. In that letter he refers to Mr. Dempsey as "the

offender" or an "attacker" and to Ms. Stefanowicz as the "female victim of a sex

crime." *Id.*, Ex. P, ECF No. 124-16.  Furthermore, Defendant Voci forwarded this

letter to the Bucknell University Board of Trustees. *Id.*

As a preliminary matter, Mr. Dempsey's argument that "Defendant Voci's

role 'was to advise [the Stefanowiczs'] and explain to them what the criminal

26

process looked like and assist them'" understates the relationship between Defendant Voci and Ms. Stefanowicz.  Even if Defendant Voci was initially contacted for advice on the criminal process, this does not preclude the possibility of an attorney-client relationship forming from that point.  Nor does the fact that an attorney merely advocating on behalf of his client, rather than representing the client in civil or criminal litigation, preclude the existence such a relationship, especially when the client has a significant interest in ongoing litigation to which he or she is not an explicit party.

It is clear from the facts provided that Defendant Voci did, in fact, form an attorney-client relationship with Ms. Stefanowicz.  In fact, legal advice and assistance, regardless of its purpose, is the very essence of legal representation. The fact that Ms. Stefanowicz was the "victim" does not prohibit her from retaining an attorney and from being afforded all of the protections of an attorney-client relationship.  Moreover, Defendant Voci was actually engaged in litigation on behalf of Ms. Stefanowicz immediately prior to the student conduct hearing when she filed suit and requested a preliminary injunction to prevent the hearing from going forward.  In addition, the mere fact that attorneys outside of the Bucknell University community were prohibited from serving as advisors/counsel in the student conduct hearing does not nullify the already-existing attorney-client relationship between Defendant Voci and Ms. Stefanowicz.

27

Given the existence of this attorney-client relationship, it is this Court's determination that the letters and emails authored by Defendant Voci to University officials were in fact afforded an absolute privilege from a claim of defamation as communications pertinent to a judicial proceeding and made in furtherance of the client's interests.  The two letters and the one email at issue were written by Defendant Voci in an effort to delay the internal hearing process, and they were clearly authored in anticipation of Ms. Stefanowicz's motion for a preliminary injunction.  Everything stated in that correspondence was to protect his client's emotional well-being and the ongoing criminal litigation in which she had a stake, and the subject matter was pertinent and material to the relief sought, that is, the postponement of the student conduct hearing.  Moreover, the September 15, 2010 teleconference was also afforded an absolute privilege.  Despite the fact that it did not deal with Defendant Voci's representation of Ms. Stefanowicz in a judicial tribunal, he was acting as her attorney at the time and he was advocating her interests as the alleged victim of a sexual assault.

The fact that the September 21, 2010 letter and the September 29, 2010 email were sent to Dean Conrad rather than counsel for Bucknell University does not negate the privilege afforded to it.  Neither does the fact the September 29, 2010 letter was subsequently forwarded to the Board of Trustees.  This is a unique situation whereby the representatives of the university and the officials involved

28

are plentiful, and counsel for the university was not necessarily the most effective person with whom to advocate for his client.  Rather, the decision to email Dean Conrad and subsequently forward his correspondence to the Board of Trustees reflected Defendant Voci's professional judgment that zealous advocacy required communication with other members of Bucknell University who he believed could better assist his client.

Consequently, these statements are privileged.  To decide otherwise would significantly diminish an attorney's ability to even adequately represent his client's interests in a variety of forums, much less to do so zealously.  Requiring an attorney to verify the veracity of his client's assertions in the face of contrary allegations by the opposing party would only act to the detriment of both attorney and client.

### 2.   Communication with Pennsylvania state senators

Defendant Voci argues that the letter received by Bucknell University from State Senators Yaw and Tomlinson is not relevant to a defamation claim against him because he did not contact the senators with the details surrounding Ms. Stefanowicz's assault; rather, it was the Stefanowicz family that reached out to the senators.  In his response, Mr. Dempsey makes no reference to the alleged communication with the senators and presents no evidence in defense of his allegation. *See* Fed. R. Civ. P. 56(c)(1)(A).  As such, Mr. Dempsey has failed to

29

provide sufficient information to create a genuine dispute of fact on this issue, and summary judgment is granted on Mr. Dempsey's claim of defamation with regard to any alleged communication between Defendant Voci and the senators.

3.    *The Daily Item* Newspaper Articles

Unlike the letters to and from Bucknell University officials and counsel, the statements that Defendant Voci made to Joseph Deinlein of *The Daily Item* do not fall within the ambit of the absolute privilege afforded to statements made by counsel in the course of representation.  Statements to newspapers cannot be considered statements made in the regular course of judicial proceedings, and they are generally not pertinent to the relief sought.  Consequently, the Court must determine whether Mr. Dempsey has established a defamation claim based on these statements.

Within the October 5, 2010 and October 6, 2010 newspaper articles, there are only two statements made by Defendant Voci which can be considered "published" by Defendant Voci so as to satisfy the second element of a defamation cause of action. *See* Deinlein Aff. 1-2.  All other information within these two articles came from the motion for a preliminary injunction that Ms. Stefanowicz filed in an attempt to postpone the student conduct hearing and which would clearly fall within the ambit of the judicial privilege.  *Id.*  With regard to the first, Defendant Voci is quoted in the October 5, 2010 article as saying, "Our client did

30

not request this hearing date. . . . She instituted the internal charges at the suggestion of university officials who advised her in the aftermath of incident. As you can imagine, this is a shaken 19-year-old girl reaching out to the university." There is nothing defamatory directed towards Mr. Dempsey with regards to this statement.  The mere fact that Ms. Stefanowicz was upset and shaken neither implicitly nor explicitly reflects upon Mr. Dempsey's reputation.  As such, summary judgment is granted for Defendant Voci with regard to this statement.

However, the second statement authored by Defendant Voci is an actionable defamatory statement.  In the October 6, 2010 article, Defendant Voci is quoted as saying, "[Ms. Stefanowicz] was told her charges against her attacker would be thrown out if she did not attend the hearing. . . . And the charges against her would be tried in absentia."  This statement, specifically its characterization of Mr. Dempsey as an "attacker," is obviously defamatory as it impugns Mr. Dempsey's reputation and forever labels him in print as a violent sexual deviant.  There is no doubt that such a statement could, and likely did at some point in time, lower Mr. Dempsey in the estimation of the community.

Furthermore, Mr. Dempsey has proven at this stage of the litigation the basic elements of a defamation claim.  As already established, the statement was published by Defendant Voci.  Additionally, it is clear to any reader that the statement applied to Mr. Dempsey, as his name is cited within the article as the

31

student Ms. Stefanowicz had accused.  Moreover, this Court has no doubt that the readers of the newspaper article at issue understood the defamatory meaning of the word "attacker" within the context of a sexual assault hearing. *See Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 489 A.2d 1364, 1368 (Pa. Super. Ct. 1985) ("If the court has any doubt that the communication is defamatory, then the issue must be given to the jury for them to determine whether the defamatory meaning was understood by the recipient.").  Finally, because this statement involved words imputing serious sexual misconduct, it constitutes defamation per se, and Mr. Dempsey is relieved of his burden of proving special damages.  *See Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 580 (E.D.Pa. 1999).

Nevertheless, there is one remaining issue of fact that is not within the purview of this Court's authority to decide.  Specifically, Defendant Voci asserts that "the statements made by Attorney Voci were neither untrue nor unjustifiable." Def. Voci M.S.J. at 24.  To the contrary, Mr. Dempsey argues that this characterization of him as an "attacker" was made in direct contravention of numerous witness reports which proved otherwise.  Though Mr. Dempsey has proven a *prima facie* defamation claim as a matter of law, the issue of veracity is a factual defense appropriately left for determination by a jury; consequently, summary judgment must be denied on this claim.

**F. Fraud (Count VIII)**

At this stage in the litigation, the only remaining statement supporting Mr. Dempsey's claim of fraud is a statement made to him by Defendant Officer Ulmer when Mr. Dempsey requested a copy of certain documents[10].  Based on the allegations in the Complaint, Defendant Ulmer argues that the statement "[Ms. Stefanowicz] had not pressed charges against him" is not actually false, because as of the time of Mr. Dempsey's request, charges had not yet been filed.  Defendant Bucknell University argues further that, just as Defendant Ulmer is not liable for fraud, neither can it be vicariously liable for a truthful statement.  In response, Mr. Dempsey alleges that Defendant Ulmer actually stated that Ms. Stefanowicz was not pursuing charges against him, which was a false and misleading statement.  Furthermore, he contends, Bucknell University is vicariously liable for this fraud because Defendant Ulmer acted during the course of and within the scope of his employment.

In order to state a claim for fraud, a plaintiff must plead sufficient facts to support the following elements: (1) a representation; (2) which is material; (3) which was made falsely, either knowingly or recklessly; (4) with intent to mislead another into relying on it; (5) justifiable reliance; and (6) resulting injury. *See Sewak v. Lockhart*, 699 A.2d 755, 759 (Pa. Super. Ct. 1997).

---

[10] *See supra* Section I n.3.  Regardless of which document was requested, the analysis is the same.

This Court does not know and cannot make the determination as to what Defendant Ulmer said to Mr. Dempsey when he requested a copy of specific documents; ordinarily, this would be an issue of fact to be determined by the jury. However, this Court is satisfied that the fact at issue is not genuinely disputed. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A); *see also Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) ("It is clear, however, that if a moving party satisfies its initial burden of proving a *prima facie* case for summary judgment, the opposing party must do more than simply show that there is some metaphysical doubt as to material facts.") (citations omitted).

Despite Mr. Dempsey's bald assertion that Defendant Ulmer stated that "Kelly was not pursuing charges against him," he presents no evidence to support that claim. In his Brief in Opposition to the Bucknell Defendants' Motion for Summary Judgment, Mr. Dempsey does not cite to any part of the record to demonstrate that Defendant Ulmer actually made the statement at issue, or, for that matter, any particular statement regarding Mr. Dempsey's request. Moreover, after searching the rather extensive record in this case, the Court can find no such

supporting documentation to verify that Defendant Ulmer made such a statement to Mr. Dempsey, much less that the statement was false. Consequently, because Mr. Dempsey has failed to provide sufficient information to create a genuine dispute of fact, Defendant Ulmer's motion for summary judgment is granted on Count VIII for fraud. Because there is no underlying liability on the part of Defendant Ulmer, the employee, there can be no vicarious liability on the part of Bucknell. *See Brezenski v. World Truck Transfer, Inc.*, 755 A.2d 36, 39 (Pa. Super. Ct. 2000) ("[a]n employer is vicariously liable for the *wrongful* acts of an employee. . .") (emphasis added).

## G. Breach of Contract (Count X)

The last remaining claim for breach of contract emanates from the failure of Bucknell University to provide Mr. Dempsey with certain requested documents and information prior to the student conduct hearing. Specifically, Mr. Dempsey argues that he requested but did not receive: (1) an audio recording of Ms. Stefanowicz's first interview; (2) the complete BUPS incident report; (3) Officer Fisher's notes on Mr. Dempsey's first interview with BUPS; and (4) certain witness statements, specifically, a statement by made by Gregory Fast on September 5, 2010. Mr. Dempsey argues that these documents were contractually required to be provided to him prior to the hearing by the Student Handbook and failure to do so was a breach of contract on the part of Bucknell University. If not

35

for these breaches, he contends, he would not have been found responsible for disorderly conduct in the student conduct hearing.

Bucknell University, on the other hand, argues that what Mr. Dempsey received in contemplation of the hearing went above and beyond what it was contractually required to produce.  Moreover, it contends that even if there was a breach, Mr. Dempsey was not harmed at all because he was found not guilty of everything except disorderly conduct and, further, that charge was based on the testimony of various witnesses.

The disputed part of the contract is the following provision contained in the Student Handbook: The [University] will provide the respondent and the aggrieved party with the following information, materials, and opportunities. . . A copy of the charge[s] and supporting information, including the Public Safety Information Report, Police Report, Housing and residential Life Information Report, and statements from any witnesses . . . ."  The parties naturally dispute what was required to be provided under this section.

To prove a claim for breach of contract, Mr. Dempsey must prove the following elements: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resulting damages. *See Lackner v. Glosser*, 892 A.3d 21, 30 (Pa. Super. Ct. 2006).  Pennsylvania law has clarified that "the relationship between a private educational institution and an enrolled

36

student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract." *Swartley v. Hoffner*, 734 A.2d 915, 919 (Pa. Super. Ct. 1999). This contract is embodied by the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution, including the student handbook. *See id.*

To prove damages, Pennsylvania law requires a plaintiff to provide the factfinder with evidence from which damages may be calculated to a "reasonable certainty." *ATACS Corp. v. Trans World Communications, Inc.*, 155 F.3d 659, 668 (3d Cir. 1988). "At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor." *Id.* (citations omitted).

Mr. Dempsey has presented no evidence of damages as a result of Bucknell's purported breach of contract. Defendants have included in their motion for summary judgment Mr. Dempsey's expert report detailing the damages that Mr. Dempsey has suffered as a result of the Defendants' conduct. However, this allegation deals only with the resulting damage to Mr. Dempsey of the allegations of sexual assault, not on the disorderly conduct conviction that Mr. Dempsey received as a result of the student conduct hearing. Since Mr. Dempsey was

exonerated during that hearing of any claims of sexual assault, his expert report is inapplicable.

Mr. Dempsey does allege in his opposition brief that "[b]ut for this breach, Reed would not have been found responsible for Disorderly Conduct, as the withheld information contradicted Kelly's story and proved Reed was actually the victim of Kelly's aggressive actions." However, this Court is at a loss to see how the information requested, all of which bore solely on the issue of whether Mr. Dempsey sexually assaulted Ms. Stefanowicz, would have exonerated him of the disorderly conduct charge. Moreover, even to the extent that Mr. Dempsey argues that he was the victim of Ms. Stefanowicz's aggressive actions and he actually had no part in the disorderly conduct other than to ward her off, the numerous witness statements relied upon him as exculpatory evidence would prove the contrary. It is clear from both the witness statements and Mr. Dempsey's own statements that he was just as culpable in "play-fighting" with Ms. Stefanowicz, the activity which formed the basis of his disorderly conduct conviction. Nothing in Ms. Stefanowicz's audiotaped interview, Gregory Fast's statement, the incident report, or Defendant Officer Fisher's notes says otherwise[11].

Furthermore, Mr. Dempsey has presented no evidence other than his opinion to the effect that, first, he would have been exonerated on the disorderly conduct

_____

[11] The Court was not provided with a copy of Officer Fisher's notes on Mr. Dempsey's initial interview. However, it is likely that the interview was similar to Mr. Dempsey's own written statement and deposition which implicated him as a willing participant in the play-fighting.

charge and, second, that any damages resulted from that disorderly conduct conviction. Because this Court determines as a matter of law that Mr. Dempsey has presented no evidence of damages, the Court need not reach the more difficult issue of contract interpretation to determine whether Bucknell did, in fact, breach its contract with Mr. Dempsey. Consequently, summary judgment must be granted for Bucknell University on Count X for breach of contract.

## H. Tortious Interference (Count XIV)

The only remaining claim for tortious interference with contract arises from Defendant Voci's communications with Bucknell University officials throughout the internal investigation of Ms. Stefanowicz's claims and the student conduct hearing process. Defendant Voci argues first that Mr. Dempsey has failed to demonstrate how Defendant Voci's conduct has harmed the contractual relationship between Mr. Dempsey and Bucknell University. Furthermore, he contends that, as with the defamation claim, he was privileged in his communications with Dean Conrad because he was seeking to further the interests of Ms. Stefanowicz and to protect her from the emotional harm that could result from being forced to face and be questioned by her assailant, as well as the negative effect that the student conduct hearing could have on the pending criminal proceedings, in which his client had a significant stake.

Mr. Dempsey responds that Defendant Voci's communications with Bucknell University officials caused Mr. Dempsey to be temporarily suspended and interfered with the procedural rights afforded to Mr. Dempsey by the Bucknell University Student Handbook.  In addition, he contends that Defendant Voci interfered by contacting the Board of Trustees, making public defamatory statements, threatening adverse publicity and litigation if Mr. Dempsey was not removed from Bucknell, and, finally, attempting to postpone the hearing through the motion for a preliminary injunction that he filed on behalf of Ms. Stefanowicz. He claims that Defendant Voci acted purposefully and, further, that whether Defendant Voci's conduct was proper is an issue for a jury and therefore summary judgment should be denied at this juncture in the litigation.

To make a claim for tortious interference with a contract in Pennsylvania, a plaintiff must prove the following elements: (1) the existence of a contractual relationship, or prospective contractual relationship, between the complainant and a third party; (2) purposeful action by the defendant, specifically intended to harm the existing relationship, or to prevent a prospective relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) actual legal damage. *See Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. Ct. 1987).  "Legal damage occurs through loss of a legal right to which one is entitled.

. . ." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 385 n.10 (3d Cir. 2004).

Defendant Voci is arguing that Mr. Dempsey fails to satisfy the third element as a matter of law, while Mr. Dempsey argues that the existence of privilege or justification is a fact-finding analysis for the jury.  In doing so, Mr. Dempsey improperly conflates the two separate requirements of first, the absence of privilege and second, the determination of impropriety or lack of justification. While determination of impropriety is often a fact-finding endeavor for the jury, determination of privilege is a matter of law for the Court to decide.

It is true, as Mr. Dempsey points out, that "the Restatement (Second) of Torts, which Pennsylvania has expressly adopted, focuses upon whether conduct is 'proper,' rather than 'privileged.'" *Hopkins v. GNC Franchising, Inc.*, 288 Fed.Appx. 871, 874 (3d Cir. 2008) (citing *Adler, Barish,Daniels, Levin and Creskoff v. Epstein*, 393 A.2d 1175, 1184 n.17 (Pa. 1978).  However, this statement is merely a reflection of the shift in parlance from the Restatement (First) of Torts to the Restatement (Second) of Torts.  While the first Restatement once said, "One *without privilege to do so*, induces or otherwise purposefully causes a third person to perform a contract with another," the second Restatement modifies this language to state, "[O]ne who intentionally and *improperly* interferes with the performance of a contract. . . ." (emphases added).  The implication that this shift in terminology

41

eradicates any consideration of privilege is misplaced.  Rather, what the change accomplished was to broaden the defense, whereby now, even if a defendant's actions do not fall within the narrow ambit of a distinct privilege, they may nevertheless be immune from suit for tortious interference because they were proper in the given circumstances.

Consequently, the first step in the inquiry under the third element of a tortious interference claim requires the fact-finder to analyze whether the conduct at issue was privileged.  If the fact-finder determines that the conduct was not privileged, the next step in the inquiry is to analyze the propriety of the defendant's conduct.  It is only at that point in the inquiry that the fact finder must consider the factors listed in Restatement (Second) of Torts § 767.  *See Silver v. Mendel*, 894 F.2d 598, 604-6 (3d Cir. 1990) (demonstrating the progression of a privilege analysis under a claim for tortious interference with contract, whereby the court first considers the existence of privilege and then moves onto consideration of the various factors demonstrating propriety).

In accordance with this progression of analysis, this Court must first consider whether Defendant Voci's conduct was privileged under applicable law. The Unites States Court of Appeals for the Third Circuit has taken two different approaches to determining whether a defendant's conduct was privileged within the context of a claim for tortious interference.  The first approach is that of *Silver*

*v. Mendel*, 894 F.2d 598 (3d Cir. 1990), in which the plaintiff sued several defendants who were involved in filing a Petition for Involuntary Bankruptcy against the plaintiff's company, which ultimately ruined his business.  There, the court analyzed the issue of privilege in the same manner in which it is analyzed in the context of defamation. *See Silver*, 894 F.2d at 603; *see supra* section III.E. That is, the court endorsed the application of the judicial privilege doctrine as articulated by *Post v. Mendel* to "liability based on those communications which are issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought." *Id.* (citing *Post*, 507 A.2d at 353).  The *Silver* approach was confirmed in 2003 by *General Refractories Co. v. Fireman's Fund Ins. Co.* which, while not dealing directly with the issue of tortious interference, implicitly acknowledged that this approach is still viable. 337 F.3d 297, 311 (3d Cir. 2003) (recognizing that judicial privilege exists in the context of a tortious interference claim).

The second approach is that of *Schulman v. J.P. Morgan Inv. Management, Inc.*, whereby a commercial tenant brought an action against the landlord's mortgagee.  There, the Court analyzed the issue by relying on § 773 of the Restatement (Second) of Torts in which:

> One who, by asserting in good faith a legally protected interest of his own or threatening in good faith to protect the interest by appropriate means, intentionally causes a third person not to perform an existing contract or enter into a prospective contractual relation with another does not interfere

improperly with the other's relation if the actor believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

35 F.3d 799, 810 (3d Cir. 1994); *see also* RESTATEMENT (SECOND) OF TORTS § 773.

This Court, while acknowledging that both approaches coexist, must find a way to reconcile them in order to resolve the issue currently before it.  As such, this Court opts to follow the approach laid out in *Silver v. Mendel* based on the specific factual scenario underlying that case which is more analogous to that of the case at bar.  This approach is much more narrowly tailored to the situation before the Court which deals with the conduct of attorneys on behalf of their clients.  On the other hand, the §773 approach is a much broader one, directed to the conduct of individuals acting on their own behalf to protect their own legally protectable interests.  As such, the court will apply the judicial privilege doctrine to Defendant Voci's conduct.

As explained above, *see supra* III.E., the conduct of Defendant Voci was protected by the judicial privilege doctrine.[12]  Mr. Dempsey does not allege any different underlying facts to support his claim of tortious interference than those asserted in support of his defamation claim.  Because Defendant Voci's actions are

---

[12] Though Mr. Dempsey also arguably supports this claim by contending that Defendant Voci's public defamatory statements interfered with his contract with Bucknell University, he once again provides no factual support for this claim.  Therefore, although this Court has allowed Mr. Dempsey's defamation claim to stand on the statement he made to *The Daily Item* because of a lack of privilege, there is no genuine dispute as to whether that potentially defamatory statement interfered with Mr. Dempsey's contract with the University.

44

protected by absolute privilege, the Court need not even reach the application of the § 767 factors for determining the propriety of his conduct.  Summary judgment is therefore granted for Defendant Voci on Count XIV for tortious interference with contract.

## I. Intentional Infliction of Emotional Distress (Count XVI)

Finally, all Defendants argue that summary judgment must be granted in their favor on Mr. Dempsey's claim for intentional infliction of emotional distress in Count XVI because Mr. Dempsey has not even attempted to provide any evidence that he suffered physical harm as a result of the Defendants actions. Notably, Mr. Dempsey does not respond to this argument in either of his opposition briefs.

In order to assert a claim for intentional infliction of emotional distress under Pennsylvania law, a plaintiff must establish: (1) that the defendant's conduct was extreme and outrageous; (2) that the conduct was intentional or reckless; (3) the conduct caused emotional distress; and (4) the distress was severe. *See Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir. 1979); *see also Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997).  "Extreme and outrageous" conduct is "conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious and utterly intolerable in a civilized community." *Robinson v. May Dept. Stores Co.*, 246 F.Supp.2d 440, 444 (E.D.Pa. 2003) (citations omitted).

Moreover, in order to state a claim for intentional infliction of emotional distress, a plaintiff must allege some physical injury, harm, or illness caused by the defendant's conduct. *See Corbett v. Morgenstern*, 934 F.Supp. 680, 684 (E.D.Pa. 1996) (citing *Rolla v. Westmoreland Health Sys.*, 651 A.2d 160, 163 (Pa. Super. Ct. 1994)).  If a plaintiff fails to present any "competent medical evidence" of physical injury, the defendant is entitled to judgment as a matter of law. *See Robinson*, 246 F.Supp.2d at 444.

Here, Mr. Dempsey has not argued that he suffered any physical injury, harm, or illness as a result of any of the Defendants' actions, and he has presented no evidence that could possibly support such an inference.  Consequently, Defendants' motions for summary judgment are granted as to this count.

## IV. CONCLUSION

Defendants' Motions for Summary Judgment are granted in part and denied in part.  Counts I, II, III, IV, VIII, X, XIV and XVI are dismissed in their entirety. Summary judgment is denied with respect to Count VII for defamation as asserted against Defendant Voci.

BY THE COURT:
/s Matthew W. Brann
Matthew W. Brann
United States District Judge

46